John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:    (212) 374-5401
Facsimile:     (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs*

Andrew B. Bowman
**LAW OFFICES OF ANDREW B. BOWMAN**
1804 Post Road East
Westport, Connecticut 06880
Telephone:   (202) 259-0599
andrew@andrewbowmanlaw.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **JANE DOE** and **JOHN DOE,** | Case No. 3:21-cv-01525 |
| Plaintiffs, | |
| – against – | **FIRST AMENDED COMPLAINT** |
| **HEATHER GERKEN, ELLEN COSGROVE, YASEEN ELDIK,** and **YALE UNIVERSITY** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Jane Doe ("Jane") and John Doe ("John") by their attorneys, Balestriere

Fariello, for their Complaint against Defendants Heather Gerken ("Gerken"), Ellen

Cosgrove ("Cosgrove"), Yaseen Eldik ("Eldik"), and Yale University ("Yale" or the

"University") respectfully allege as follows:

## PRELIMINARY STATEMENT

1.     Two Yale Law School deans, along with Yale Law School's Director of Diversity, Equity & Inclusion, worked together in an attempt to blackball two students of color from job opportunities as retaliation for refusing to lie to support the University's investigation into a professor of color.

2.     Such misconduct increasingly appears to be part of a course of conduct of the Defendants putting their own needs ahead of those of the students they are charged to teach and, where appropriate, take care of.

3.     The misconduct continues as Plaintiffs were forced to bring suit to seek a remedy for their claims. After filing suit, a professor at Yale Law School—in one of the first official comments by Defendants regarding Plaintiffs' claims, and after refusing to address any purported concerns with Plaintiffs' claims with the Plaintiffs themselves or their counsel—characterized this litigation as a misuse of the courts by two prospective lawyers.

4.     As set forth in the Original Complaint (Dkt. No. 1), Gerken, Yale Law School's Dean, and Cosgrove, the Associate Dean, approached an esteemed law professor and expert in constitutional law, and discouraged the professor—who already employed Jane and John as long-term research assistants—from hiring Jane and John as so-called "Coker Fellows," prestigious teaching assistant positions that often lead to federal clerkships and other lucrative career opportunities.

5.      Defendants Gerken and Cosgrove approached the professor as retaliation for Plaintiffs Jane and John's reporting a harassing and defamatory report (the "Dossier," Ex. A)[1], which was compiled and circulated by another law student and related to Plaintiffs' private interactions with a high-profile Yale Law School Professor, Amy Chua ("Chua").

6.      The Dossier, which Defendants disseminated, placed Jane and John at the center of an ongoing campus-politics feud between Gerken and Chua.

7.      When Plaintiffs reported the Dossier to the University, Defendants Cosgrove and Eldik pressured Jane and John to make knowingly and materially false statements in a formal complaint against Chua.

8.      When Plaintiffs refused, Gerken and Cosgrove retaliated by speaking with the professor and telling him that he should not hire Jane and John because of their "lack of candor," despite Plaintiffs' steadfast refusal to lie to further the University's crusade against Chua.

9.      Not only did Gerken and Cosgrove harm Plaintiffs by knowingly circulating a document full of lies to Plaintiffs' employer and professor, but they also violated the University's Policy Against Discrimination and Harassment (the "Handbook")—by its own terms a binding contract on all members of Yale's community—whereby the administration is explicitly prohibited from retaliating against students who report a concern, file a complaint, and/or participate in an investigation.

---

[1] The attached exhibit is redacted to reflect Plaintiffs' pseudonyms, and Defendants have already been provided an unredacted version.

10.     Gerken and Cosgrove's retaliation harmed Jane and John by depriving them of valuable career opportunities. Because of Gerken and Cosgrove's coercion, neither Jane nor John is employed as a Coker Fellow.

11.     Despite being otherwise compelling applicants for judicial clerkships, neither Jane nor John applied for clerkships, fearing that the administration would make good on its threats to ensure that every judge sees the Dossier.

