**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SIERRA STUBBS and GAVIN JACKSON,

                                    Plaintiffs,

v.

HEATHER GERKEN, ELLEN COSGROVE,
YASEEN ELDIK, and YALE UNIVERSITY,

                                    Defendants.

Case No. 3:21-cv-01525

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

**INTRODUCTION** ............................................................................................................. 1

**BACKGROUND** .............................................................................................................. 3

    I.    Factual Allegations ................................................................................. 3
    II.   Procedural History ................................................................................. 6

**LEGAL STANDARD** ....................................................................................................... 6

**ARGUMENT** ................................................................................................................... 7

I.    Plaintiffs' Breach of Contract Claim Fails .................................................... 7

    A.   Plaintiffs plead that the Policy is a contract ............................................. 8

    B.   This Court may consider the Policy language on this motion
         to dismiss ................................................................................................. 8

    C.   Plaintiffs do not plausibly allege Defendants breached the Policy ......... 10
           1.  The Policy was not in effect when the events Plaintiffs complain
               of occurred ................................................................................ 11
           2.  Plaintiffs do not allege they reported a concern, filed a complaint, or
               participated in an investigation related to "protected characteristics"
               as defined in the Policy. .......................................................... 11
           3.  Plaintiffs do not allege they were retaliated against for reporting a
               concern, filing a complaint, or participating in an investigation. ................. 14

II.   Plaintiffs Promissory Estoppel Claim Impermissibly Duplicates Their
     Contract Claim ........................................................................................... 6

III.  Plaintiffs' Intentional Interference Claim Aails to State a Claim ..................... 19
    A.   Plaintiffs do not allege an existing business relationship with
         anyone other than the Professor ............................................................. 19
    B.   Plaintiffs do not adequately allege actual loss. ....................................... 21

IV.  Plaintiffs' Defamation Claim Is Fatally Deficient ......................................... 22

    A.   Plaintiffs complain of opinions, not facts .............................................. 23
           1.  Plaintiffs do not allege that Gerken and Cosgrove made
               defamatory factual statements when sharing the "dossier" ............ 23

2.  Plaintiffs do not allege that Bell's alleged statements to the press are actionable statements of objective fact. ........................................................... 26

B.  Yale is not responsible for Professor Bell's alleged commentary. ...................... 27

V.  Plaintiffs' Unreasonable Publicity and False Light Claims are Baseless. ...................... 28

A.  The unreasonable publicity and false light claims fail because Plaintiffs do not allege that Defendants shared the "dossier" with more than one person ................................. 28

B.  The unreasonable publicity claim also fails because the contents of the "dossier" were not private when shared ................................................. 30

C.  The unreasonable publicity claim also fails because the contents of the "dossier" have attracted great public interest ......................................... 31

VI.  Plaintiff's IIED Claim Does Not Pass Muster .......................................... 33

A.  Gerken and Cosgrove's alleged conduct was not extreme and outrageous ................... 33

B.  Plaintiffs do not plausibly allege they suffered emotional distress ............................... 35

**CONCLUSION** ........................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A-G Foods, Inc. v. Pepperidge Farm, Inc.*,
579 A.2d 69 (Conn. 1990) ................................................................................27

*Alleva v. Stamford Health Grp.*,
2019 WL 3248816 (Conn. Super. June 6, 2019) ...............................................34

*Am. Diamond Exch. v. Alpert*,
28 A.3d 976 (Conn. 2011) ................................................................................21

*Appleton v. Bd. of Educ.*,
757 A.2d 1059 (Conn. 2000) ............................................................................33

*Arista Records LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)...........................................................................6, 35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................6, 7, 25, 28

*Estate of Axelrod v. Flannery*,
476 F. Supp. 2d 188 (D. Conn. 2007) .................................................................9

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
234 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................10

*Baer v. New England Home Delivery Servs., LLC*,
2007 WL 3173701 (Conn. Super. Oct. 18, 2007)...............................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................7

*Berry v. Zalon*,
2018 WL 1749970 (Conn. Super. Mar. 8, 2018).....................................25, 29, 30

*Borg v. Cloutier*,
239 A.3d 1249 (Conn. App. 2020) ....................................................................29

*Bradley v. Yovino*,
2021 WL 3722706 (Conn. Super. July 26, 2021) .................................................8

*Burns v. Quinnipiac Univ.*,
991 A.2d 666 (Conn. App. 2010) ......................................................................18

*Callahan v. Callahan,*
   2017 WL 3332743 (Conn. Super. Ct. June 27, 2017)..........................................20

*Cassidy v. Lawson,*
   2005 WL 2508593 (D. Conn. Sept. 29, 2005) .......................................................25

*Cerejo v. Cerejo,*
   2012 WL 3089772 (Conn. Super. June 29, 2012) .................................................34

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d Cir. 2002)....................................................................................9

*Colon v. Town of W. Hartford,*
   2001 WL 45464 (D. Conn. Jan. 5, 2001) .................................................................9

*Crismale v. Walston,*
   194 A.3d 301 (Conn. App. 2018) ...........................................................................23

*CSL Silicones, Inc. v. Midsun Grp., Inc.,*
   301 F. Supp. 3d 328 (D. Conn. 2018).....................................................................24

*Curtis v. Aetna Life Ins. Co.,*
   2021 WL 1056785 (D. Conn. Mar. 18, 2021) ..........................................................9

*Deutsch v. Backus Corp.,*
   2011 WL 522849 (Conn. Super. Ct. Jan. 14, 2011)...............................................21

*Devone v. Finley,*
   2014 WL 1153773 (D. Conn. Mar. 20, 2014) ........................................................25

*Doe v. Danbury Hosp.,*
   2021 WL 402055 (Conn. Super. Jan. 12, 2021) ....................................................28

*Doe v. Quinnipiac Univ.,*
   404 F. Supp. 3d 643 (D. Conn. 2019)................................................................8, 13

*Dunbar v. Omnicom Grp., Inc.,*
   2021 WL 633732 (D. Conn. Feb. 18, 2021) ..........................................................26

*Foncello v. Amorossi,*
   931 A.2d 924 (Conn. 2007) ...................................................................................29

*Garfinkle v. Jewish Family Serv. of Greater Hartford, Inc.,*
   2020 WL 8264101 (Conn. Super. Dec. 15, 2020) .................................................34

*Gillians v. Vivanco-Small,*
   15 A.3d 1200 (Conn. App. 2011) ...........................................................................35

v

*Glatzel v. Brittle*,
2010 WL 4620975 (Conn. Super. Oct. 25, 2010) ................................................................31

*Glazer v. Dress Barn, Inc.*,
873 A.2d 929 (Conn. 2005) ........................................................................................18

*Gleason v. Smolinski*,
125 A.3d 920 (Conn. 2015) ........................................................................................23

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016) ..........................................................................................9

*Goguen v. Brezniak*,
2021 WL 4895129 (Conn. Super. Sept. 21, 2021) ............................................................29

*Golek v. Saint Mary's Hosp., Inc.*,
34 A.3d 452 (Conn. App. 2012) ..................................................................................21

*Goodrich v. Waterbury Republican-American, Inc.*,
188 Conn. 107 (1982) ..........................................................................................23, 29

*Grigorenko v. Pauls*,
297 F. Supp. 2d 446 (D. Conn. 2003) ....................................................................30, 33, 35

*Harp v. King*,
835 A.2d 953 (Conn. 2003) ........................................................................................27

*HB v. Monroe Woodbury Cent. Sch. Dist.*,
2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) ..................................................................33

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*,
761 A.2d 1268 (Conn. 2000) ......................................................................................19

*Hirsch v. Arthur Andersen & Co.*,
72 F.3d 1085 (2d Cir. 1995) ........................................................................................16

*Holcombe v. Ingredients Solutions, Inc.*,
2019 WL 1383432 (D. Conn. Mar. 27, 2019) ..............................................................16, 17

*Johnson v. Schmitz*,
119 F. Supp. 2d 90 (D. Conn. 2000) ..............................................................................24

*Kelly v. Kurtz*,
219 A.3d 948 (Conn. App. 2019) ..................................................................................21

*Kollar v. Allstate Ins. Co.*,
2017 WL 3222535 (D. Conn. July 27, 2017) ....................................................................20

*Kuselias v. Niederkohr*,
  2021 WL 4775623 (Conn. Super. Sept. 17, 2021)..........................................................29, 30

*L-7 Designs, Inc. v. Old Navy, LLC*,
  647 F.3d 419 (2d Cir. 2011)...............................................................................................9

*Lawrence v. Altice USA*,
  2020 WL 108980 (D. Conn. Jan. 9, 2020)...........................................................................32

*Learning Care Grp., Inc. v. Armetta*,
  2014 WL 12651264 (D. Conn. Sept. 30, 2004).....................................................................26

*Levin v. McPhee*,
  119 F.3d 189 (2d Cir. 1997)...............................................................................................25

*Lively v. WAFRA Inv. Advisory Grp., Inc.*,
  6 F.4th 293 (2d Cir. 2021) ..............................................................................................7, 9

*Lynch v. City of New York*,
  952 F.3d 67 (2d Cir. 2020).............................................................................................1, 7

*Maselli v. Reg'l Sch. Dist. No. 10*,
  235 A.3d 599 (Conn. App. 2020) .......................................................................................35

*McLennon v. City of New York*,
  171 F. Supp. 3d 69 (E.D.N.Y. 2016) ..................................................................................10

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  289 F. Supp. 2d 416 (S.D.N.Y. 2003)..................................................................................33

*Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*,
  87 A.3d 534 (Conn. 2014) ...............................................................................................8

*Michalsky v. Moffly Publications, Inc.*,
  2020 WL 5537003 (Conn. Super. Aug. 13, 2020)..................................................................20

*Michel v. Yale Univ.*,
  --- F. Supp. 3d ----, 2021 WL 2827358 (D. Conn. July 7, 2021)......................................18, 19

*Miller Auto. Corp. v. Jaguar Land Rover N. Am.*,
  2010 WL 3260028 (D. Conn. Aug. 12, 2010) (Burns, J.) ...............................................17, 18