12.     And Defendants added to their misconduct even after filing suit when a professor at Yale Law School accused Plaintiffs of having no basis or legitimate purpose to bring their lawsuit, stating, among other things, that Plaintiffs—two young adults very early in their legal careers—have filed a "frivolous" lawsuit with the intent to harm the reputation of the very institution, Yale Law School, from which Plaintiffs seek to graduate.

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because this action is between citizens of different states, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

14.     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b)(1) because Defendants reside in the State of Connecticut.

## PARTIES

*Plaintiffs*

15.     Jane is a natural person who has completed her second year at the Yale Law School and is currently on a voluntary leave of absence from the school. She is African American and a resident of Georgia.

16.     John is a natural person who has enrolled in his third year at the Yale Law School. He is Asian American and a resident of California.

*Defendants*

17.     Yale University is a nonprofit educational corporation located in New Haven, Connecticut. Yale Law School, a professional school at Yale University, is unincorporated and does not have separate personhood.

18.     Heather Gerken is the current Dean of Yale Law School and, on information and belief, a resident of Connecticut.

19.     Ellen Cosgrove is the Associate Dean of Student Affairs at Yale Law School and, on information and belief, a resident of Connecticut.

20.     Yaseen Eldik is the Director of Equity, Diversity & Inclusion at Yale Law School and, on information and belief, a resident of Connecticut.

## STATEMENT OF FACTS

*Background*

21.     Like many top law schools, Yale Law School employs a limited grading scale and does not compute grade point averages, presumably in an attempt to encourage collegiality and collaboration among its students.

22.     Unlike other elite law schools, Yale Law School, which pioneered this model in the 1960s, takes the limiting grading scale to its current extreme.  All first-term classes are ungraded and subsequent classes have only three grades: Honors, Pass, and Low Pass.  The Law School does not impose a mandatory curve on its professors.

23.     While this system protects what would otherwise be the bottom half of a law school class, it makes competition tight for its more traditionally ambitious students, who often seek competitive federal clerkships or other government jobs, whose limited availability and competitive nature are considered highly prestigious and desirable.

24.     This system means that Yale Law School students are in high competition over non-grade signifiers of merit.  For students who entered Yale Law School in Fall 2019, as did Plaintiffs, this competition for non-grade signifiers of merits is heightened, as the COVID-19 Pandemic caused Yale Law School to drop all grades for Plaintiffs' entire first year.  Plaintiffs' class has only four semesters of graded credits, unlike students in "typical" classes of Yale Law School graduates, who have five semesters of graded credits on their transcripts.

25.     One such signifier is the so-called Coker Fellowship, a highly coveted teaching assistant position.

26.     Coker Fellows assist select professors—who each choose two Coker Fellows—in their teaching of "small groups," which teach both substantive law, like Constitutional Law or Contracts, and legal research and writing.

27.     Small groups are first-year students' "home bases": they are designed to allow the students to form close relationships with at least one professor and with a

6

cohort of peers with whom they attend every class in their first semester. Many small groups are extremely tight-knit groups, and all small-group professors take a special interest in forming deep and meaningful relationships with their Coker Fellows and their small-group students.

28.     Coker Fellows' primary responsibilities include supervising memoranda, briefs, and other first-term writing projects; providing or coordinating instruction in legal writing and research; assisting the small-group professor in devising first-term assignments and programs; counseling members of the small group and helping them adjust to law school; and arranging social events and visits to courts, agencies, and other institutions and managing the small group social budget.

29.     Attorneys at firms including Covington & Burling; Cravath, Swaine & Moore; Wachtell Lipton; Davis Polk; and Jenner & Block, or those who have become professors themselves at Columbia University or Princeton University, who achieved a Coker Fellowship, often list the fellowship in their biographies, even decades after graduation.

30.     The Coker Fellowship also offers a valuable opportunity to work closely with a respected professor and to build relationships with a group of other Yale Law students who will someday be colleagues and possible connections.

31.     This networking benefit is generally seen as substantial, as it offers students a chance to distinguish themselves to professors who would make important recommendations to judges in a student's search for federal clerkship positions.