*NetScout Sys., Inc. v. Gartner, Inc.*,
  223 A.3d 37 (Conn. 2020)................................................................................................23

*One Barberry Real Estate Holding, LLC v Maturo*,
  2021 WL4430599 (D. Conn. Sept. 27, 2021)........................................................................20

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019)...........................................................................................10

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)............................................................................33

*Perez-Dickson v. City of Bridgeport*,
    43 A.3d 69 (Conn. 2012) ................................................................................................35

*Perkins v. Freedom of Info. Comm'n*,
    635 A.2d 783 (Conn. 1993).............................................................................................29

*Perry v. NYSARC, Inc.*,
    424 F. App'x 23 (2d Cir. 2011) ......................................................................................16

*Peter-Michael, Inc. v. Sea Shell Assocs.*,
    709 A.2d 558 (Conn. 1998) ..............................................................................13, 14, 15

*PHL Variable Ins. Co. v. Town of Oyster Bay*,
    929 F.3d 79 (2d Cir. 2019)................................................................................................7

*Reid v. United States*,
    2020 WL 3256331 (E.D.N.Y. June 15, 2020) ...............................................................16

*Rizzitelli v. Thompson*,
    2010 WL 3341516 (Conn. Super. Aug. 2, 2010)...........................................................31

*Rodriguez v. Am. Friends of the Hebrew Univ., Inc.*,
    1998 WL 146227 (S.D.N.Y. Mar. 25, 1998) .................................................................25

*Saliga v. Chemtura Corp.*,
    2015 WL 5822589 (D. Conn. Oct. 1, 2015) ..................................................................34

*Siddiqui v. Rocheleau*,
    2019 WL 12239678 (D. Conn. May 15, 2019)...............................................................16

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)...........................................................................................32

*Stevens v. Helming*,
    135 A.3d 728 (Conn. App. 2016) ...................................................................................25

*Stevens v. Helming*,
    2014 WL 3805495 (Conn. Super. June 23, 2014) .........................................................26

*Summerhill v. City of Meriden*,
    2012 WL 1004298 ..........................................................................................................21

*Tracy v. New Milford Pub. Schs.*,
   922 A.2d 280 (Ct. App. 2007) .................................................34

*Trahan v. Lazar*,
   457 F. Supp. 3d 323 (S.D.N.Y. 2020).........................................8

*Traylor v. Parker*,
   2016 WL 5003981 (Conn. Super. Aug. 4, 2016)................................26

*Watkins v. City of Waterbury Bd. of Educ.*,
   2020 WL 1184783 (D. Conn. Mar. 11, 2020) ......................................33

*Williams v. Freije*,
   2011 WL 6976570 (Conn. Super. Dec. 15, 2011) ............................27

*Xiotech Corp. v. Express Data Prods. Corp.*,
   11 F. Supp. 3d 225 (N.D.N.Y. 2014)...................................................10

*Yamashita v. Scholastic, Inc.*,
   936 F.3d 98 (2d Cir. 2019).................................................................7

**Other Authorities**

Eda Aker & Philip Mousavizadeh, *Two Students Sue Yale Law
   Administrators for Alleged Retaliation in Amy Chua Case*, Yale
   Daily News (Nov. 15, 2021),
   https://yaledailynews.com/blog/2021/11/15/two-students-sue-yale-
   law-administrators-for-alleged-retaliation-in-amy-chua-case.........................26

David Lat, *The Yale Law School Scandals: Dean Heather Gerken Speaks Out*,
   Original Jurisdiction (Nov. 18, 2021), https://davidlat.substack.com/p/the-
   yale-law-school-scandals-dean .................................................................32

Dahlia Lithwick & Susan Matthews, *Meltdown at Yale Law*, Slate (May 15, 2021,
   3:45 PM), www.slate.com/news-and-politics/2021/05/amy-chua-yale-law-
   school-dinner-parties.html .......................................................................32

Sarah Lyall & Stephanie Saul, *Gripped by 'Dinner Party-gate,' Yale Law
   Confronts a Venomous Divide*, N.Y. Times (June 7, 2021),
   www.nytimes.com/2021/06/07/us/amy-chua-yale-law.html .................................32

Philip Mousavizadeh, *Law Student Received Coker Fellowship, Undermining
   Case Against Law School*.......................................................................2, 32

Restatement (Second) of Torts Section 652D.................................................29, 30, 31

U.S. Dept. of Commerce, Final Q1 FY 2022-2023 Attach J - Glossary of Acronyms,
    https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.commerce.gov
    %2Fsites%2Fdefault%2Ffiles%2F2021-12%2FFinal%2520Q1%2520FY%25202022-
    2023%2520Attach%2520J%2520-
    %2520Glossary%2520of%2520Acronyms.docx&wdOrigin=BROWSELINK ..................... 5

U.S. Dept. of Commerce, Meet the Secretary, https://staff.commerce.gov/ .................................. 5

U.S. Dept. of Commerce, Staff Directory, https://staff.commerce.gov/ .......................................... 5

Lizzie Widdicombe, *What is Going On at Yale Law School?*, The New Yorker
    (June 19, 2021), www.newyorker.com/news/annals-of-education/what-is-
    going-on-at-yale-law-school; .................................................................................................. 32

Yale University, Former Trustees, https://www.yale.edu/board-trustees/former-trustees ............. 5

Yale University, *University Policies, Procedures, Forms, and Guides*,
    https://your.yale.edu/university-policies-procedures-forms-and-guides (last
    visited February 14, 2022) ....................................................................................................... 7

Yale University, 9000 Yale University Policy Against Discrimination and Harassment,
    https://your.yale.edu/policies-procedures/policies/9000-yale-university-policy-against-
    discrimination-and-harassment ................................................................................................ 17

## INTRODUCTION

Yale Law School ("YLS") students Sierra Stubbs and Gavin Jackson have sued YLS Dean Heather Gerken, YLS Associate Dean of Students Ellen Cosgrove, and YLS Director of Diversity, Equity, and Inclusion Yaseen Eldik, as well as Yale University, over harms Plaintiffs allegedly suffered after another YLS student distributed a document (melodramatically called a "dossier") that circulated throughout YLS and was reported on by the national media and legal blogosphere. The "dossier" purportedly chronicles meetings that Plaintiffs had with a YLS professor, Amy Chua, at her home, in contravention of restrictions that Chua had agreed on with YLS. Plaintiffs allege that when they complained to Cosgrove and Eldik about the third student's compilation and dissemination of the document, which spread around YLS like a high school rumor, they were pressured to confirm that the allegations about Chua in the document were true. *See* Sec. Am. Compl. ("SAC") ¶¶ 52-55, ECF No. 30.  Plaintiffs further allege that Cosgrove and Eldik warned them about professional repercussions for not confirming the document's allegations, and that Cosgrove and Gerken shared a marked-up version of the widely-disseminated document with a professor (the "Professor") who was considering hiring them as teaching assistants, to discourage him from hiring them. *See id.* ¶¶ 59–60, 70–72.[1] They claim they "lost" the teaching assistant jobs as a result, *id.* ¶ 97, but they pointedly do not allege that they failed to receive teaching assistant offers from the Professor or from other YLS professors.[2]

---

[1] Defendants view the case as meritless and many of the factual allegations as flatly wrong, but sufficiently detailed factual allegations in a complaint must be treated as true on a motion to dismiss. *Lynch v. City of New York*, 952 F.3d 67, 75-76 (2d Cir. 2020). The allegations that Defendants would dispute if the case survived this motion range from the broad (e.g., allegations of efforts to "blackball" students or "retaliate" against them) to the particular (e.g., allegations that Cosgrove ever met or even talked with the Professor about Plaintiffs).

[2] While not germane to this motion, public press accounts relate that Plaintiffs' lead counsel has backtracked, acknowledging that at least one of the Plaintiffs received an offer to serve as a teaching assistant but declined and instead took a leave of absence. *See* Law student received

Plaintiffs allege that these events support seven causes of action against Defendants: a breach of contract claim based on a non-retaliation policy in a university handbook, *id.* ¶¶ 84–88; a promissory estoppel claim regarding the same alleged retaliation, *id.* ¶¶ 89–92; an intentional interference with prospective business relationship claim, alleging that their potential employment with all YLS professors and all federal judges has been undermined, *id.* ¶¶ 93–97; a defamation claim based on two theories, one on Gerken and Cosgrove's sharing of the widely-available document with a single professor, and the other on an otherwise-uninvolved YLS professor, Monica Bell, commenting on the lawsuit to a newspaper after seeing media reports about it, *id.* ¶¶ 98–106; an unreasonable publicity claim arising from sharing the "dossier" with the Professor, *id.* ¶¶ 107–110; a false light claim based on the same meeting with the one Professor, *id.* ¶¶ 111–14; and an intentional infliction of emotional distress ("IIED") claim, *id.* ¶¶ 115–19.

All seven fail to state a claim.  The Yale anti-retaliation policy on which Plaintiffs base their breach of contract claim was not yet even in effect when Plaintiffs allege they were retaliated against, and in any event the policy prohibits retaliation based on complaints of discrimination or harassment related to protected characteristics (such as race or gender), not on any conceivable sort of alleged retaliation. Plaintiffs' promissory estoppel claim fails because it impermissibly duplicates their claim that a contractual promise against retaliation was breached, and also because they fail to specify any promise outside that contract that was allegedly breached.  Their tortious interference claim fails because they do not allege any specific business

---

Coker fellowship, undermining case against Law School - Yale Daily News (Attorney John "Balestriere explained that the damages do not refer simply to the awarding of the [teaching assistant position], but rather to the fact that his client took a leave of absence from the Law School as a result of this incident — and therefore did not undertake the [teaching assistant position]."").

relationships they had with professors or judges—except for their relationship with the Professor, and as to him, they do not allege that he did not extend teaching assistant offers to them.  The defamation claim against Gerken and Cosgrove fails because Plaintiffs allege statements of opinion, and their defamation claim relating to Bell's statements likewise relies on opinion statements—and opinions offered by a professor not alleged to have been part of the school's administration or in any other way acting in furtherance of her employer when she commented as a law professor on a lawsuit.  Plaintiffs' unreasonable publicity and false light claims fail because they do not allege Defendants ever publicized the already very-public "dossier," which they admit has attracted significant public interest.  Finally, the IIED claim fails because it does not allege extreme and outrageous conduct causing severe emotional distress.