*Jane and John Begin Their Studies at Yale and Meet Chua*

32.     Plaintiffs Jane and John enrolled at Yale Law School in the Fall of 2019.

33.     After a successful academic year in her first year of law school, Jane met Chua for the first time in the Spring of 2020 in her International Business Transactions class.  John met Chua for the first time in the Spring of 2021 while also enrolled in her International Business Transactions course.

34.     Chua became perhaps the most famous member of the Yale faculty following the success of her 2011 memoir *Battle Hymn of the Tiger Mother* and has served as an important mentor for her students, many of whom successfully obtain prestigious clerkships.

35.     Defendant Gerken began publicly criticizing Chua in September 2018—a year before Jane or John had even enrolled in the law school—during the confirmation hearings for now-Supreme Court Justice Brett Kavanaugh.

36.     In response to anonymous public allegations that amounted to Chua having given advice on dress or appearance to clerkship candidates preparing for interviews, Gerken sent an email to all members of the Yale Law School community (which was quickly leaked to the press) concerning the "allegations of faculty misconduct" supposedly against Chua and describing them as "of enormous concern" to Gerken.

37.     In her missive, Gerken also directed students who had "been affected by misconduct" to "reach out to" Defendant Cosgrove.

38.     It was subsequently reported in 2019 that Chua had entered a "no-socializing" agreement with the University whereby she agreed to not socialize with students off-campus.

39.     Starting in February 2021, both Jane and John became embroiled in Gerken and Cosgrove's apparent vendetta against Chua. That month, Jane and John separately attended Zoom "office hours" with Chua to discuss their coursework.

40.     These office hours discussions would also cover career discussions and any concerns that Jane or John voiced about the University.

41.     In particular, John struggled with what he felt was a lack of institutional support for students of color, which ended with his frustrated resignation from the board of the Yale Law Journal. His resignation received media coverage including on the popular legal blog (particularly among law students) Above the Law. This caused John to face significant hostility at the school.

42.     Chua, having similarly faced such race-based, online-instigated hostility, as well as being one of the few faculty members of color at Yale Law School, was in a unique position to offer John guidance on these issues.

43.     Given the sensitive nature of the subject, John and Jane (who was John's friend and had also faced similar hostility) wished to discuss their issues with Chua in person.

44.     To avoid meeting in public to discuss such a sensitive subject, Jane, John, and Chua decided to meet at Chua's home, which was a common practice amongst Yale

faculty members. (In fact, Gerken has met with both Jane and John at Gerken's own residence on several occasions.)

45.     John and Jane met Chua twice at her home, in February 2021 and March 2021. Both meetings included only John, Jane, and Chua, and no meals were involved.

*The Dossier*

46.     Unbeknownst to Jane or John at the time, these two meetings somehow became subject of pernicious law school gossip. One of their classmates went so far as to compile a bizarre 20-page document, the Dossier (Ex. A), that purported to document the "secret dinner parties" that Chua was supposedly hosting with John, Jane, and unidentified federal judges.

47.     The Dossier eventually gained such wide circulation that it became the subject of investigative reporting from news outlets including *The New Yorker*, *The New York Times*, and *The Atlantic*.

48.     *The New Yorker* described the Dossier as "extremely thin," and *The New York Times* anonymously quoted "several" Yale Law professors who had told the newspaper that "they were shocked at how unpersuasive" the Dossier was.

49.     On its face, the Dossier—which refers to Jane and John as "Jane Doe" and "John Doe" in its main text but identifies them by name through exhibited screenshots of text messages—claims that Jane and John had "repeatedly lied" about their experience as students of color at the Law School, and further "repeatedly lied" about the existence of the secret dinner parties, before supposedly admitting their existence to the Dossier's author either in person or in "self-deleting" text messages.

10

50.     As evidence, the Dossier included a number of text messages, some with Jane or John, none of which consisted of them admitting to any secret dinner parties. On the contrary, in large part they seemed to consist of the Dossier's author making his own claims in text messages—to Jane, John, and other unidentified friends—about the existence of such parties.

51.     The Dossier also included photos of John's feet outside in the snow as "evidence" and denounced Jane and John for "deliberately enabling" a "secret atmosphere of favoritism, misogyny, and sexual harassment."