The suit should be dismissed in its entirety.

## BACKGROUND

### I.      Factual Allegations

Stubbs and Jackson enrolled at YLS in 2019 and associated with Chua, who had "entered a no-socializing agreement with [Yale] University whereby she agreed to not socialize with students off-campus." SAC ¶ 32, 38.[3] Another student, concerned that Plaintiffs were "'deliberately enabling' a 'secret atmosphere of favoritism, misogyny, and sexual harassment,'" *id.* ¶ 51, created what Plaintiffs call a "dossier," which "purported to document the 'secret dinner parties' that Chua was supposedly hosting with [Plaintiffs] and unidentified federal judges," *id.* ¶ 46.  This "dossier," which identified Plaintiffs by name through screenshots of text messages, claims they had "'repeatedly lied' about the existence of the secret dinner parties."  *Id.* ¶ 49.

---

[3] Throughout this brief, unless otherwise indicated, emphasis is added and internal citations, quotation marks, alterations, and ellipses are omitted.

Plaintiffs allege that the "dossier" "circulate[d] among the [YLS] student body." *Id.* ¶ 52.  They

do not allege that any Defendant played any role in circulating it.

    After the "dossier" had widely circulated at YLS, Cosgrove (the Associate Dean of

Students) and Eldik (the Director of Diversity, Equity, and Inclusion) allegedly pressured

Plaintiffs to confirm the "dossier's" allegations against Chua. *Id.* ¶¶ 53-55. When Plaintiffs

refused to do so, *see id.* ¶ 57, Cosgrove and Eldik warned them that the allegations against them

in the widely-disseminated "dossier" could have professional repercussions for them.  Plaintiffs

allege that Cosgrove and Eldik told Stubbs the "dossier" would "likely end up in 'every judges'

chambers,'" *id.* ¶ 59. They also allege that Cosgrove told Stubbs that because of the "dossier,"

YLS had been receiving complaints about her possibly serving as a Coker Fellow (a kind of

teaching assistant), *id.* ¶ 62, and that if she accepted a Coker Fellowship with the Professor, YLS

administrators "would approach the [P]rofessor with the allegations" regarding her, *id.* ¶ 63.

Plaintiffs also allege that Cosgrove and Eldik advised Jackson not to apply for a clerkship that

summer because of the "dossier's" "wide publicity." *Id.* ¶ 60.

    Plaintiffs then allege that Gerken and Cosgrove approached the Professor, who was in the

process of hiring Coker Fellows, "with the intent to induce the professor to decline to extend a

fellowship to either" Stubbs or Jackson, *id.* ¶ 70, and "convince him that [Stubbs] and [Jackson]

were lying about their interactions with Chua, making them untrustworthy and unsuited for

employment," *id.* ¶ 71.  "In the course of this attempt," they allegedly brought a copy of the

"dossier" with them, which Cosgrove had "marked up with highlighting and annotations to show

where Cosgrove believed that [Stubbs] and [Jackson] were lying."  *Id.* ¶ 72.

    This is the sole allegation in the SAC of any Defendant sharing the "dossier" with anyone

at all.  Plaintiffs never aver that the alleged attempt to convince the Professor not to offer them

Coker fellowships worked. They do not allege that the Professor did not offer them Coker

fellowships. They do not allege that they did not receive offers of Coker fellowships from other

YLS professors.

Plaintiffs allege that comments made about their lawsuit by Bell—a professor who

studies and writes about the law—have defamed them, and that Yale is to blame. *Id.* ¶¶ 79-82.

They do not allege that Bell served in any administrative position at Yale, or as its spokesperson.

But they complain that Bell spoke to the Yale Daily News, opining that their suit aimed "to

generate press attention and 'cause a stir,'" that they "do not 'think they can win' the lawsuit, but

rather just want to 'make things . . . look bad,;'" and that "this lawsuit is 'frivolous' and

'embarrassing for'" Stubbs and Jackson.  *Id.* ¶ 82.

Plaintiffs assert these alleged actions caused them "significant career damage."  *Id.* ¶ 75.

They say Stubbs, due to "ongoing harassment" after the "dossier" was widely circulated (by

others) at YLS, took a leave of absence from YLS. *Id.* They do not allege what she is doing on

her leave of absence, but federal executive department websites of which this Court can take

judicial notice show that she is working at the U.S. Department of Commerce, under YLS

alumna (and former Yale Trustee) Commerce Secretary Gina Raimondo.[4] They say Jackson—

who had been serving as Gerken's speechwriter—resigned, but they do not allege Gerken fired

him or asked him to resign. *Id.* Plaintiffs aver that they have not (yet) applied for judicial

clerkships. *Id.* ¶ 76. They allege that their meeting with Cosgrove and Eldik, and Gerken and

Cosgrove's meeting with the Professor, and Bell's comments on their lawsuit, have caused them

---

[4] *See* Staff Directory (commerce.gov) (search for "Sierra" with "Stubbs") (listing Stubbs as
employee in the Office of the Secretary (of Commerce));  Final Q1 FY 2022-2023 Attach J -
Glossary of Acronyms.docx (live.com) (defining "OS" as "Office of the Secretary"). Commerce
Secretary Gina Raimondo is a YLS graduate, *see* Gina M. Raimondo | U.S. Department of
Commerce, and former Trustee of Yale (from 2014-21). *See* Former Trustees | Yale University.

significant damages. They complain of "insomnia, anxiety, nausea, and loss of appetite." *Id.* ¶ 77.

## II.     Procedural History

Plaintiffs pseudonymously filed their original complaint, ECF No. 1, on November 15, 2021, and an amended complaint, ECF No. 26, on January 14, 2022.  On January 19, 2022, after the Court denied their motion to litigate pseudonymously, ECF No. 29, Plaintiffs filed the SAC. The parties promptly filed the Joint Planning Report of the Parties, ECF No. 31, and the Court entered a scheduling order, ECF No. 32, noting that it was "aware that defendants intend to seek a stay of discovery. If defendants move for a stay of discovery, and the Court grants that motion, the Court will revisit the scheduling order if and when any stay is lifted."[5] While Plaintiffs have already filed three complaints in this suit, this is the only dispositive motion filed to date.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In assessing whether a claim is supported by the necessary "factual amplification . . . to render a claim plausible," *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010), courts consider only "factual allegations, and the reasonable inferences that can be drawn therefrom, as

---

[5] Defendants filed a (corrected) motion to stay discovery, ECF No. 34, on January 26, 2022; the next day, this Court denied that motion without prejudice to re-filing, ECF No. 35, noting that it would consider a renewed motion to stay discovery after Defendants filed a motion to dismiss, which would allow the court to determine "whether there are substantial grounds for dismissal."

true." *PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3d 79, 89 (2d Cir. 2019). By contrast, legal conclusions and conclusory factual allegations are not presumed true. *Iqbal*, 556 U.S. at 678.  To the contrary, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *id.*; *accord Twombly*, 550 U.S. at 557 (holding that a "naked assertion" devoid of "further factual enhancement" fails to state a claim).

A court evaluating a motion to dismiss for failure to state a claim may consider any attachments to a complaint as material incorporated by reference, *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020), as well as material that is "integral to the complaint, or of which courts can take judicial notice," *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 305 (2d Cir. 2021).  Ultimately, "[w]hen the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the court must grant a motion to dismiss." *Yamashita v. Scholastic, Inc.*, 936 F.3d 98, 104 (2d Cir. 2019).

## ARGUMENT

Plaintiffs have not soundly alleged any of their seven causes of action.  Therefore, and for the reasons stated below, the SAC should be dismissed in its entirety.

### I.    Plaintiffs' Breach of Contract Claim Fails.

Plaintiffs allege Defendants breached the Yale Policy Against Discrimination and Harassment (the "Policy"), which they contend is a contract, by retaliating against them in violation of the Policy's prohibition against retaliation. [6]  *See generally* SAC. ¶¶ 9, 73, 84–88. Connecticut contract law requires Plaintiffs to prove formation of an agreement, performance by

---

[6] The non-retaliation policy is one of several university policies.  *See University Policies, Procedures, Forms, and Guides*, Yale University, https://your.yale.edu/university-policies-procedures-forms-and-guides (last visited February 14, 2022).  This brief refers to the policy interchangeably as the "Policy" or the "Handbook," which is the term that Plaintiffs use.

one party, breach by the other party, and damages. *Meyers v. Livingston, Adler, Pulda,*

*Meiklejohn and Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014)).[7]  Plaintiffs have not adequately

pleaded a breach of contract claim arising out of the Policy for three independent reasons: (1) the

Policy did not exist when the events Plaintiffs complain of took place; (2) Plaintiffs do not allege

they were retaliated against for complaining of harassment at all; and (3) they do not allege they

were retaliated against for complaining of the type of harassment prohibited by the Policy.

### A.      Plaintiffs plead that the Policy is a contract.

Plaintiffs plead that the Policy is "by its own terms a binding contract." SAC ¶ 9. That is

consistent with Connecticut law, which recognizes that the relationship between a student and a

university is contractual.  *See, e.g.*, *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 667 (D. Conn.

2019) (noting that the "basic legal relation between a student and a private university or college

is contractual in nature" and that the "regulations of the institution determine the contractual

relationship between the student and the educational institution." Numerous courts have found

that university student handbooks represent enforceable contracts "between the school and its

active students."  *Bradley v. Yovino*, 2021 WL 3722706, at *2 (Conn. Super.  July 26, 2021).