52.     Jane and John became aware of the Dossier in late April 2021, when it had begun to circulate among the Yale Law School student body.

53.     Shortly thereafter, beginning on April 23, 2021, Cosgrove and Eldik contacted Jane and John concerning the Dossier. However, they were not investigating the fact that a Yale Law School student was circulating such a document for an apparent harassing purpose, or even investigating the allegations made in the Dossier.

54.     Instead, Cosgrove and Eldik pressured Jane and John to make a formal statement confirming the allegations against, and lodge their own formal complaint, against Chua.

55.     Despite Jane and John repeatedly denying the Dossier's assertions, Cosgrove and Eldik pressured Jane and John to make such a statement, even calling them on a daily basis over the course of a week in April 2021, insisting that Jane and John had a "moral obligation" to "future generations of students" to make the false statements against Chua.

56.     Cosgrove and Eldik also made references to Jane of the "effort against Professor Chua" and insisted that if Jane would "just give them" a statement, they would have "enough" against Chua.

57.     During the course of this week, Jane and John consistently refused to make false statements, and instead repeatedly asked Cosgrove and Eldik for assistance against the troubling invasion of privacy and resulting harassment that they suffered.

58.     Cosgrove and Eldik ignored these requests to help and discouraged Jane and John from filing a formal complaint concerning the harm the Dossier and its creator had caused Jane and John.

59.     Instead, Cosgrove and Eldik ratcheted up the pressure. On a joint call including Cosgrove, Eldik, and Jane, Eldik told Jane that the Dossier would likely end up in "every judges' chambers," "following [her] even after [she] graduates," effectively sabotaging any hopes of her securing a clerkship whether she applied now or in the future.

60.     In a joint call including Cosgrove, Eldik, and John, Eldik and Cosgrove strongly suggested that John should not apply for a clerkship in the summer of 2021 because of the Dossier's wide publicity.

61.     It was suggested that, for these reasons, Jane and John should cooperate by making a statement against Professor Chua.

62.     Cosgrove also directly threatened Jane, claiming that Yale Law School was receiving complaints about her potentially serving as a Coker Fellow due to the Dossier,

and further suggested that such complaints would be moot if Jane made a statement against Chua.

63.     That threat having no effect, Cosgrove became more direct, telling Jane that if Jane accepted a Coker Fellowship with the professor—despite Jane's repeated denials that she had received an illicit offer from the professor—Cosgrove or another member of the Yale Law School administration would approach the professor with the allegations.

64.     In his own interactions with Cosgrove and Eldik, John unequivocally denied the Dossier's claim that the professor had extended him an illicit Coker Fellowship offer.

65.     When John asked Cosgrove and Eldik to help him deal with the false rumors being spread by other students to the contrary, Cosgrove and Eldik indicated that they were unaware of any complaints or rumors to that effect—despite having threatened Jane with those very same rumors and complaints—and insinuated that they would require concrete proof of this harassment before assisting John.

66.     When John informed Cosgrove and Eldik about his concerns regarding the lies and misrepresentations included in the Dossier, it was suggested to John that unless he filed a complaint against Chua, the administration could not effectively protect him from further harassment.

*Gerken's Retaliation*

67.     In April 2021, Defendant Gerken became personally involved in the efforts to pressure Jane and John to make a false statement against Chua.

13

68.     Gerken's direct involvement began when Jane, who was a student in Gerken's academic clinic and was then writing a lengthy paper under Gerken's direct and personal supervision, sought Gerken's advice in dealing with the Dossier.

69.     While it later became apparent that Gerken was fully aware of the Dossier, Gerken advised Jane to "be candid" with Cosgrove and Eldik and faculty members who may hear of the Dossier.  Jane in response explained to Gerken that the allegations in the Dossier were false and questioned why her own candor was at issue.

70.     A few days thereafter, Gerken and Cosgrove personally approached the professor, who was in the process of hiring Coker Fellows for his small group, with the intent to induce the professor to decline to extend a fellowship to either Jane or John.