### B.      This Court may consider the Policy language on this motion to dismiss.

Plaintiffs did not attach the Policy to their Amended Complaint, but they incorporate it by

reference, SAC ¶¶ 9, 73, 86 (naming policy and quoting from it), and it is integral to their breach

of contract claim. It should thus be treated as part of the complaint. *See, e.g.*, *Trahan v. Lazar*,

457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020) ("extrinsic documents may be considered as part of

the pleadings if they either are (1) attached to the complaint; (2) incorporated into the complaint

---

[7] Plaintiffs bring only state law claims involving conduct in Connecticut. All are governed by
Connecticut law in this diversity action.

by reference; or (3) integral to the complaint"); *Colon v. Town of W. Hartford*, 2001 WL 45464, *1 n.1 (D. Conn. Jan. 5, 2001) (even "where a plaintiff does not attach to the complaint or incorporate by reference a document on which it relies," if it "is integral to the complaint, a defendant may introduce that document as part of a motion attacking the pleadings"); *cf. Lively*, 6 F.4th at 306 ("[O]n a motion for judgment on the pleadings, courts may consider all documents that qualify as part of the non-movant's pleading, including (1) the complaint or answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matter of which the court may take judicial notice."); *see generally Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (where plaintiff had "actual notice" of the documents and "relied upon the documents in framing the complaint," it was properly considered part of the complaint). That makes good sense, because in:

> most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.

*Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016); *see also Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 200 (D. Conn. 2007) ("The primary purpose of this exception is to prevent plaintiffs from generating complaints invulnerable to rule 12(b)(6) simply by clever drafting."). Unsurprisingly, "if a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Curtis v. Aetna Life Ins. Co.*, 2021 WL 1056785, at *6 (D. Conn. Mar. 18, 2021); *cf. L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (noting that on a motion for judgment on the pleadings, a court assumes pleaded facts to be true "unless contradicted by more specific allegations or documentary evidence").

The Policy is integral to the Second Amended Complaint.  "A document is integral to the complaint where the plaintiff (1) has 'actual notice' of the document and its information and (2) has 'relied upon the documents in framing the complaint.'"  *McLennon v. City of New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) (quoting *Chambers*, 282 F.3d at 153).  "Typically, an integral matter is a contract, agreement, or other document essential to the litigation." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019).  In fact, "where [a] claim is for breach of contract, the complaint is deemed to incorporate the contract by reference because the contract is integral to the plaintiffs' claim."  *Xiotech Corp. v. Express Data Prods. Corp.*, 11 F. Supp. 3d 225, 230 n.3 (N.D.N.Y. 2014) (collecting cases); *see Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017) ("the contract itself . . . by definition is integral to the complaint") (citing *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011)).  Plaintiffs' contract claim relies on the Policy, which the SAC repeatedly references. *Id.* ¶¶ 9, 73, 84–88. The Policy language should be considered by the Court in deciding this motion to dismiss.

**C.    Plaintiffs do not plausibly allege Defendants breached the Policy.**

It is not surprising that Plaintiffs did not attach a copy of the Policy—which is publicly available to them or anyone visiting Yale's website, *see* 9000 Yale University Policy Against Discrimination and Harassment | It's Your Yale, and is attached here as Exhibit 1-A—to the SAC. If they had, it would have been obvious that their breach of contract claim fails for three reasons. First, the Policy was not in effect when the events they complain of took place. Second, they do not allege that they ever "reported a concern, filed a complaint, and/or participated in an investigation *pursuant to this policy*," i.e., the Policy Against Discrimination and Harassment based on specifically defined protected characteristics. Third, they do not allege that they

10

"reported a concern, filed a complaint, and/or participated in an investigation" concerning discrimination or harassment.

1.      **The Policy was not in effect when the events Plaintiffs complain of occurred.**

The Policy text states that it has an "effective date" of August 1, 2021, and a "revision date" of January 1, 2022. *See* [9000 Yale University Policy Against Discrimination and Harassment | It's Your Yale](#) (noting both dates). Both dates come *after* the events that they complain of, SAC ¶¶ 39-73 (alleging events between February 2021 and April 2021).[8] Their reliance on a Policy that did not exist at the relevant time, and which has no retroactive language, dooms their contract claim. Plaintiffs have failed to state a claim for the breach of a contractual provision—the Policy—because it did not exist at the time of the alleged breach.

2.      **Plaintiffs do not allege they reported a concern, filed a complaint, or participated in an investigation related to "protected characteristics" as defined in the Policy.**

The Policy text prohibits retaliation against members of the Yale community who have "reported a concern, filed a complaint, and/or participated in an investigation *pursuant to this policy*." *Id.*; *accord* SAC ¶73, ¶ 86 (citing that precise language). The term "this policy" plainly refers to the Policy in which that clause occurs, i.e., the [9000 Yale University Policy Against Discrimination and Harassment | It's Your Yale.](#) Only a limited set of concerns, complaints and investigations is covered by the Policy. They all involve "Discrimination" or "Harassment," as carefully defined by the Policy.

The Policy defines "Discrimination" as:

---

[8] The SAC alleges that Plaintiffs "entered into a binding contract, the Handbook," when they enrolled in "Fall 2019 and Fall 2020." *Id.* ¶ 85. Both enrollments predate the August 2021 Policy.

11

treating an individual adversely in University admissions or in the conduct of educational programs or employment *based on sex, sexual orientation, gender identity or expression, race, color, national or ethnic origin, religion, age, disability, status as a special disabled veteran, veteran of the Vietnam era or other covered veteran, or membership in any other protected classes as set forth in Connecticut and federal law ("protected characteristics").*

*Id.* It defines "Harassment" as:

subjecting an individual to objectively offensive, unwelcome conduct *based on any of the protected characteristics*, when such conduct (i) is severe, persistent, or pervasive and (ii) has the purpose or effect of unreasonably interfering with the individual's work, academic performance or participation in university activities or creates an intimidating or hostile environment.  Harassment may be found in a single severe episode, as well as in persistent behavior.  Harassment is evaluated using a "reasonable person" standard.

*Id.* And it defines "Retaliation" as:

any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation *pursuant to this policy*. Retaliation includes conduct that would discourage a reasonable person from engaging in activity protected under this policy.  Retaliation may be present even where there is a finding of "no responsibility" on the underlying allegations of Discrimination or Harassment.  Retaliation does not mean good faith actions lawfully pursued in response to a report of Discrimination or Harassment.  In determining whether an act constitutes Retaliation, the context of the act will be considered, including the individual's exercise of free expression in accordance with Yale's free expression policies.

*Id.*

The Policy aims to combat "Discrimination, Harassment, and Retaliation." *Id.* It prohibits Retaliation to ensure that the protections against Discrimination and Harassment are not undermined by retaliation against those who report, complain of, or participate in an investigation of Discrimination or Harassment, even if the reported Discrimination or Harassment is ultimately found not to have occurred. To that end, the Policy's definition of Retaliation notes that "Retaliation may be present even where there is a finding of 'no responsibility' on the *underlying allegations of Discrimination or Harassment*." *Id.*  In short, the Policy's prohibition on Retaliation concerns only retaliation against those involved in reports of

Discrimination or Harassment. The Policy nowhere suggests it addresses retaliation for other issues, unconnected to allegations of Discrimination or Harassment.

Contracts are interpreted according to the "ordinary meaning" of their words, with the contract "construed as a whole and in such a manner as to give effect to every provision, if reasonably possible." *Peter-Michael, Inc. v. Sea Shell Assocs.*, 709 A.2d 558, 561 (Conn. 1998). Here, the Policy defines "Retaliation" to mean retaliation in response to complaints of discrimination or harassment based on a "protected characteristic" identified in the Policy, such as race or sex.

Plaintiffs do not claim that Defendants retaliated against them because Plaintiffs "reported a concern, filed a complaint, and/or participated in an investigation" regarding "protected characteristics." *Id.*[9] They do not allege that they reported a concern, filed a complaint, or participated in an investigation concerning adverse treatment or objectively offensive conduct relating to a protected characteristic like race or sex. To be sure, the SAC repeatedly invokes generic harassment, alleging that the "dossier" circulated by another student subjected them to "harassment" and that they complained about that harassment to Defendants. SAC ¶¶ 53, 57, 65-66, 75, 85, 91. But none of those allegations refer to Harassment as defined in the Policy: "subjecting an individual to objectively offensive, unwelcome conduct *based on any of the protected characteristics*." 9000 Yale University Policy Against Discrimination and

---

[9] The SAC never alleges that Eldik retaliated against Plaintiffs; he is not even alleged to have shared the "dossier" with the Professor. The breach of contract claim against him fails on this basis too. Moreover, the breach of contract claim cannot survive against any of the individual Defendants. There is no basis for holding individual university administrators accountable for alleged breaches of a contract between a student and a university. While Connecticut law recognizes that the "basic legal relation between a student and a private university or college is contractual in nature," *Doe*, 404 F. Supp. 3d at 667, that contract is *between the student and the university*, not between the student and individual administrators or professors.

Harassment | It's Your Yale (attached as Exhibit 1-A).  The Policy defines "protected characteristics" clearly and comprehensively: "sex, sexual orientation, gender identity or expression, race, color, national or ethnic origin, religion, age, disability, status as a special disabled veteran, veteran of the Vietnam era or other covered veteran, or membership in any other protected classes as set forth in Connecticut and federal law." *Id.*  Because Plaintiffs do not (and could not) allege that they were subjected to objectively offensive, unwelcome conduct based on any of those protected characteristics, they have not alleged that they were subject to Harassment as defined in the Policy.

Instead, they allege that they complained to Defendants of behavior that could colloquially be characterized as harassment, but that does not fall within the definition of Harassment provided in the Policy. For example, they allege that they complained of harassment in the form of an "invasion of privacy," SAC ¶ 57, and of "false rumors being spread by other students," and of purported "lies and misrepresentations" in the "dossier," *see id.* ¶¶ 65–66. They claim (falsely) that they were retaliated against because they refused to state that a YLS professor was violating YLS rules. That is not a "protected characteristic[]," so the Policy does not aid them. The generic, undefined retaliation they allege bears no connection to the "Retaliation" carefully defined in the Policy. *See e.g.*, *id.* (complaining of retaliation due to "false rumors spread by other students" and purported "lies and misrepresentations"). In short, Plaintiffs' breach of contract claim has no basis in the language of the alleged contract.