71.     The purpose of Gerken and Cosgrove's approach to the professor was to not only dissuade him from offering a Coker Fellowship to Jane and John, but to convince him that Jane and John were lying about their interactions with Chua, making them untrustworthy and unsuited for employment, despite the professor already employing both Jane and John as his research assistants.

72.     In the course of this attempt, Gerken and Cosgrove brought with them a copy of the Dossier that Cosgrove had personally marked up with highlighting and annotations to show where Cosgrove believed that Jane and John were lying. Cosgrove did not try to investigate the specific allegations contained in the Dossier with Jane or John, even though they repeatedly informed her that it was full of lies and misrepresentations.

73.     These actions constituted improper retaliation, which Yale's Handbook defines as "any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy."

*Harm to Jane and John*

74.     The actions of Gerken, Cosgrove, and Eldik caused significant harm to Jane and John.

75.     In addition to the significant career damage created by Defendants' actions, Jane has taken a leave of absence from Yale Law School due to the ongoing harassment that arose. John has resigned as Gerken's speechwriter.

76.      Given the false accusations, both Jane and John did not apply for any judicial clerkships, and their ability to form and maintain relationships with their peers has also been irreparably and permanently stunted.

77.     Moreover, because of Defendants' misconduct, both Jane and John have suffered insomnia, anxiety, nausea, and loss of appetite.

*Yale Continues to Defame Plaintiffs*

78.     On November 15, 2021, Plaintiffs filed their Complaint in this action.

79.     On the same day, Yale, through Monica Bell ("Bell"), a Yale Law School Associate Professor of Law and of Sociology with expertise in constitutional law, published additional false accusations about Jane and John.

80.     Bell accused Jane and John, two prospective lawyers, early in their careers, of bringing their suit not to seek a remedy for their wrongs, but out of improper motivations and intentions.

81.     Specifically, Yale through Bell accused Jane and John of acting with the sole intent of disrupting Yale's process of considering whether to reappoint Gerken as Dean of Yale Law School with press attention.

82.     In a statement to *The Yale Daily News*, Bell stated that the only point of Plaintiffs' lawsuit is to generate press attention and "cause a stir." Bell stated that Jane and John do not "think they can win" the lawsuit, but rather just want to "make things . . . look bad." Bell stated that this lawsuit is "frivolous" and "embarrassing for" Jane and John.

83.     Neither Jane nor John have discussed this litigation with Bell or any of the Defendants.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**BREACH OF CONTRACT**
**(Against all Defendants)**

84.     Plaintiffs reallege and incorporate each and every one of the above allegations as if set out here in full.

85.     In Fall 2019 and Fall 2020, Jane and John entered into a binding contract, the Handbook, with all members of Yale's community—whereby the administration explicitly agreed not to retaliate against students who make harassment complaints.

86.     The Handbook defines retaliation as "any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy."

87.     Gerken and Cosgrove, however, approached the professor to presumably dissuade him from offering a Coker Fellowship to Jane and John because they refused to make statements against Chua.

88.     Defendants, by retaliating against Jane and John, breached their contract with Jane and John.

**SECOND CAUSE OF ACTION**
**PROMISSORY ESTOPPEL**
**(Against all Defendants)**

89.     Plaintiffs reallege and incorporate each and every one of the above allegations as if set out here in full.

90.     Defendants made a clear and definite promise to Jane and John that they would not retaliate against them if they ever complained of harassment.

91.     Jane and John relied on Defendants' promise and requested assistance from Cosgrove and Eldik regarding the invasion of privacy and resulting harassment that they suffered after making their complaint.

92.     Defendants ignored these requests to help, discouraged Jane and John from filing any sort of formal complaint, and then retaliated against Jane and John.

**THIRD CAUSE OF ACTION**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS**
**RELATIONSHIP**
**(Against all Defendants)**

93.     Plaintiffs reallege and incorporate each and every one of the above allegations as if set out here in full.

94.     Jane and John, as law students, had a prospective relationship with Yale's professors and judges' chambers around the country. Defendants, however, intentionally interfered with their prospective relationships while knowing of the relationship.