> **3.      Plaintiffs do not allege they were retaliated against for reporting a concern, filing a complaint, or participating in an investigation.**

Plaintiffs also do not allege they were retaliated against because they complained of harassment, even if harassment were defined colloquially, instead of as a defined term in the Policy.  Plaintiffs allege that they were harassed, *see, e.g.*, SAC ¶ 57, that they complained to

Cosgrove and Eldik about the harassment, *see, e.g.*, *id.*, that their complaints were ignored, *see, e.g.*, ¶¶ 57–58, 65, and that Gerken and Cosgrove retaliated against them, *see, e.g.*, *id.* ¶¶ 70–72. But they do not claim the alleged retaliation occurred *because of* their complaints about harassment—they do not allege that Defendants approached the Professor, *see id.* ¶ 70, because Plaintiffs complained they were being harassed due to the circulation of the "dossier."

Rather, Plaintiffs explicitly and repeatedly allege they were retaliated against for an entirely different reason: their refusal to make a statement against Chua. The SAC straightforwardly states that Gerken and Cosgrove "approached the professor to presumably dissuade him from offering a Coker Fellowship to [Stubbs and Jackson] *because they refused to make statements against Chua*." *Id.* ¶ 87. And in introducing the SAC, they allege "[w]hen Plaintiffs refused" "to make knowingly and materially false statements in a formal complaint against Chua," "Gerken and Cosgrove retaliated by speaking with the professor and telling him that he should not hire [Stubbs and Jackson] because of their 'lack of candor,' despite Plaintiffs' steadfast refusal to lie to further the University's crusade against Chua"). *Id.* ¶¶ 7–8; *cf. id.* ¶ 71 ("The purpose of Gerken and Cosgrove's approach to the professor was to not only dissuade him from offering a Coker Fellowship to [Stubbs and Jackson], but to convince him that [Stubbs and Jackson] were lying about their interactions with Chua . . . ."). Allegations that Gerken and Cosgrove retaliated against Plaintiffs for not supporting accusations against Chua are not allegations of Retaliation as defined in the Policy. Retaliation "means any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation," [9000 Yale University Policy Against Discrimination and Harassment | It's Your Yale](#) (attached as Exhibit 1-A), not adverse action against a person who refused to further a "crusade against" a professor, SAC ¶ 8.

Plaintiffs offer one conclusory allegation to the contrary. They say Gerken and Cosgrove "approached the professor as retaliation for Plaintiffs [Stubbs and Jackson]'s reporting a harassing and defamatory report [the "dossier"]." *Id.* ¶ 5.  But this conclusory allegation contradicts the SAC's numerous more-specific allegations that Gerken and Cosgrove retaliated against Plaintiffs *because they would not speak out against Chua*.  Courts in the Second Circuit have consistently recognized that when a plaintiff's "own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *E.g.*, *Reid v. United States*, 2020 WL 3256331, at *6 (E.D.N.Y. June 15, 2020) (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993)); *Siddiqui v. Rocheleau*, 2019 WL 12239678, at *13 (D. Conn. May 15, 2019) (same); *see also Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (noting that a court need not accept as true "factual assertions that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice").  This Court should evaluate the breach of contract claim in light of the multiple specific factual allegations, not the one contradictory conclusory allegation. *See Hirsch*, 72 F.3d at 1095–96 (upholding dismissal where "attenuated allegations" supporting claim were contradicted "by more specific allegations in the Complaint").

## II.   Plaintiffs' Promissory Estoppel Claim Impermissibly Duplicates Their Contract Claim.

Plaintiffs' promissory estoppel claim fails because it impermissibly duplicates their breach of contract claim.  "Under the doctrine of promissory estoppel, Connecticut courts will enforce '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance . . . if injustice can be avoided only by enforcement of the promise.'" *Holcombe v.*

*Ingredients Solutions, Inc.*, 2019 WL 1383432, at *5 (D. Conn. Mar. 27, 2019) (quoting

*D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch.*, 520 A.2d 217, 221 (Conn. 1987)

(reversing an Appellate Court judgment that had upheld promissory estoppel claims)).  An

equitable claim for promissory estoppel claim can survive only if "there is no written contract."

*Miller Auto. Corp. v. Jaguar Land Rover N. Am.*, 2010 WL 3260028, at *8 (D. Conn. Aug. 12,

2010) (Burns, J.).

Plaintiffs' promissory estoppel claim is supported by a single allegation describing the

supposed promise: "Defendants made a clear and definite promise to [Stubbs and Jackson] that

they would not retaliate against them if they ever complained of harassment."  SAC ¶ 90. In fact,

the word "promise" does not appear anywhere in the SAC except ¶ 90 and ¶ 91 (which asserts

reliance on the promise). But this paragraph, asserting the alleged promise that Defendants

"would not retaliate against them if they ever complained of harassment," merely duplicates the

Policy provision prohibiting Retaliation. In other words, the promissory-estoppel promise is the

same as the breach-of-contract promise.  *Compare* SAC ¶ 90 ("Defendants made a clear and

definite promise to [Stubbs and Jackson] that they would not retaliate against them if they ever

complained of harassment.") *with id.* ¶ 85 (Stubbs and Jackson "entered into a binding contract,

the Handbook, with all members of Yale's community—whereby the administration explicitly

agreed not to retaliate against students who make harassment complaints."); *see also* 9000 Yale

University Policy Against Discrimination and Harassment | It's Your Yale (attached as Ex. 1-A

(defining terms). The SAC contains no allegation that any Defendant made any other promise to

any Plaintiff.  Plaintiffs' promissory estoppel claim therefore cannot stand.  *See Holcombe*, 2019

WL 1383432, at *7 (finding promissory estoppel claim failed as duplicative where plaintiff

sought "recovery under a theory of promissory estoppel for commitments she claims were

captured in an enforceable contract"). Without alleging a separate and distinct promise not covered in the contract they claim, Plaintiffs' promissory estoppel claim cannot survive.

To be sure, a plaintiff can maintain alternative claims for breach of contract and promissory estoppel "when there is an issue of whether the [written] agreement may be too indefinite as to allow for contract formation." *See Glazer v. Dress Barn, Inc.*, 873 A.2d 929, 963 (Conn. 2005). But Plaintiffs allege that the Policy constitutes an enforceable contract, *see* SAC ¶ 85, and Defendants agree, *see supra* at 8; *see also Burns v. Quinnipiac Univ.*, 991 A.2d 666, 673-74 (Conn. App. 2010) (finding that a university handbook formed part of the contract between the plaintiff law student and the defendant university). While Plaintiffs' breach of contract claim should be dismissed for the reasons given above in Part I, the *only* promise alleged in the SAC is the promise Yale ostensibly made in the Policy. Neither Yale nor any other Defendant is alleged to have made any other, independent promise. Accordingly, even if this Court finds (as it should) that the Policy did not exist when the events Plaintiffs complain of occurred, Plaintiffs' promissory estoppel claim has no basis.

Finally, and in any event, Plaintiffs' promissory estoppel claim cannot survive because it incorporates their breach of contract claim. *See* SAC ¶¶ 84-88 (alleging the existence of a contract and a breach of that contract); *id.* ¶ 89 (incorporating all prior allegations). While parties can plead breach of contract and promissory estoppel claims in the alternative, the alternative pleading of an equitable, quasi-contract claim "cannot be accomplished by the express incorporation of a claim of a breach of contract." *Michel v. Yale Univ.*, --- F. Supp. 3d ----, 2021 WL 2827358, at *9 (D. Conn. July 7, 2021) (finding the plaintiff failed to state a quasi-contract claim for unjust enrichment because he incorporated breach of contract allegations by reference into his unjust enrichment claim); *see also Miller*, 2010 WL 3260028, at *8 (holding that

18

"incorporating paragraphs describing an enforceable contract renders a promissory estoppel claim invalid").  Doing so "is not alternative pleading, but rather is internally and legally inconsistent within the count itself"; Plaintiffs thus "failed to assert a distinct, alternative cause of action." *See Michel*, 2021 WL 2827358, at *10.

### III.     Plaintiffs' Intentional Interference Claim Aails to State a Claim.

A plaintiff alleging a tortious interference claim must plead "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss."  *See Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 761 A.2d 1268, 1273 (Conn. 2000).  Plaintiffs do not allege a business relationship with any third party except for the Professor and do not allege that they suffered any actual loss as a result of Defendants' supposed interference.

#### A.     Plaintiffs do not allege an existing business relationship with anyone other than the Professor.

Plaintiffs plausibly allege a business relationship with the Professor.  But in alleging they "had a prospective relationship with Yale's professors and judges' chambers around the country," SAC ¶ 94, they ignore Connecticut law and offer only speculation.[10]

Connecticut law requires tortious interference claims to aver the specific business relationships that were allegedly interfered with.  "Tortious interference requires proof that a defendant intentionally interfered with. . . . a *specific* business relationship or relationships." *Baer v. New England Home Delivery Servs., LLC*, 2007 WL 3173701, at *3 (Conn. Super. Oct. 18, 2007).  "Courts have dismissed tortious interference with business expectancy claims when

---

[10] In addition, to the extent this claim is based on the sharing of the "dossier," it fails against Eldik, who is not alleged to have shared it with anyone.

plaintiffs fail to allege *specific opportunities or relationships* that the defendant has interfered with." *Kollar v. Allstate Ins. Co.*, 2017 WL 3222535, at *11 (D. Conn. July 27, 2017). "Simply put, the plaintiffs cannot establish a claim for tortious interference with a business expectancy with a third party that they cannot identify." *Callahan v. Callahan*, 2017 WL 3332743, at *2 (Conn. Super. Ct. June 27, 2017).

Other than the Professor, Plaintiffs do not identify any specific relationships. Instead, they sweep broadly, alleging that they "had a prospective relationship with Yale's professors and judges' chambers around the country." SAC ¶ 94. That is a categorical allegation, and it does not meet the requirement that a plaintiff "identify" the "specific" person or organization whose relationship a defendant allegedly interfered with. Plaintiffs' allegation mirrors the deficient allegations of the plaintiff in the recent case of *Michalsky v. Moffly Publications, Inc.*, 2020 WL 5537003 (Conn. Super. Aug. 13, 2020). There, a former employee alleged his former employers retaliated against him by firing him "and falsely asserting that he was being fired for cause, as a fraudulent and oppressive effort to interfere with his ability to get a new job." *Id.* at *1. The plaintiff also alleged "that he will have job applications and he will have interviews and the false termination for cause will be communicated." *Id.* at *11. The court struck the plaintiff's interference claim because the plaintiff had failed to "allege a specific business relationship and an actual false communication to that prospective employer," and had also failed to allege that any such specific "relationship has actually been interfered with." *Id.*; *see also One Barberry Real Estate Holding, LLC v Maturo*, 2021 WL4430599, at *24 (D. Conn. Sept. 27, 2021) (dismissing a claim for tortious interference because plaintiffs failed to "identify a specific relationship or opportunity that Defendants caused them to forego").

Accordingly, the only specific relationship that satisfies this requirement is Plaintiffs' relationship with the Professor. Plaintiffs' tortious interference claim directed at their speculative relationships with every judge in the United States and every professor at YLS should be dismissed.

### B.    Plaintiffs do not adequately allege actual loss.

Plaintiffs' tortious interference claim should also be dismissed in its entirety—including as to their relationship with the Professor—because they fail to plausibly allege actual loss. "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss," "it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss." *Am. Diamond Exch. v. Alpert*, 28 A.3d 976, 986 (Conn. 2011).  That requires a plaintiff to plead "the pecuniary loss to the plaintiff"; "it is essential to a cause of action for unlawful interference with business that it appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." *Kelly v. Kurtz*, 219 A.3d 948, 967 (Conn. App. 2019); *Golek v. Saint Mary's Hosp., Inc.*, 34 A.3d 452, 462 (Conn. App. 2012) (affirming holding that plaintiff failed to prove actual loss and rejecting a "claim that an allegation of damage to his professional reputation suffices to establish actual loss"). Courts appropriately dismiss tortious interference claims that inadequately plead actual loss. *See, e.g.*, *Summerhill v. City of Meriden*, 2012 WL 1004298, at *3 (striking tortious interference claim for failure to "allege any supporting facts" on actual loss); *Deutsch v. Backus Corp.*, 2011 WL 522849, at *8 (Conn. Super. Ct. Jan. 14, 2011) (concluding "plaintiff has not alleged facts legally sufficient to state a tortious interference with business expectancies cause of action" because plaintiff "failed to state with legal sufficiency that the defendants tortiously interfered in his business relationships with his patients because he has not alleged an actual loss").

21

Plaintiffs have not adequately alleged they suffered actual loss.  They allege they "lost the Coker Fellowship, and will potentially suffer further losses in the form of clerkships."  SAC ¶ 97. As to the Coker fellowships, the allegation of "lost" teaching assistant positions constitutes conclusory pleading, not the necessary factual averments of actual loss. They don't allege the Professor denied either of them a Coker fellowship, or that they even applied to the Professor for a Coker fellowship. They don't allege that any other professor denied them a Coker fellowship, or that they applied to other professors for the position.[11] They don't allege that, because they "lost" the fellowships, they made less money this year than they currently make in other jobs. In short, they plead no factually-based theory of actual loss.

The same is true for "losses in the form of clerkships." They speculate that they will "*potentially* suffer losses in the form of clerkships," but they don't allege what they *actually* lost. In fact, they admit they haven't even applied for clerkships, *id.* ¶ 11. These attenuated allegations are far from the concrete allegations of actual loss needed to state a claim of tortious interference.

## IV.    Plaintiffs' Defamation Claim Is Fatally Deficient.

Plaintiffs' defamation claim offers two theories, one based on allegations regarding the individual Defendants and one based on allegations regarding Bell's response to the filing of this lawsuit.  Neither states a claim. Both theories fail because Plaintiffs complain of non-actionable opinions, not facts. Moreover, the allegations on both theories lack the necessary specificity.

---

[11] They don't allege they didn't receive offers of Coker fellowships because they can't. *See supra* n.1 (implying Plaintiffs "lost" Coker fellowships in the sense that they chose not to accept them).

Finally, the defamation theory directed at Bell's statements cannot be attributed to Yale under the doctrine of respondeat superior.[12]

### A.     Plaintiffs complain of opinions, not facts.

To establish a prima facie case of defamation, a plaintiff must demonstrate that "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason v. Smolinski*, 125 A.3d 920, 947 (Conn. 2015). But "a defendant cannot be held liable for expressing a mere opinion." *NetScout Sys., Inc. v. Gartner, Inc.*, 223 A.3d 37, 47 (Conn. 2020).  A factual statement—also known as an "objective fact"—"relates to an event or state of affairs that existed in the past or present and is capable of being known." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 111 (1982). By contrast, an opinion—sometimes referred to as evaluative statement—"is a personal *comment* about another's conduct, qualifications or character that has some basis in fact." *Id.* Courts determining whether a statement is an evaluative opinion or a statement of objective fact examine three factors:

> (1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective meaning; (2) whether the nature and tenor of the actual language used by the declarant suggests a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification.

*Id.* at 49–50.  "Whether a statement is an assertion of a fact or an assertion of an opinion is a question of law." *Crismale v. Walston*, 194 A.3d 301, 313 (Conn. App. 2018).

### 1.     Plaintiffs do not allege that Gerken and Cosgrove made defamatory factual statements when sharing the "dossier."

---

[12] Neither theory implicates Eldik, who is not alleged to have shared the "dossier" or offered comments about Plaintiffs' lawsuit to the press.

Plaintiffs allege Gerken and Cosgrove shared the marked-up copy of the "dossier" "to show where Cosgrove *believed* that Stubbs and Jackson were lying," SAC ¶ 72, and otherwise convince the Professor that Stubbs and Jackson "were lying about their interactions with Chua, making them untrustworthy and unsuited for employment," *id.* ¶ 71.

In other words, Plaintiffs complain that Gerken and Cosgrove *believed* that they were lying and showed the Professor parts of the "dossier" that they thought supported their belief in Plaintiffs' lack of candor. Those are textbook opinion statements, not statements of fact. Plaintiffs essentially contend that Gerken and Cosgrove had no right to express their opinions about Plaintiffs' candor and suitability for a Coker fellowship; in other words, they had no right to *evaluate* Plaintiffs statements and draw their own subjective conclusions. That position contravenes Connecticut law. An earlier case brought by a student against Yale is instructive. In *Johnson v. Schmitz*, 119 F. Supp. 2d 90 (D. Conn. 2000), a Yale graduate student sued Yale and two Yale faculty members, alleging that the professors defamed him by stating (in a meeting with other professors) that the student's "ideas were ridiculous and unoriginal" and that the student "did not have what it took to write a thesis and be awarded a Ph.D." *See id.* at 101–02. Noting that "the law protects even exaggerated or hyperbolic language of opinion," *id.* at 101, Judge Arterton easily concluded that the statements were "merely expressions of opinion" under Connecticut law, *id* at 102. The plaintiff argued that the opinion statements were not protected because the defendants did not "actually believe[] the truth of the criticisms they made of" him, but the court rejected that argument, noting that even "a false opinion is not actionable under defamation law." *Id.* The gravamen is whether a plaintiff has pleaded defamatory statements that have "a *factual* basis." *See id. ; see also CSL Silicones, Inc. v. Midsun Grp., Inc.*, 301 F. Supp. 3d 328, 376 (D. Conn. 2018) (dismissing a defamation claim based on a sued party's statement of

belief as a "non-actionable statement[] of opinion"); *Cassidy v. Lawson*, 2005 WL 2508593, at

*5 (D. Conn. Sept. 29, 2005) (finding the defendant's statement about the plaintiff's

"motivations" was a "protected expression of pure opinion"); *cf. Levin v. McPhee*, 119 F.3d 189,

197 (2d Cir. 1997) ("When the defendant's statements, read in context, are readily understood as

conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not

fact.") (applying materially identical New York law); *Rodriguez v. Am. Friends of the Hebrew*

*Univ., Inc.*, 1998 WL 146227, at *8-9 (S.D.N.Y. Mar. 25, 1998) (finding no defamation under

New York law where the defendant "deliberately disparaged plaintiff's performance" so that she

would get fired, because such disparagement constituted a statement of opinion).

Here, the SAC acknowledges that Cosgrove and Gerken "believed" the evaluative

opinions they allegedly shared with the Professor: that Plaintiffs were lying and their lack of

candor made them unsuited to serve as Coker fellows. The SAC does not allege that Gerken and

Cosgrove made any statements of objective fact, as opposed to evaluative opinion statements.

Other than the allegations relating to the sharing of the "dossier" in Paragraphs 70-72, the

only statement in the SAC potentially applicable to the defamation theory arising from Gerken

and Cosgrove's alleged actions is an assertion that "Defendants shared and stated numerous false

statements defaming Sierra and Gavin to third parties." SAC ¶ 99. While it reiterates the

allegation of the sharing of the "dossier," the paragraph does not offer any other factual

allegations, and so fails to satisfy *Iqbal* and the basic requirements of defamation pleading.[13]

---

[13] *See Stevens v. Helming*, 135 A.3d 728, 732 n.3 (Conn. App. 2016) ("A complaint for
defamation must, on its face, specifically identify what allegedly defamatory statements were
made, by whom, and to whom."); *Berry*, 2018 WL 1749970, at *5  (dismissing a defamation
count that alleged a defendant "defamed the plaintiff by saying and/or inferring that the plaintiff
was a threat or menace to children" as insufficiently specific); *Devone v. Finley*, 2014 WL
1153773, at *8 n.3 (D. Conn. Mar. 20, 2014) (finding that Rule 8(a) requires a plaintiff to allege
"the detail necessary for a court to determine which statements were allegedly defamatory.");

**2.      Plaintiffs do not allege that Bell's alleged statements to the press are actionable statements of objective fact.**

Plaintiffs allege Bell defamed them by mischaracterizing their lawsuit. They say she:

- accused them "of bringing their suit not to seek a remedy for wrongs, but out of improper motivations and intentions," SAC ¶ 80;
- accused them of "acting with the sole intent of disrupting Yale's process of considering whether to reappoint Gerken as Dean of [YLS] with press attention," *id.* ¶ 81; and
- told the *Yale Daily News* that Plaintiffs filed this lawsuit to "cause a stir," and do not "think they can win," *id.* ¶ 82.

Those allegations are incorporated in the single paragraph of the defamation count referring to Bell, which states that "Yale, through Bell, also shared and stated that Plaintiffs, by pursuing this litigation, have the sole intention of generating media attention to interfere with Gerken's potential reappointment as Dean . . . ." *Id.* ¶ 100.[14] None of these allegations state a claim for defamation.

"Courts in [Connecticut] and others, as well as federal courts, have consistently determined that characterizing a lawsuit as frivolous, foolish or in some other derogatory manner constitute matters of opinion."  *See, e.g.*, *Traylor v. Parker*, 2016 WL 5003981, at *4 (Conn. Super. Aug. 4, 2016); *Stevens v. Helming*, 2014 WL 3805495, at *9 (Conn. Super. June 23, 2014) (finding a statement that "could be reasonably understood to speculate on the probable outcome of a hypothetical litigation" was a "speculative statement [that] does not give rise to defamation liability"); *cf. Dunbar v. Omnicom Grp., Inc.*, 2021 WL 633732, at *15 (D. Conn. Feb. 18, 2021) (finding that "press statements, released by parties to commercial litigation, and/or statements by a litigant condemning an opponent's legal claims as baseless, frivolous, or

---

*Learning Care Grp., Inc. v. Armetta*, 2014 WL 12651264, at *7 (D. Conn. Sept. 30, 2004) ("[A] defamation complaint must at least plead the content of the alleged communications, when they were made, the context in which they were made, or by and to whom they were made to satisfy the requirements of notice pleading.").

[14] All four paragraphs seem to refer to statements to the *Yale Daily News*. *See* Two students sue Yale Law administrators for alleged retaliation in Amy Chua case - Yale Daily News.

without merit are non-actionable opinions, and therefore not libelous or defamatory, as a matter of law"). Bell's alleged statements that Plaintiffs had "improper motivations and intentions," that they aimed to disrupt the YLS process of reappointing Dean Gerken, and that they filed the suit to gain publicity, not to win, are all non-actionable opinions under Connecticut law.

**B.      Yale is not responsible for Professor Bell's alleged commentary.**

Plaintiffs' defamation theory arising out of Bell's alleged statements fails for a second reason: her actions can't be imputed to Yale under the doctrine of respondeat superior.[15] Connecticut courts have "long adhered to the principle that in order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business." *See A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 579 A.2d 69, 73 (Conn. 1990). In determining whether an employee has acted within the scope of her employment, "courts look to whether the employee's conduct: (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer." *Harp v. King*, 835 A.2d 953, 974 (Conn. 2003). Unless an employee was at least partly motivated to serve her employer, the employer is not liable. *A-G Foods*, 579 A.3d at 74.

The SAC contains no factual allegations satisfying those elements. It does not allege Bell's duties as a professor at Yale, whether she was engaged in those duties when she allegedly defamed Plaintiffs, or how her supposedly defamatory statements to the *Yale Daily News* aimed to serve her employer. *See Williams v. Freije*, 2011 WL 6976570, at *3 (Conn. Super. Dec. 15,

---

[15] Plaintiffs' defamation claim is brought against all Defendants. While they allege Yale is responsible for Bell's allegedly defamatory statements, *see, e.g.*, Compl. ¶ 100, they do not allege that Gerken, Cosgrove, or Eldik are responsible for Bell's statements. That provides an independent basis for dismissal of the defamation theory based on Bell's comments as against the individual Defendants.

2011); *see also Doe v. Danbury Hosp.*, 2021 WL 402055, at *3 (Conn. Super. Jan. 12, 2021) (dismissing claims alleged under a vicarious liability theory because the plaintiff offered "no factual allegations" that the defendant's "actions were intended in any way to advance the interests" of her employer). Instead of offering any factual allegations to support a theory of respondeat superior, Plaintiffs offer a bit of laconic ipse dixit: Bell's conduct was allegedly committed by "Yale, through Bell."  SAC ¶ 100.  That's about as "[t]hreadbare" as an allegation can be. *Iqbal*, 556 U.S. at 678.

## V.     Plaintiffs' Unreasonable Publicity and False Light Claims Are Baseless.

Plaintiffs' unreasonably publicity and false light claims (the "Privacy Claims") are both necessarily based on Gerken and Cosgrove's presentation of the marked-up "dossier" to the Professor, *see* SAC ¶ 72, which is the only factual allegation in the SAC concerning the sharing of private facts about the Plaintiffs with any third party.[16] The Privacy Claims themselves merely assert the elements of the causes of action. *See id.* ¶ 108 (unreasonable publicity) ("Defendants broadcast matters concerning the private lives of [Plaintiffs] that would be highly offensive to a reasonable person"); *id.* ¶ 112 (false light) ("Defendants have placed [Plaintiffs] in a false light which would be highly offensive to a reasonable person"). Both Privacy Claims fail because Plaintiffs do not allege the "dossier" was ever publicized.  The unreasonable publicity claim also fails because the contents of the "dossier" were not private when the "dossier" was shared with the Professor and it contains matters of legitimate public concern.

### A.     The unreasonable publicity and false light claims fail because Plaintiffs do not allege that Defendants shared the "dossier" with more than one person.

---

[16] Eldik is not alleged to have shared the "dossier" with anyone, so these claims against him fail.

Connecticut tort law protects privacy interests with four doctrines, two of which are the torts of unreasonable publicity and false light. *Foncello v. Amorossi*, 931 A.2d 924, 929 (Conn. 2007). They have similar elements.  An unreasonable publicity claim requires showing "public disclosure of any matter that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Perkins v. Freedom of Info. Comm'n*, 635 A.2d 783, 790 (Conn. 1993). A false light claim requires showing "that the false light in which she was placed would be highly offensive to a reasonable person, and the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which she would be placed." *Borg v. Cloutier*, 239 A.3d 1249, 1268 (Conn. App. 2020).  "The essence" of a false light claim is "the matter published concerning the claimant (1) is not true and (2) is such a major misrepresentation of her character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable person in her position." *Id.*

Both claims require public disclosure. *See Goguen v. Brezniak*, 2021 WL 4895129, at *6-7 (Conn. Super. Sept. 21, 2021) (striking an unreasonable publicity claim because the plaintiff failed to allege the defendant publicly made the statement at issue, finding "the defendant's statement is not a public statement made for general consumption, but rather the equivalent of office gossip"); *Berry v. Zalon*, 2018 WL 1749970, at *4 (Conn. Super. Mar. 8, 2018) (striking a false light claim because the plaintiff did not sufficiently allege "the element of publicity"). Consistent with both torts' origins in the Restatement,[17] Connecticut courts draw the definition of "publicity" from the Restatement.  *See Kuselias v. Niederkohr*, 2021 WL 4775623, at *3 (Conn. Super. Sept. 17, 2021). That definition, found in Section 652D of the Restatement, applies to

---

[17] *Perkins* drew the unreasonable publicity elements from Section 652D of the Restatement (Second) of Torts**.**  *Perkins*, 635 A.2d at 789-90**.** The false light elements were adopted from section 652E.  *See Goodrich*, 448 A.2d at 1330 (Conn. 1982).

both false light claims and unreasonable publicity claims. *Berry*, 2018 WL 1749970, at \*4. As defined there, "publicity" means

> that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. Thus, it is not an invasion of the right of privacy to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

*Id.* (quoting Restatement (Second) of Torts § 652D cmt. a (1977)). Indeed, "publicity can only involve communication that is made *in public*." *Kuselias*, 2021 WL 4775623, at \*3. Ultimately, "[u]nlike the limited publication required to state a claim for defamation, the publicity element . . . requires publication . . . to the public at large or to so many persons as to make it substantially certain that the matter will become public knowledge." *Grigorenko v. Pauls*, 297 F. Supp. 2d 446, 448 (D. Conn. 2003) (collecting cases).

Plaintiffs do not allege that any Defendant published the "dossier" to the public at large. They allege only that Gerken and Cosgrove shared a marked-up copy of the "dossier" with *one person*: the Professor. *See* SAC ¶ 72. It "is not an invasion of the right of privacy to communicate a fact concerning the plaintiff's private life to a single person." *Berry*, 2018 WL 1749970, at \*4 (quoting Restatement (Second) of Torts § 652D cmt. a). While Plaintiffs allege the "dossier" was "circulate[d] among the [YLS] student body," SAC ¶ 52, they do not allege that any *Defendant* circulated it or shared it with anyone other than the Professor, in a private meeting. Plaintiffs thus fail to satisfy the "publicity" element for both Privacy Claims.

### B.   The unreasonable publicity claim also fails because the contents of the "dossier" were not private when shared.

Plaintiffs' unreasonable publicity claim also fails because by the time Gerken and Cosgrove allegedly shared the "dossier" with the Professor, it had already been spread through the law school grapevine. An "essential question" with regard to unreasonable publicity claims

"is whether the [claimant] alleges that the matter publicized concerned his 'private life.'" *See Rizzitelli v. Thompson*, 2010 WL 3341516, at *6 (Conn. Super.  Aug. 2, 2010).  But there "is no liability when the defendant merely gives further publicity to information about the plaintiff *that is already public*."  Restatement (Second) of Torts § 652D cmt. b.

When Cosgrove and Gerken allegedly shared the "dossier" with the Professor, its contents had already been made public.  Indeed, Plaintiffs allege the "dossier" "had begun to circulate among the [YLS] student body" in "late April 2021." SAC ¶ 52. While Plaintiffs do not specify the date on which Cosgrove and Gerken shared it with the Professor, the timeline set forth in the SAC makes clear that they allege Cosgrove and Gerken shared the "dossier" *after* it was already circulating at YLS.  Only after the "dossier" began to circulate did Cosgrove and Eldik contact Plaintiffs concerning it, *id.* ¶ 53, and only after Cosgrove, Eldik, and Gerken allegedly pressured Plaintiffs to issue a statement against Chua did Cosgrove and Gerken allegedly approach the Professor with the marked-up "dossier," *see id.* ¶ 70; *see generally id.* ¶¶ 53–70 (detailing the days-long conversations between Plaintiffs and Cosgrove, Eldik, and Gerken concerning the "dossier").  At most, Cosgrove and Gerken gave "further publicity to information about [Plaintiffs] that [was] already public." Restatement (Second) of Torts § 652D cmt. b.  The unreasonable publicity claim thus fails for this additional reason. *See Glatzel v. Brittle*, 2010 WL 4620975, at *2-3 (Conn. Super. Oct. 25, 2010) (finding "all of the information republished by the defendants . . . was previously made public" and holding that the plaintiff failed to plead a claim for unreasonable publicity).

### C.  The unreasonable publicity claim also fails because the contents of the "dossier" have attracted great public interest.

"When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy."  Restatement (Second) of Torts § 652D cmt. d.  Plaintiffs themselves allege

31

that the "dossier" was of legitimate public concern: "The Dossier eventually gained such wide

circulation that it became the subject of investigative reporting from news outlets including *The

New Yorker*, *The New York Times*, and *The Atlantic*." *See* SAC ¶ 47.

Press coverage went far beyond the examples Plaintiffs cite. *See, e.g.*, Lizzie

Widdicombe, *What is Going On at Yale Law School?*, The New Yorker (June 19, 2021),

www.newyorker.com/news/annals-of-education/what-is-going-on-at-yale-law-school; Dahlia

Lithwick & Susan Matthews, *Meltdown at Yale Law*, Slate (May 15, 2021, 3:45 PM),

www.slate.com/news-and-politics/2021/05/amy-chua-yale-law-school-dinner-parties.html;

Sarah Lyall & Stephanie Saul, *Gripped by 'Dinner Party-gate,' Yale Law Confronts a Venomous

Divide*, N.Y. Times (June 7, 2021), www.nytimes.com/2021/06/07/us/amy-chua-yale-law.html

(discussing the backdrop of this case, which "has been adjudicated all over social media and

picked up in outlets ranging from The Chronicle of Higher Education to Fox News"); *see also*

Philip Mousavizadeh, *Law Student Received Coker Fellowship, Undermining Case Against Law

School*, Yale Daily News (Dec. 2, 2021, 1:16 AM),

https://yaledailynews.com/blog/2021/12/02/law-student-received-coker-fellowship-undermining-

case-against-law-school/ (reporting that Stubbs received a Coker fellowship); David Lat, *The

Yale Law School Scandals: Dean Heather Gerken Speaks*, Original Jurisdiction (Nov. 18, 2021),

https://davidlat.substack.com/p/the-yale-law-school-scandals-dean ("[I]n case the significance of

this is still unclear, this is not only the lesson being taught to the future lawyers of America, but

to the future holders of high office who will be positioned to make decisions that will affect a

nation and its citizens.").[18]

---

[18] This Court can take judicial notice of the fact of the publications, though not of the reported facts. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *see also Lawrence v. Altice USA*, 2020 WL 108980, at *1 (D. Conn. Jan. 9, 2020) ("Courts may take

**VI.     Plaintiffs' IIED claim Does Not Pass Muster.**

Plaintiffs' IIED claim, which stems from Gerken and Cosgrove's supposed "retaliation,"

*see* SAC ¶ 116, must also fail.  A plaintiff alleging an IIED claim must show:

> (1) that the actor intended to inflict emotional distress or that he knew or should
> have known that emotional distress was the likely result of his conduct; (2) that
> the conduct was extreme and outrageous; (3) that the defendant's conduct was the
> cause of the plaintiff's distress; and (4) that the emotional distress sustained by
> the plaintiff was severe.

*Appleton v. Bd. of Educ.*, 757 A.2d 1059, 1062 (Conn. 2000).  Plaintiffs' claim fails for two

separate reasons: it does not allege that Gerken and Cosgrove engaged in "extreme and

outrageous" conduct, or that Plaintiffs have suffered "severe" emotional distress.

**A.     Gerken and Cosgrove's alleged conduct was not extreme and outrageous.**

IIED claims:

> are often pleaded but rarely get very far because liability for this intentional tort
> has been found "only where the conduct has been so outrageous in character, and
> so extreme in degree, as to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a civilized community."

*Grigorenko*, 297 F. Supp. 2d at 449 (quoting *Appleton*, 757 A.2d at 1062). Whether conduct is

"extreme and outrageous" is a "question, in the first instance, for the court."  *Watkins v. City of*

---

judicial notice of facts not subject to reasonable dispute either because they are generally known
in the relevant community or can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned."). Such publicly available documents include news
articles, which can be noticed "for the fact of their publication."  *E.g.*, *HB v. Monroe Woodbury
Cent. Sch. Dist.*, 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012); *accord Pension Comm. of
the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 175-76
(S.D.N.Y. 2006) ("Courts may . . . take judicial notice of . . . press articles, for the fact of their
publication."); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425
n.15 (S.D.N.Y. 2003) ("The Court may take judicial notice of newspaper articles for the fact of
their publication without transforming the motion into one for summary judgment."). Taking
judicial notice of the publications does not mean taking judicial notice of the facts reported.
Defendants take issue with several of the facts reported and opinions offered in the publications.

*Waterbury Bd. of Educ.*, 2020 WL 1184783, at *3 (D. Conn. Mar. 11, 2020); *accord Tracy v. New Milford Pub. Schs.*, 922 A.2d 280, 286 (Ct. App. 2007).

The bar for extreme and outrageous conduct is high.  "Connecticut courts have been reluctant to allow claims for intentional infliction of emotional distress . . . and in applying Connecticut law, federal courts in this District have interpreted the extreme and outrageous requirement strictly." *Saliga v. Chemtura Corp.*, 2015 WL 5822589, at *21 (D. Conn. Oct. 1, 2015); *see also Alleva v. Stamford Health Grp.*, 2019 WL 3248816, at *3 (Conn. Super. June 6, 2019) ("With respect to claims of intentional infliction of emotional distress, [Connecticut] appellate courts have set a high and sometimes seemingly insurmountable hurdle.") (citing *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 126 (Conn. 2003); *Di Terisi v. Stamford Health Sys., Inc.*, 63 A.3d 1011, 1020-22 (Conn. App. 2013)).

Plaintiffs do not clear that high bar. Their claim stems from Gerken and Cosgrove approaching the Professor with a marked-up copy of the "dossier" "to show where Cosgrove *believed* that [Plaintiffs] were lying."  *See* SAC ¶ 72 (alleging details concerning Gerken and Cosgrove's meeting with the Professor), ¶ 116 (tying their IIED claim to this meeting).[19]  This conduct is not extreme or outrageous.  Plaintiffs acknowledge that Cosgrove "believed" what she allegedly said.  *See Cerejo v. Cerejo*, 2012 WL 3089772, at *6 (Conn. Super. June 29, 2012) (making allegations that are "honestly believed to be true" does "not amount to extreme and outrageous conduct"). Moreover, even attempts to "destroy [a person's] professional reputation and career" in a manner far more insidious than Plaintiffs allege here are not extreme and outrageous under the IIED doctrine.  *See Garfinkle v. Jewish Family Serv. of Greater Hartford,*

---

[19] Eldik is not alleged to have participated in the meeting. While Plaintiffs allege he said the "dossier" would "likely end up in 'every judges' chambers,'" they do not say he shared the "dossier" with anyone or threatened to. SAC ¶ 59. The claim against him should be dismissed.

*Inc.*, 2020 WL 8264101, at *6 (Conn. Super. Dec. 15, 2020) ("Even the allegations that the defendants conspired with the Claims Conference in an attempt to force JCS Florida to terminate the plaintiff and destroy his professional reputation and career, are insufficient to allege a cause of action for intentional infliction of emotional distress."); *Gillians v. Vivanco-Small*, 15 A.3d 1200, 1204 (Conn. App. 2011) (finding that a "concerted effort to remove an employee . . . does not constitute outrageous conduct" even where the plaintiff alleged "defendants vindictively conspired to terminate the plaintiff's employment" in retaliation for filing a grievance); *Grigorenko*, 297 F. Supp. 2d at 448-49 (finding an allegation by a Yale School of Medicine (YSM) professor that two faculty colleagues wrote a letter to the YSM Dean accusing her of plagiarism and misrepresenting evidence could not "reasonably be characterized as extreme and outrageous.").

    **B.**    **Plaintiffs do not plausibly allege they suffered severe emotional distress.**

    In addition to not alleging extreme and outrageous conduct, Plaintiffs have not plausibly pled severe emotional distress.  They allege that Defendants' actions caused them "insomnia, anxiety, nausea, and loss of appetite," SAC ¶ 117, as well as "pain and suffering, inconvenience and loss of enjoyment of life," *id.* ¶ 118.  But these allegations, devoid of "factual amplification," *Arista Records*, 604 F.3d at 120, do not make their IIED claim plausible. Connecticut law requires more than a list of alleged ailments. "Emotional distress is unlikely to be considered severe in the absence of treatment, medical, psychological, or otherwise." *Maselli v. Reg'l Sch. Dist. No. 10*, 235 A.3d 599, 617 (Conn. App. 2020). And Plaintiffs do not allege they sought medical treatment for the alleged ailments, or that the ailments lasted for an extended period. *See, e.g.*, *Perez-Dickson v. City of Bridgeport*, 43 A.3d 69, 102 (Conn. 2012) ("There was no evidence that the plaintiff was in distress for an extended period or that she sought medical

treatment.").  In short, Plaintiffs do not allege they suffered the severe emotional distress required for an IIED claim to survive a motion to dismiss.

## CONCLUSION

For the reasons above, the Court should dismiss the SAC in its entirety.

**DEFENDANT YALE UNIVERSITY**

*/s/ Jonathan Freiman*
Jonathan M. Freiman (ct24248)
Paul A. Tuchmann (ct8018)
Wiggin and Dana LLP
One Century Tower
265 Church Street
PO Box 1832
New Haven, CT 06508-1832
jfreiman@wiggin.com
ptuchmann@wiggin.com
Tel.: (203) 498-4400
Fax: (203) 782-2889

490\301\4870-7267-5598.v3

36