95.     Defendants threatened Jane that the Dossier would likely end up in "every judges' chambers," sabotaging any hopes of her securing a clerkship unless she cooperated with the investigation.

96.     Defendants also approached the professor to dissuade him from offering a Coker Fellowship to Jane and John because they refused to make statements against Chua.

97.     As such, both Jane and John lost the Coker Fellowship, and will potentially suffer further losses in the form of clerkships.

<u>**FOURTH CAUSE OF ACTION**</u>
**DEFAMATION**
**(Against all Defendants)**

98.     Plaintiffs reallege and incorporate each and every one of the above allegations as if set out here in full.

99.     Defendants shared and stated numerous false statements defaming Jane and John to third parties. The defamatory statements include the sharing of a document—the Dossier—that Defendants knew or reasonably should have known was defamatory.

100.    Yale, through Bell, also shared and stated that Plaintiffs, by pursuing this litigation, have the sole intention of generating media attention to interfere with Gerken's potential reappointment as Dean of Yale Law School.

101.    Each of the defamatory statements made by Defendants were false.

18

102.    Defendants knew these statements to be false or acted with reckless disregard as to the truth of the statements.

103.    These defamatory statements served no legitimate purpose and were made with malicious intent to damage Plaintiffs' reputations and good names.

104.    These false statements disparaged Jane and John in their profession or trade. Accordingly, these statements constitute defamation per se, and injury is presumed.

105.    In addition, Plaintiffs, who are not public figures, lost the Coker Fellowship as a result of these statements.

106.    Plaintiffs are entitled to damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**UNREASONABLE PUBLICITY**
**(Against All Defendants)**

107.    Plaintiffs reallege and incorporate each and every one of the above allegations as if set out here in full.

108.    Defendants broadcast matters concerning the private lives of Jane and John that would be highly offensive to a reasonable person.

109.    Those matters were not a matter of a legitimate concern to the public.

110.    Jane and John have suffered injury as a result of Defendants' acts.

**SIXTH CAUSE OF ACTION**
**FALSE LIGHT**
**(Against All Defendants)**

111.    Plaintiffs reallege and incorporate each and every one of the above allegations as if set out here in full.

112.    Defendants have placed Jane and John in a false light which would be highly offensive to a reasonable person.

113.    Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matters and the false light in which Jane and John would be placed.

114.    Plaintiffs have suffered injury as a result of Defendants' acts.

**SEVENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against All Defendants)**

115.    Plaintiffs reallege and incorporate each and every one of the above allegations as if set out here in full.

116.    The aforementioned conduct of Defendants, through their employees and agents, was intended to cause Jane and John severe emotional distress in that they knew or should have known that the University's retaliation against students would likely cause harm and emotional distress to Plaintiffs.

117.    Indeed, Defendants' conduct caused both Jane and John to suffer extreme emotional distress, leading to insomnia, anxiety, nausea, and loss of appetite.

118.    As a direct and proximate cause of Defendants' aforementioned extreme and outrageous conduct, Jane and John sustained and continue to experience emotional distress, pain and suffering, inconvenience and loss of enjoyment of life stemming from Defendants' retaliation.

119.    In fact, Jane and John will continue to suffer in the future emotional distress, pain and suffering, inconvenience and loss of enjoyment of life as they seek legal employment after graduation.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that the Court enter judgment in Plaintiff's favor and against Defendants, awarding:

A.  Compensatory damages in an amount to be determined at trial, but in any event at least $75,000;

B.  Punitive damages in an amount to be determined at trial, but in any event at least $75,000;

C.  Applicable interest on the foregoing amount;

D.  Costs of suit herein;

E.  Investigation costs;

F.  Payment of reasonable attorneys' fees;

G.  Any and all other relief the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury for all issues so triable in this action.


Dated: New York, New York
          January 14, 2022


By: _/s/ Andrew B. Bowman_
Andrew B. Bowman
**LAW OFFICES OF ANDREW B. BOWMAN**
1804 Post Road East
Westport, Connecticut 06880
Telephone:   (202) 259-0599
andrew@andrewbowmanlaw.com

John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5401
Facsimile:    (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs*