John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (212) 374-5401
Facsimile:      (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs*

Andrew B. Bowman
**LAW OFFICES OF ANDREW B. BOWMAN**
1804 Post Road East
Westport, Connecticut 06880
Telephone:   (202) 259-0599
andrew@andrewbowmanlaw.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **SIERRA STUBBS** and **GAVIN JACKSON,** | Case No. 3:21-cv-01525 |
| Plaintiffs, | |
| – against – | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| **HEATHER GERKEN, ELLEN COSGROVE, YASEEN ELDIK,** and **YALE UNIVERSITY** | |
| Defendants. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

LEGAL STANDARD ......................................................................................................... 14

I.  PLAINTIFFS HAVE PLEADED A BREACH OF CONTRACT CLAIM UNDER
CONNECTICUT LAW ............................................................................................... 14

    A.  Under Connecticut Law, a Private University's Policies and Customs, Written
or Unwritten, Are Contractually Binding .................................................................... 14

    B.  Plaintiffs Have Stated a Violation of Yale's Anti-Retaliation Policy ................. 15

II.  PLAINTIFFS HAVE PLEADED A CLAIM FOR PROMISSORY ESTOPPEL IN THE
ALTERNATIVE ...................................................................................................... 20

III. PLAINTIFFS' HAVE PLEADED AN INTENTIONAL INTEREFERENCE CLAIM 21

    A.  Plaintiffs Have Alleged a Specific Business Relationship ................................... 21

    B.  Plaintiffs Have Alleged an Actual Loss .................................................................. 23

IV. PLAINTIFFS HAVE PLEADED A DEFAMATION CLAIM ..................................... 24

    A.  Defendants Presented their Statements as a Fact—Not Simply as Opinions ... 25

    B.  Bell's Defamatory Statements, as Alleged, Were Made on the Behalf of Yale .. 27

V.  PLAINTIFFS HAVE PLEADED UNREASONABLE PUBLICITY AND FALSE
LIGHT CLAIMS ...................................................................................................... 28

VI. PLAINTIFFS HAVE PLEADED A CLAIM FOR INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS .......................................................................................... 29

    A.  Gerken and Cosgrove's Alleged Conduct Was Extreme and Outrageous ........ 29

    B.  Plaintiffs Have Alleged Severe Emotional Distress ............................................. 31

## TABLE OF AUTHORITIES

**Cases**

*Goel v. Bunge, Ltd.,*
    820 F.3d 554 (2d Cir. 2016) ..................................................... 14

*A-G Foods, Inc. v. Pepperidge Farm, Inc.,*
    579 A.2d 69 (Conn. 1990) ...................................................... 27

*Anthem Sports, LLC v. Under the Weather, LLC,*
    320 F. Supp. 3d 399 (D. Conn. 2018) .......................................... 21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................ 14

*Berry v. Loiseau,*
    614 A.2d 414 (Conn. 1992) ..................................................... 31

*Borg v. Cloutier,*
    239 A.3d 1249 (Conn. App. Ct. 2020) .......................................... 28

*Brookridge Funding Corp. v. Nw. Hum. Res., Inc.,*
    170 F. App'x. 170 (2d Cir. 2006) .............................................. 20

*Burns v. Quinnipiac Univ.,*
120 Conn. App. 311 (Conn. App. Ct. 2010) ......................................... 14

*Chiaravallo v. Middletown Transit Dist.,*
    No. 3:18-cv-1360 (SRU), 2021 WL 4310662 (D. Conn. Sept. 22, 2021) ............ 23

*Cox v. Galazin,*
    460 F. Supp. 2d 380 (D. Conn. 2006) .......................................... 24

*Deravin v. Kerik,*
    335 F.3d 195 (2d Cir. 2003) ................................................... 18

*Dunbar v. Omnicom Grp., Inc.,* ......................................................
    No. 3:19-cv-00956 (KAD), 2021 WL 633732 (D. Conn. Feb. 18, 2021) ............ 25

*Golek Saint Mary's Hosp., Inc.,*
    34 A.3d 452 (Conn. App. Ct. 2012) ............................................ 23

*Grigorenko v. Pauls,*
   297 F. Supp. 2d 446 (D. Conn. 2003) ................................................................... 28

*Harp v. King*, 835 A.2d 953 (Conn. 2003) ............................................................... 27

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.,*
   596 F. Supp. 2d 497 (D. Conn. 2009) ................................................................... 21

*Johnson v. Schmitz,*
   119 F. Supp. 2d 90 (D. Conn. 2000) ..................................................................... 14

*Kollar v. Allstate Ins. Co.,*
   No. 3:16-CV-01927 (VAB), 2017 WL 3222535 (D. Conn. July 27, 2017) ......................... 22

*Lynch v. City of New York,*
   952 F.3d 67 (2d Cir. 2020) ................................................................................. 14

*Michalsky v. Moffly Publ'n, Inc.,*
   No. FSTCV196042420S, 2020 WL 5537003 (Conn. Super. Ct. Aug. 13, 2020) ............... 23

*Osberg v. Yale Univ.,*
   No. CV085021879S, 2009 WL 659072 (Conn. Super. Ct. Feb. 11, 2009) ............. 14, 15, 19

*Perkins v. Freedom of Info. Comm'n,*
   635 A.2d 783 (Conn. 1993) ................................................................................. 28

*Pipkin v. Bridgeport Bd. of Educ.,*
   323 F. Supp. 2d 326 (D. Conn. 2004) ................................................................... 29

*Seitz v. J.C. Penney Props., Inc.,*
   No. 3:15-cv-01131 (VAB), 2017 WL 4316874 (D. Conn. Sept. 28, 2017) ........................ 20

*Shea v. City of Waterbury,*
   No. CV085007926, 2009 WL 1057986 (Conn. Super. Ct. Feb 20, 2009) ........................ 26

*Skakel v. Grace,*
   5 F. Supp. 3d 199 (D. Conn. 2014) ...................................................................... 24

*Stevens v. Helming,*
   No. CV116019393S, 2014 WL 3805495 (Conn. Super. Ct. June 23, 2014) ...................... 26

*Taylor v. Maxxim Med., Inc.,*
   No. 3:99CV338 AHN, 2000 WL 630918 (D. Conn. 2000) .......................................... 29

**Rules**

Fed. R. Civ. P. 8(a)(2) ........................................................................................................... 14

Fed. R. Civ. P. 8(d)(2) ........................................................................................................... 20

## PRELIMINARY STATEMENT[1]

Defendants Heather Gerken ("Gerken"), Ellen Cosgrove ("Cosgrove"), Yaseen Eldik ("Eldik"), and Yale University ("Yale") unlawfully targeted Plaintiffs Sierra Stubbs ("Sierra") and Gavin Jackson ("Gavin"), who are two students of color, to advance their ongoing campus-politics feud with a professor at Yale Law School. Defendants' Motion to Dismiss the Second Amended Complaint (Dkt. No. 36-1, the "Motion") should be denied and the action should proceed into discovery.

Gerkan and Cosgrove, who are two Yale Law School deans, and Eldik, a Director at Yale Law School, worked together to blackball Sierra and Gavin from post-graduate opportunities as retaliation *for refusing to lie* to support Yale's investigation of Professor Amy Chua ("Chua"). Defendants' extreme and outrageous conduct is not only impermissible under Connecticut law, but also a violation of Yale's own policies that supposedly endeavor to protect students.

First, Plaintiffs have alleged a breach of contract claim against all Defendants because Yale retaliated after Sierra and Gavin refused to make false statements against Chua. Under Connecticut law, a private university's policies and customs, written or unwritten, are contractually binding. Yale's anti-retaliation policy prohibits "any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy" (hereafter the "Anti-Retaliation Policy"). When Sierra and Gavin refused to lie to support the University's investigation,

---

[1] All capitalized terms are defined in Plaintiffs' Second Amended Complaint (Dkt. No. 30, "SAC"). Some terms are redefined herein for the Court's convenience.

Defendants began a retaliation campaign, which included attempting to dissuade a Yale Law School professor—who already employed Sierra and Gavin as research assistants—from offering Sierra and Gavin a Coker Fellowship, and disseminating a harassing and defamatory report (Dkt. No. 30-1, the "Dossier") about Sierra and Gavin. The Court should find that Plaintiffs have alleged a claim for breach of contract and a promissory estoppel claim in the alternative.

Second, Plaintiffs have alleged a defamation claim against all Defendants because Defendants presented the Dossier as factual evidence. While Defendants now couch their defamatory statements as "opinions," the circumstances and nature of Defendants' statement are clear: Defendants actively refused to investigate the specific allegations contained in the Dossier while disseminating the Dossier to members of the public and the Yale Law School community, including at least one professor. The Dossier provided, among other false statements, that Sierra and Gavin were serial liars who attended Chua's secret dinner parties with unnamed federal judges; that they had received illicit Coker Fellowship offers; and that they had not sought out "racial consolation" from Chua. After Sierra and Gavin—two law students who realized that Defendants' misconduct was harmful to their career as future lawyers—filed this suit, Professor Monica Bell ("Bell"), on behalf of Yale and the other Defendants, then falsely stated that Plaintiffs' suit was filed with the sole intent of tortiously interfering with Gerken's reappointment as the Dean of Yale Law School. Such a statement does not, in any way, qualify as mere speculation on the outcome of this litigation. The Court should find that Plaintiffs have alleged a claim for defamation.

Third, Plaintiffs have alleged a claim for intentional interference with prospective business relationships. Defendants' tortious interference began when they disseminated the defamatory Dossier to the public—while simultaneously threatening that it would end up in every judges' chambers if Sierra and Gavin applied for federal clerkships at any time in the future—and directly to at least one Yale Law School professor. Such interference effectively sabotaged Plaintiffs' ability to apply for clerkships. The Court should find that Plaintiffs have alleged a claim for intentional interference with prospective business relationships.

 Fourth, Plaintiffs have alleged claims for publicity and false light because Defendants broadcasted the Dossier—which concerns the private lives of Sierra and Gavin—to the public. The Dossier, which claims that Sierra and Gavin had "repeatedly lied" about their experience as students of color at Yale Law School and were supportive of and purposely benefiting from corruption, sexual harassment, and bigotry, is highly offensive to a reasonable person. Defendants, who refused to investigate the Dossier, had knowledge, or acted in reckless disregard by publicizing the Dossier. Plaintiffs have alleged claims for publicity and false light.

Fifth, Plaintiffs have alleged a claim for intentional infliction of emotional distress because Defendants' retaliatory conduct was extreme and outrageous and was designed to cause Sierra and Gavin severe emotional pain. Indeed, Defendants' conduct has caused such pain—such as emotional distress and anxiety—that is utterly intolerable for a school campus. The Court should find that Plaintiffs have alleged a claim for intentional infliction of emotional distress.

3

The Court should dismiss Defendants' Motion and the action should proceed into discovery.

## STATEMENT OF FACTS

*Yale Law School*

Like many top law schools, Yale Law School employs a limited grading scale and does not compute grade point averages, presumably in an attempt to encourage collegiality and collaboration among its students. (SAC ¶ 21.) Unlike other elite law schools, Yale Law School, which pioneered this model in the 1960s, takes the limiting grade scale to its current extreme. (*Id.* ¶ 22.) All first-term classes are ungraded, and subsequent classes have only three grades: Honors, Pass, and Low Pass. (*Id.* ¶ 22.) The Law School does not impose a mandatory curve on its professors. (*Id.* ¶ 22.) While this system protects what would otherwise be the bottom half of a law school class, it makes competition tight for its more traditionally ambitious students, who often seek competitive federal clerkships or other government jobs, and whose limited availability and competitive nature are considered highly prestigious and desirable. (*Id.* ¶ 23.) This system means that Yale Law School students are in high competition over non-grade signifiers of merit. (*Id.* ¶ 24.)

For students who entered Yale Law School in Fall 2019, as did Plaintiffs, this competition for non-grade signifiers of merits is heightened, as the Covid-19 Pandemic caused Yale Law School to drop all grades for Plaintiffs' entire first year. (*Id.* ¶ 24.) Plaintiffs' class has only four semesters of graded credits, unlike students in "typical" classes of Yale Law School graduates, who have five semesters of graded credits on their

4

transcripts. (*Id.* ¶ 24.)

*The Coker Fellowship*

One such signifier is the so-called Coker Fellowship, a highly coveted teaching assistant position. (*Id.* ¶ 25.) Coker Fellows assist select professors—who each choose two Coker Fellows—in their teaching of "small groups," which teach both substantive law, like Constitutional Law or Contracts, and legal research and writing. (*Id.* ¶ 26.) Small groups are first-year students' "home bases": they are designed to allow the students to form close relationships with at least one professor and with a cohort of peers with whom they attend every class in their first semester. (*Id.* ¶ 27.) Many small groups are extremely tight-knit groups, and all small-group professors take a special interest in forming deep and meaningful relationships with their Coker Fellows and their small-group students. (*Id.* ¶ 27.)

Coker Fellows' primary responsibilities include supervising memoranda, briefs, and other first-term writing projects; providing or coordinating instruction in legal writing and research; assisting the small-group professor in devising first-term assignments and programs; counseling members of the small group and helping them adjust to law school; and arranging social events and visits to courts, agencies, and other institutions, and managing the small group social budget. (*Id.* ¶ 28.) Attorneys at firms including Covington & Burling; Cravath, Swaine & Moore; Wachtell Lipton; Davis Polk; and Jenner & Block, or those who have become professors themselves at Columbia University or Princeton University, who achieved a Coker Fellowship, often list the fellowship in their biographies, even decades after graduation. (*Id.* ¶ 29.)

The Coker Fellowship also offers a valuable opportunity to work closely with a respected professor and to build relationships with a group of other Yale Law students who will someday be colleagues and possible connections. (*Id.* ¶ 30.) This networking benefit is generally seen as substantial, as it offers students a chance to distinguish themselves to professors who would make important recommendations to judges in a student's search for federal clerkship positions. (*Id.* ¶ 31.)

*Sierra and Gavin Begin Their Studies at Yale and Meet Chua*

Plaintiffs Sierra and Gavin enrolled at Yale Law School in the Fall of 2019. (*Id.* ¶ 32.) After a successful academic year in her first year of law school, Sierra met Chua for the first time in the Spring of 2020 in her International Business Transactions class. (*Id.* ¶ 33.) Gavin met Chua for the first time in the Spring of 2021 while also enrolled in her International Business Transactions course. (*Id.* ¶ 33.) Chua became perhaps the most famous member of the Yale faculty following the success of her 2011 memoir *Battle Hymn of the Tiger Mother* and has served as an important mentor for her students, many of whom successfully obtain prestigious clerkships. (*Id.* ¶ 34.)

Defendant Gerken began publicly criticizing Chua in September 2018—a year before Sierra or Gavin had even enrolled in the law school—during the confirmation hearings for now-Supreme Court Justice Brett Kavanaugh. (*Id.* ¶ 35.) In response to anonymous public allegations that amounted to Chua having given advice on dress or appearance to clerkship candidates preparing for interviews, Gerken sent an email to all members of the Yale Law School community (which was quickly leaked to the press) concerning the "allegations of faculty misconduct" supposedly against Chua and

describing them as "of enormous concern" to Gerken. (*Id.* ¶ 36.) In her missive, Gerken also directed students who had "been affected by misconduct" to "reach out to" Defendant Cosgrove. (*Id.* ¶ 37.) It was subsequently reported in 2019 that Chua had entered a "no-socializing" agreement with the University whereby she agreed to not socialize with students off-campus. (*Id.* ¶ 38.)

Starting in February 2021, both Sierra and Gavin became embroiled in Gerken's and Cosgrove's apparent vendetta against Chua. (*Id.* ¶ 39.) That month, Sierra and Gavin separately attended Zoom "office hours" with Chua to discuss their coursework. (*Id.* ¶ 39.) These office hours discussions also covered career discussions and any concerns that Sierra or Gavin voiced about the Law School. (*Id.* ¶ 40.) In particular, Gavin struggled with what he felt was a lack of institutional support for students of color, which ended with his frustrated resignation from the board of the *Yale Law Journal*. (*Id.* ¶ 41.) His resignation received media coverage including on the popular legal blog (particularly among law students) Above the Law. (*Id.* ¶ 41.) This caused Gavin to face significant hostility at the school. (*Id.* ¶ 41.)

Chua, having similarly faced such race-based, online-instigated hostility, as well as being one of the few faculty members of color at Yale Law School, was in a unique position to offer Gavin guidance on these issues. (*Id.* ¶ 42.) Given the sensitive nature of the subject, Sierra and Gavin (who was Gavin's friend and had also faced similar hostility) wished to discuss their issues with Chua in person. (*Id.* ¶ 43.) To avoid meeting in public to discuss such a sensitive subject, Sierra, Gavin, and Chua decided to meet at Chua's home, which was a common practice amongst Yale faculty members. (*Id.* ¶ 44.)

(In fact, Gerken has met with both Sierra and Gavin at Gerken's own residence on several occasions.) (*Id.* ¶ 44.) Sierra and Gavin met Chua twice at her home, in February 2021 and March 2021. (*Id.* ¶ 45.) Both meetings included only Gavin, Sierra, and Chua, and no meals were involved. (*Id.* ¶ 45.)

*The Dossier*

Unbeknownst to Sierra or Gavin at the time, these two meetings somehow became subject of pernicious law school gossip. (*Id.* ¶ 46.) One of their classmates went so far as to compile a bizarre 20-page document, the Dossier, that purported to document the "secret dinner parties" that Chua was supposedly hosting with Gavin, Sierra, and unidentified federal judges. (*Id.* ¶ 46.) The Dossier eventually gained such wide circulation that it became the subject of investigative reporting from news outlets including *The New Yorker*, *The New York Times*, and *The Atlantic*. (*Id.* ¶ 47.) *The New Yorker* described the Dossier as "extremely thin," and *The New York Times* anonymously quoted "several" Yale Law professors who had told the newspaper that "they were shocked at how unpersuasive" the Dossier was. (*Id.* ¶ 48.)

On its face, the Dossier—which refers to Sierra and Gavin as "Jane Doe" and "John Doe" in its main text, but identifies them by name through exhibited screenshots of private text messages—claims that Sierra and Gavin had "repeatedly lied" about their experience as students of color at the Law School, and further "repeatedly lied" about the existence of the secret dinner parties, before supposedly admitting their existence to the Dossier's author either in person or in "self-deleting" text messages. (*Id.* ¶ 49.)

As "evidence," the Dossier included a number of text messages, some with Sierra

8

or Gavin, none of which consisted of them admitting to any secret dinner parties—since no such dinner parties ever occurred. (*Id.* ¶ 50.) On the contrary, in large part, they seemed to consist of the Dossier's author making his own declarations in text messages— to Sierra, Gavin, and other unidentified friends—about the existence of such parties. (*Id.* ¶ 50.) The Dossier also included photos of Gavin's feet outside in the snow as "evidence" and denounced Sierra and Gavin for "deliberately enabling" a "secret atmosphere of favoritism, misogyny, and sexual harassment." (*Id.* ¶ 51.)

Sierra and Gavin became aware of the Dossier in late April 2021, when it had begun to circulate among the Yale Law School student body. (*Id.* ¶ 52.) Shortly thereafter, beginning on April 23, 2021, Cosgrove and Eldik contacted Sierra and Gavin concerning the Dossier. (*Id.* ¶ 53.) However, they were not investigating the fact that a Yale Law School student was circulating such a document for an apparent harassing purpose, despite Plaintiffs emphasizing the harassment they were experiencing and asking for help, or even investigating the allegations made in the Dossier. (*Id.* ¶ 53.)

Instead, Cosgrove and Eldik pressured Sierra and Gavin to make a formal statement confirming the allegations against, and lodge their own formal complaint, against Chua. (*Id.* ¶ 54.) Despite Sierra and Gavin repeatedly denying the Dossier's assertions, Cosgrove and Eldik pressured Sierra and Gavin to make such a statement, even calling them on a daily basis over the course of a week in April 2021, insisting that Sierra and Gavin had a "moral obligation" to "future generations of students" to make the false statements against Chua. (*Id.* ¶ 55.) Cosgrove and Eldik also made references to Sierra of the "effort against Professor Chua" and insisted that if Sierra would "just give

them" a statement, they would have "enough" against Chua. (*Id.* ¶ 56.)

 During the course of this week, Sierra and Gavin consistently refused to make false statements, and instead repeatedly asked Cosgrove and Eldik for assistance against the troubling invasion of privacy and resulting harassment that they suffered. (*Id.* ¶ 57.) Cosgrove and Eldik ignored these requests to help and discouraged Sierra and Gavin from filing a formal complaint concerning the harm the Dossier and its creator had caused Sierra and Gavin. (*Id.* ¶ 58.) Instead, Cosgrove and Eldik ratcheted up the pressure. (*Id.* ¶ 59.) On a joint call including Cosgrove, Eldik, and Sierra, Eldik told Sierra that the Dossier would likely end up in "every judges' chambers," "following [her] even after [she] graduates," effectively sabotaging any hopes of her securing a clerkship whether she applied now or in the future. (*Id.* ¶ 59.)

 In a joint call including Cosgrove, Eldik, and Gavin, Eldik and Cosgrove strongly suggested that Gavin should not apply for a clerkship in the summer of 2021 because of the Dossier's wide publicity. (*Id.* ¶ 60.) It was suggested that, for these reasons, Sierra and Gavin should cooperate by making a statement against Professor Chua. (*Id.* ¶ 61.) Cosgrove also directly threatened Sierra, claiming that Yale Law School was receiving complaints about her potentially serving as a Coker Fellow due to the Dossier, and further suggested that such complaints would be moot if Sierra made a statement against Chua. (*Id.* ¶ 62.)

 That threat having no effect, Cosgrove became more direct, telling Sierra that if Sierra accepted a Coker Fellowship with the professor—despite Sierra's repeated denials that she had received an illicit offer from the professor—Cosgrove or another member of

the Yale Law School administration would approach the professor with the allegations. (*Id.* ¶ 63.) In his own interactions with Cosgrove and Eldik, Gavin unequivocally denied the Dossier's claim that the professor had extended him an illicit Coker Fellowship offer. (*Id.* ¶ 64.)

When Gavin asked Cosgrove and Eldik to help him deal with the false rumors being spread by other students to the contrary, Cosgrove and Eldik indicated that they were unaware of any complaints or rumors to that effect—despite having threatened Sierra with those very same rumors and complaints—and insinuated that they would require concrete proof of this harassment before assisting Gavin. (*Id.* ¶ 65.)

When Gavin informed Cosgrove and Eldik about his concerns regarding the lies and misrepresentations included in the Dossier, it was suggested to Gavin that unless he filed a complaint against Chua, the administration could not effectively protect him from further harassment. (*Id.* ¶ 66.)

*Gerken's Retaliation*

In April 2021, Defendant Gerken became personally involved in the efforts to pressure Sierra and Gavin to make a false statement against Chua. (*Id.* ¶ 67.) Gerken's direct involvement began when Sierra, who was a student in Gerken's academic clinic and was then writing a lengthy paper under Gerken's direct and personal supervision, sought Gerken's advice in dealing with the Dossier. (*Id.* ¶ 68.) While it later became apparent that Gerken was fully aware of the Dossier, she feigned lack of knowledge when she advised Sierra to "be candid" with Cosgrove, Eldik, and other faculty members who may hear of the Dossier. (*Id.* ¶ 69.) In response, Sierra reiterated to Gerken that the

11

allegations in the Dossier were false and questioned why her own candor was at issue. (*Id.* ¶ 69.)

A few days thereafter, Gerken and Cosgrove personally approached the professor, who was in the process of hiring Coker Fellows for his small group, with the intent to induce the professor to decline to extend a fellowship to either Sierra or Gavin. (*Id.* ¶ 70.) The purpose of Gerken's and Cosgrove's approach to the professor was to not only dissuade him from offering a Coker Fellowship to Sierra and Gavin, but to convince him that Sierra and Gavin were lying about their interactions with Chua, making them untrustworthy and unsuited for employment, despite the professor already employing both Sierra and Gavin as his research assistants. (*Id.* ¶ 71.)

In the course of this attempt, Gerken and Cosgrove brought with them a copy of the Dossier that Cosgrove had personally marked up with highlighting and annotations to show where Cosgrove believed that Sierra and Gavin were lying. (*Id.* ¶ 72.) Cosgrove did not try to investigate the specific allegations contained in the Dossier with Sierra or Gavin, even though they repeatedly informed her that it was full of lies and misrepresentations. (*Id.* ¶ 72.) These actions constituted improper retaliation, which Yale's Handbook defines as "any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy." (*Id.* ¶ 73.)

*Harm to Sierra and Gavin*

The actions of Gerken, Cosgrove, and Eldik caused significant harm to Sierra and Gavin. (*Id.* ¶ 74.) In addition to the significant career damage created by Defendants'

actions, Sierra has taken a leave of absence from Yale Law School due to the ongoing

harassment that arose. (*Id.* ¶ 75.) Gavin has resigned as Gerken's speechwriter. (*Id.* ¶ 75.)

Given the false accusations, both Sierra and Gavin did not apply for any judicial

clerkships, and their ability to form and maintain relationships with their peers has also

been irreparably and permanently stunted. (*Id.* ¶ 76.) Moreover, because of Defendants'

misconduct, both Sierra and Gavin have suffered insomnia, anxiety, nausea, and loss of

appetite. (*Id.* ¶ 77.)

*Yale Continues to Defame Plaintiffs*

On November 15, 2021, Plaintiffs filed their Complaint in this action. (*Id.* ¶ 78.)  On

the same day, Yale, through Bell, a Yale Law School Associate Professor of Law and of

Sociology with expertise in constitutional law, issued and publicized additional false

accusations about Sierra and Gavin. (*Id.* ¶ 79.) Bell accused Sierra and Gavin, two

prospective lawyers, early in their careers, of bringing their suit not to seek a remedy for

their wrongs, but out of improper motivations and intentions. (*Id.* ¶ 80.) Specifically, Yale,

through Bell, accused Sierra and Gavin of acting with the sole intent of disrupting Yale's

process of considering whether to reappoint Gerken as Dean of Yale Law School with

press attention. (*Id.* ¶ 81.)

In a statement to the *Yale Daily News*, Bell stated that the only point of Plaintiffs'

lawsuit was to generate press attention and "cause a stir." (*Id.* ¶ 82.) Bell stated that Sierra

and Gavin do not "think they can win" the lawsuit, but rather just want to "make

things . . . look bad." Bell stated that this lawsuit is "frivolous" and "embarrassing for"

Sierra and Gavin. (*Id.* ¶ 82.) Neither Sierra nor Gavin have discussed this litigation with

13

Bell or any of the Defendants. (*Id.* ¶ 83.)

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 8 requires that pleadings contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a Rule 12(b)(6) motion, a court accepts all "well-pleaded factual allegations" as true and based on that determines "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In order words, the court's task at the pleadings stage is not "to assess the weight of the evidence that might be offered on either side," but rather to "assess the legal feasibility of the Complaint." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). A court should also exclude documents that are not integral to the Complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016).

## ARGUMENT

I.   **PLAINTIFFS HAVE PLEADED A BREACH OF CONTRACT CLAIM UNDER CONNECTICUT LAW**

   A. **Under Connecticut Law, a Private University's Policies and Customs, Written or Unwritten, Are Contractually Binding**

Plaintiffs have pleaded a breach of contract claim because Yale has an Anti-Retaliation Policy. Under Connecticut law, the "basic legal relationship between a student and a private university or college is contractual in nature" and the "catalogs, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract." *Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320-21 (Conn. App. Ct. 2010); *Osberg v. Yale Univ.*, No. CV085021879S, 2009 WL 659072, at *3 (Conn. Super. Ct. Feb. 11, 2009); *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000).

But a university's contractual commitments to its students are not limited to its formal written regulations. A court that is asked to enforce an asserted contract between a student and his university must examine the *oral and written* expressions of the parties in light of the *policies and customs* of the particular institution. *Burns*, 120 Conn. App. at 321; *Osberg*, 2009 WL 659072, at *8; *Johnson*, 119 F. Supp. 2d at 93 (emphasis added in each case). Thus, a student alleging a breach of contract by a university may rely both on the university's written regulations "*and other express or implied promises.*" *Burns*, 120 Conn App. at 321; *Osberg*, 2009 WL 659072, at *8; *Johnson*, 119 F. Supp. 2d at 93 (emphasis added in each case). Plaintiffs have pleaded a breach of contract claim because, as discussed below, Yale has an Anti-Retaliation Policy.

### B. Plaintiffs Have Stated a Violation of Yale's Anti-Retaliation Policy

As pleaded in the SAC, Yale University has a formal, written policy prohibiting retaliation against students who have participated in discrimination or harassment investigations.

> Retaliation means *any adverse action* taken against a person who has *reported a concern*, filed a complaint, *and/or participated in an investigation* pursuant to this policy. Retaliation includes conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the underlying allegations of Discrimination or Harassment.

Yale University, Yale University Policy Against Discrimination and Harassment, Sec. 9000, https://your.yale.edu/policies-procedures/policies/9000-yale-university-policy-against-discrimination-and-harassment (emphasis added). Accepted as true, Plaintiffs'

allegations plainly state a plausible claim that Defendants violated this Anti-Retaliation Policy by taking "adverse action" against Sierra and Gavin, who had "participated in an investigation" and "reported a concern." (SAC ¶¶ 73, 86.)

Defendants first try to evade this conclusion by claiming that the Anti-Retaliation Policy "was not in effect when the events Plaintiffs complain of occurred." (Motion at 11.) Because the Anti-Retaliation Policy had "an effective date of August 1, 2021," and because it "has no retroactive language" (*id.*), Defendants say Plaintiffs' contract claim is "doomed." (*Id.*) What Defendants neglect to mention is that the August 1, 2021, Anti-Retaliation Policy was, according to Yale's own public statements, simply a codification in one place of already existing written policies distributed throughout many different pre-existing documents. On August 2, 2021, Yale published a statement to the entire university community unequivocally acknowledging that fact, stating that the August 1 policy "*sets out in one place* the definitions of discrimination, harassment, and retaliation applicable to all students, faculty, and staff *that previously have been located in various documents*." Yale University, Yale's Policy Against Discrimination and Harassment and New Accessibility Website, Aug. 2, 2021, https://secretary.yale.edu/news/yales-policy-against-discrimination-and-harassment-and-new-accessibility-website        (emphasis added).

Having publicly announced and acknowledged that the August 1 policy merely restated existing Yale prohibitions, Yale is estopped from denying that now. Indeed, the August 2, 2021, statement is itself an express promise to the Yale community that retaliation as it was defined in the Anti-Retaliation Policy was already prohibited before

August 1, 2021, and that alleged retaliation occurring prior to that date would be judged by the definition of retaliation set forth in the Policy.[2]

Next, conceding the applicability of the Anti-Retaliation Policy, Defendants claim that Plaintiffs' allegations do not state a violation of that Policy. (Motion at 14-18.) While Defendants admit (as they must) that Sierra and Gavin allege that they were retaliated against "because they refused to make statements against [Professor] Chua" (Motion at 15 (quoting SAC ¶ 87)), that retaliation, according to Defendants, is not prohibited by the Anti-Retaliation Policy because Sierra and Gavin never claimed to have themselves been victims of racial or sexual harassment or discrimination. (Motion at 14.) But Defendants do not address that Gavin and Sierra reported concerns regarding racial discrimination and harassment, as the Dossier attempted to delegitimize their experiences as students of color.

Defendants' argument either misunderstands Plaintiffs' retaliation claim or attempts to obfuscate the plain meaning of Yale's Anti-Retaliation Policy. The latter expressly prohibits retaliation not merely against individuals who report being victimized by discrimination or harassment, as Plaintiffs did, but also against individuals who "participate in an investigation" into allegations of discrimination or harassment. *See* Anti-Retaliation Policy, *supra*. It is undisputed that sexual harassment and attacks on Sierra and Gavin's experiences as students of color are included in the kinds of

---

[2] Should the Court deem it necessary to see the pre-existing "various documents" to which Yale made reference in its August 2, 2021 statement, those documents are in Yale's control and possession, not Plaintiffs' control, and Plaintiffs should be given an opportunity to discover them.

discrimination or harassment covered by this policy. *See id*. And further, as expressly pleaded in the Complaint, the allegations against Professor Chua, as well as against Sierra and Gavin themselves, included allegations (however spurious) involving "sexual harassment." (SAC ¶ 51.)

Hence, the retaliation Defendants inflicted on Sierra and Gavin squarely violated the Anti-Retaliation Policy. Sierra and Gavin participated as "witnesses" dragged into an investigation into (among other things) allegations of sexual harassment, and they were retaliated against because of the (truthful) answers they gave in that investigation—answers Gerken and the Law School Administration did not want to hear. Even Defendants would surely concede that Yale's Anti-Retaliation Policy prohibits retaliation against a student witness who participated in a sexual harassment investigation and *corroborated* the allegations. Such retaliation would be a clear violation of the Policy. This means that Defendants are apparently arguing that the Anti-Retaliation Policy goes out of operation when a student witness gives a statement *in favor of the accused*. In other words, if a student witness corroborates harassment, retaliation is prohibited, but if the student denies harassment, the retaliation floodgates are thrown wide open. That argument finds no support in the text of the Anti-Retaliation Policy, and flies in the face of analogous case law. *Cf. Deravin v. Kerik*, 335 F.3d 195, 204-05 (2d Cir. 2003) (holding that same Title VII anti-retaliation provision applied to a witness who contradicted another employee's allegations of sexual harassment).

Finally, even if the Anti-Retaliation Policy did not prohibit the retaliation alleged in this case—which it does—Defendants' motion to dismiss would still have to be rejected

because, as stated above, Connecticut law does not limit a university's binding contractual commitment to its formal, written regulations, but in addition includes a university's unwritten "customs" and "implied promises" as well. *See Burns*, 120 Conn. App. at 321; *Osberg*, 2009 WL 659072, at *8; *Johnson*, 119 F. Supp. 2d at 93. Accordingly, Defendants' claim that the Anti-Retaliation Policy does not apply to this case, even if accepted, would merely raise material disputed issues of fact. Reasonable students at Yale Law School would surely expect that if they report a concern or are asked to participate in an investigation into misconduct of any kind, and if they participate in that investigation and answer all questions truthfully, the school is not allowed to retaliate against them. Thus, regardless of the applicability of the formal Anti-Retaliation Policy, Sierra and Gavin would be entitled to discovery as to the existence at Yale of other anti-retaliation policies, customs, and/or implied promises.

At bottom, because Plaintiffs' allegations of retaliation must be accepted as true on this motion, Defendants are taking the extraordinary position that Yale University permits a Dean to retaliate at will against students who deny accusations of faculty misconduct or report a concern of racial discrimination and harassment. According to Defendants, it makes no difference if the students' statements are completely true and if the Dean is retaliating against them due to some kind of improper vendetta against the faculty member in question. According to Defendants, the Dean is perfectly free to try to destroy those students' careers without breaching any Yale custom, policy, or implied promise to its students. Plaintiffs venture to suggest that most members of the Yale community—faculty, administrators, and students alike—would be shocked by this

19

claim. Defendants' outrageous position should be rejected outright because it is refuted by the plain language of the Anti-Retaliation Policy, but at a bare minimum, Sierra and Gavin are entitled to discovery to prove the existence other policies, customs, and implied promises at Yale prohibiting a dean from retaliating against students who don't give her the answers she wants to hear.

## II. PLAINTIFFS HAVE PLEADED A CLAIM FOR PROMISSORY ESTOPPEL IN THE ALTERNATIVE

In the alternative to Plaintiffs' breach of contract claim, Sierra and Gavin also seek to enforce Defendants' promise not to retaliate—a promise which they relied on to their detriment—on the basis of promissory estoppel. A claim for promissory estoppel works in the alternative to a claim for breach of contract. Fed. R. Civ. P. 8(d)(2) (providing "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient"); *Brookridge Funding Corp. v. Nw. Hum. Res., Inc.*, 170 F. App'x. 170, 172 (2d Cir. 2006) (observing that, in Connecticut, promissory estoppel serves as an alternative basis to enforce a contract). In order to prevail on a claim for promissory estoppel, a plaintiff must establish (1) a clear and definite promise, (2) a change in position in reliance on the promise, and (3) injury. *Seitz v. J.C. Penney Props., Inc.*, Case No. 3:15-cv-01131 (VAB), 2017 WL 4316874, at *6 (D. Conn. Sept. 28, 2017) (stating the elements). The promise must be sufficiently clear and definite such that the promisor could reasonably expect to induce reliance. *Id.* Plaintiffs have pleaded a promissory estoppel claim.

Defendants made a clear and definite promise—the Anti-Retaliation Policy—to Sierra and Gavin that they would not retaliate against them if they ever complained of harassment. As set forth above, the Anti-Retaliation Policy was also a promise to Plaintiffs that prohibited retaliation against students who have participated as witnesses in discrimination or harassment investigations. In reliance on this promise, Plaintiffs requested assistance from Cosgrove and Eldik regarding the invasion of privacy and resulting harassment that they suffered after raising their concerns. (SAC ¶ 91.) Defendants, however, ignored these requests for to help, discouraged Sierra and Gavin from filing any sort of formal complaint, and then retaliated against Sierra and Gavin. (*Id.* ¶ 92.) Plaintiffs have pleaded a claim for promissory estoppel in the alternative.

## III.   PLAINTIFFS' HAVE PLEADED AN INTENTIONAL INTEREFERENCE CLAIM

### A.  Plaintiffs Have Alleged a Specific Business Relationship

Plaintiffs have pleaded an intentional interference claim because, as Defendants partially concede, they have alleged a specific business relationship with third parties. Under Connecticut law, a claim for tortious interference with business expectancies requires three elements: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss. *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 505 (D. Conn. 2009) (stating the elements); *Anthem Sports, LLC v. Under the Weather, LLC*, 320 F. Supp. 3d 399, 418 (D. Conn. 2018) (same). Plaintiffs have alleged an intentional interference

21

claim.

Plaintiffs have alleged a business relationship—as Defendants concede (Motion at 2)—with a Yale Law School professor. Specifically, Gerken and Cosgrove approached a law school professor and discouraged the professor, who already employed Sierra and Gavin as long-term research assistants, from hiring Sierra and Gavin as Coker Fellows. (SAC ¶ 4.) Both Sierra and Gavin suffered actual harm because they both lost the Coker Fellowship. (*Id.* ¶ 97.) But Plaintiffs have also alleged that they had a prospective relationship with judges' chambers around the country. (*Id.* ¶ 94.) As pleaded, the Coker Fellowship is a prestigious teaching assistant position that often leads to federal clerkships. (*Id.* ¶ 4.) On a joint call including Cosgrove, Eldik, and Sierra, Eldik told Sierra that the Dossier would likely end up in "every judges' chambers," following [her] even after she graduates," effectively sabotaging any hopes of her securing a clerkship whether she applied now or in the future. (*Id.* ¶ 59.) In a joint call including Cosgrove, Eldik, and Gavin, Eldik and Cosgrove even strongly suggested that Gavin should not apply for a clerkship in the summer of 2021 because of the Dossier's wide publicity—which Defendants disseminated. (*Id.* ¶¶ 6, 60.) Plaintiffs have alleged that Defendants intentionally interfered with their prospective business relationships with a Yale Law School professor and clerkship opportunities.

Defendants, however, argue that Plaintiffs have not identified "any specific relationships" that were lost by Defendants' interference. (Motion at 20.) But Defendants' authority is inapposite because here, Plaintiffs have not merely pleaded that they lost opportunities in the legal industry. *See Kollar v. Allstate Ins. Co.*, No. 3:16-CV-01927 (VAB),

2017 WL 3222535, at *11 (D. Conn. July 27, 2017) (dismissing claim because plaintiff only alleged that the defendants interfered with his expectation "that he would continue to earn premiums and/or commissions," not a "specific relationship or opportunity" that the defendants caused him to forgo); *see also Michalsky v. Moffly Publ'n, Inc.*, No. FSTCV196042420S, 2020 WL 5537003, at *11 (Conn. Super. Ct. Aug. 13, 2020) (same). Plaintiffs, instead, have pleaded the specific relationships that were harmed: the Coker Fellowship with the Professor (SAC ¶ 97) and federal clerkship opportunities (*Id.* ¶ 94). Plaintiffs have pleaded that Defendants intentionally interfered with their potential business relations.

### B. Plaintiffs Have Alleged an Actual Loss

Plaintiffs have alleged an actual loss to support their tortious interference claim. Under Connecticut law, it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered an actual loss. *Chiaravallo v. Middletown Transit Dist.*, No. 3:18-cv-1360 (SRU), 2021 WL 4310662, at *20 (D. Conn. Sept. 22, 2021) (stating the standard). Plaintiffs have not alleged, as Defendants' authority holds (Motion at 7), that damage to their "professional reputation"—which occurred—establishes their total actual loss. *See Golek Saint Mary's Hosp., Inc.*, 34 A.3d 452, 462 (Conn. App. Ct. 2012) (dismissing interference claim over simple reputational harm). Instead, Plaintiffs have alleged they were unable to become Coker Fellows because of Defendants retaliation, an opportunity that would have provided valuable post-graduate opportunities. (SAC ¶¶ 29, 30, 96.) Plaintiffs, furthermore, were unable to apply for clerkships because Defendants stunted such opportunities. (*Id.* ¶ 76.) Plaintiffs have pleaded an intentional

interference with prospective business relations because they have alleged an actual loss.

## IV.    PLAINTIFFS HAVE PLEADED A DEFAMATION CLAIM

Plaintiffs have pleaded a claim for defamation per se. To establish a prima facie case of defamation, the plaintiff must demonstrate that (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (stating the elements). As to the first element, a defamatory statement is defined as a communication that tends to harm the reputation of another or lowers them in the estimate of the community or to deter third persons from association or dealing with them. *Id.* In the case of statement that is defamatory per se, injury to a plaintiff's reputation is conclusively presumed such that a plaintiff needs neither plead nor prove it. *Cox v. Galazin*, 460 F. Supp. 2d 380, 388 (D. Conn. 2006). Plaintiffs have pleaded a claim for defamation per se.

Defendants shared and stated numerous false statements defaming Sierra and Gavin to third parties. The defamatory statements include the sharing of the Dossier which Defendants knew or reasonably should have known as defamatory. The Dossier claimed that Sierra and Gavin "repeatedly lied" about the existence of secret dinner parties. (SAC ¶ 49.) Shortly after commencing this action, Defendants, through Bell, shared and stated that Sierra and Gavin, two prospective lawyers, brought this suit with the sole intent of disrupting Yale's process of reappointing Gerken as Dean of Yale Law School with press attention. (*Id.* ¶ 81.) In a statement to the *Yale Daily News*, Bell also

24

stated that the only point of Plaintiffs' lawsuit is to generate press attention and "cause a stir." Bell stated that Sierra and Gavin do not "think they can win" the lawsuit, but rather just want to "make things . . . look bad." Bell went on to conclude that this lawsuit is "frivolous" and "embarrassing for" Sierra and Gavin. (*Id.* ¶ 82.) Each of the defamatory statements made by Defendants were false and disparaged Sierra and Gavin in their profession of law. Plaintiffs have pleaded a claim for defamation per se.

### A. Defendants Presented their Statements as a Fact—Not Simply as Opinions

Defendants Gerken and Cosgrove, who refused to investigate the Dossier, proceeded to share the Dossier as factual statements. (*Id.* ¶¶ 53, 72.)  When determining whether a statement is an evaluative opinion or a statement of objective fact, the Court evaluates three factors: (1) whether the circumstances in which the statement is made should cause the audience to expect an evaluative or objective meaning; (2) whether the nature and tenor of the actual language used by the declarant suggests a statement of evaluative opinion or objective fact; and (3) whether the statement is subject to objective verification. *Dunbar v. Omnicom Grp., Inc.*, No. 3:19-cv-00956 (KAD), 2021 WL 633732, at *14 (D. Conn. Feb. 18, 2021) (summarizing relevant case law from the Connecticut Supreme Court). Whether a statement is an assertion of a fact, or an assertion of an opinion, is a question of law. *Id.* Gerken and Cosgrove asserted the Dossier as a fact.

As alleged, Gerken and Cosgrove personally approached a Yale Law School professor, who was in the process of hiring Coker Fellows for his small group, with the intent to induce the professor to decline to extend a fellowship to either Sierra or Gavin. (SAC ¶ 70.)  The purpose of Gerken and Cosgrove's approach to the professor was to not

only dissuade him from offering a Coker Fellowship to Sierra and Gavin, *but to convince him* that Sierra and Gavin were lying about their interactions with Chua regarding the facts presented in the Dossier, making them untrustworthy and unsuited for employment, despite the professor already employing both Sierra and Gavin as his research assistants. (*Id.* ¶ 71.) In the course of this attempt, Gerken and Cosgrove brought with them a copy of the Dossier that Cosgrove had personally marked up with highlighting and annotations to show where Cosgrove believed that Sierra and Gavin were lying. (*Id.* ¶ 72.)

While Defendants argue Cosgrove and Gerken only "believed" that Sierra and Gavin were lying (Motion at 24), Cosgrove and Gerken proceeded to share the Dossier as a fact they accepted as true, because they did not, as pleaded, even try to investigate the specific allegations contained in the Dossier with Sierra or Gavin, even though Plaintiffs repeatedly informed them that it was full of lies and misrepresentations (*Id.*) Defendants were not expressing a favorable or unfavorable opinion on Sierra and Gavin, but asserted statements that implied knowledge of existing facts, which Defendants refused to investigate. *See Shea v. City of Waterbury*, No. CV085007926, 2009 WL 1057986, at *5 (Conn. Super. Ct. Feb 20, 2009). Gerken and Cosgrove presented the Dossier as a fact and not as simply their opinions on Plaintiffs' credibility.

Bell, moreover, asserted that, Plaintiffs initiated this suit "with the sole intent of disrupting Yale's process of considering whether to reappoint Gerken as Dean with press attention." (SAC ¶ 81.) Bell's statement, however, does not—as Defendants argue (Motion at 26)—only speculate on "the probable outcome of a hypothetical litigation" or

condemn their suit as "baseless, frivolous, or without merit" (Motion at 26). *Stevens v. Helming*, No. CV116019393S, 2014 WL 3805495, at *9 (Conn. Super. Ct. June 23, 2014) (finding that the defendant's statement that allegations would be supportable are words speculating hypothetical litigation). Here, Bell, a professor at Yale Law School, states that Plaintiffs, two law students, "do not think they can win" their lawsuit, and therefore are attempting to tortiously interfere with Yale's operations and abuse the court system. Though Bell attempts to couch some of her statements as opinions to the *Yale Daily News*, these statements are nevertheless statements a reasonable person would understand to be facts. (SAC ¶ 81.) Bell has alleged statements to the press that are statements of objective fact.

### B. Bell's Defamatory Statements, as Alleged, Were Made on the Behalf of Yale

Bell's defamatory statements, which were presented as an objective fact, were made on behalf of Yale. A cause of action under a theory of respondeat superior requires that the plaintiff allege facts to support that the action (1) occurs primarily within the employer's authorized time and space limits; (2) is of the type that the employee is employed to perform; and (3) is motivated, at least in part, by a purpose to serve the employer. *Harp v. King*, 835 A.2d 953, 974 (Conn. 2003). Here, Plaintiffs have alleged that the defamatory statements by Bell, who was even identified as a Yale professor, to the *Yale Daily News* were on behalf of Yale. (SAC ¶ 100.) The statement served Bell's employer, Yale, as it concerned an attempt to discredit Plaintiffs and weaken their position with false allegations that Plaintiffs were solely attempting to cause a stir during Gerken's potential reappointment process for Dean of Yale Law School. (*Id.*) Bell,

therefore, was at least partially motivated to serve her employer by accusing Plaintiffs of interfering with Yale's operations. *See A-G Foods, Inc. v. Pepperidge Farm, Inc.*, 579 A.2d 69, 73 (Conn. 1990). Bell's defamatory statements were made on behalf of Yale.

The Court should find that Plaintiffs have stated a claim for defamation.

## V. PLAINTIFFS HAVE PLEADED UNREASONABLE PUBLICITY AND FALSE LIGHT CLAIMS

Plaintiffs have pleaded unreasonable publicity and false light claims against Defendants because Defendants shared the Dossier with the public. An unreasonable publicity claim requires showing public disclosure of any matter that (1) would be highly offensive to a reasonable person, and (2) is not of legitimate concern to the public. *Perkins v. Freedom of Info. Comm'n*, 635 A.2d 783, 790 (Conn. 1993). A false light claim requires a Plaintiff to show (1) that the false light in which she was placed would be highly offensive to a reasonable person, and (2) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which she would be placed. *See Grigorenko v. Pauls*, 297 F. Supp. 2d 446, 448 (D. Conn. 2003); *Borg v. Cloutier*, 239 A.3d 1249, 1268 (Conn. App. Ct. 2020). As alleged, the Dossier was *disseminated* by Defendants, which placed Sierra and Gavin at the center of an ongoing campus-politics feud. (SAC ¶ 6.) Plaintiffs allege that not only did Gerken and Cosgrove knowingly circulate the Dossier, but they also specifically shared it with a professor. (*Id.* ¶ 9.) Defendants' Motion, however, ignores Plaintiffs' allegation of public dissemination, and instead argues that Defendant Gerken and Cosgrove only "shared a marked-up copy of the 'dossier' with *one person*: the Professor," which is simply untrue. Defendants, furthermore, maintain that

the Dossier was already public before Gerken and Cosgrove shared the Dossier with a professor. (Motion at 31.) But, again, Defendants' Motion ignores Plaintiff's pleading, as the Dossier was disseminated to the public by Defendants, without any legitimate purpose. (SAC ¶ 6.) In fact, the fact that various media outlets—which Defendants now cite to (Motion at 31)—would never have picked up on the defamatory Dossier and legitimized the Dossier if Defendants hadn't been responsible for its circulation in the first place. Plaintiffs have pleaded unreasonable publicity and false light claims because Defendants disseminated the Dossier.

The Court should find that Plaintiffs have stated claims for unreasonable publicity and false light.

## VI.   PLAINTIFFS HAVE PLEADED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs have pleaded a claim for IIED. In order to establish a claim for intentional infliction of emotional distress, the plaintiff must establish four elements: (1) that the defendant intended to inflict emotional distress or that they knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was extreme and outrageous, (3) that the defendant's conduct was the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was severe. *Pipkin v. Bridgeport Bd. of Educ.*, 323 F. Supp. 2d 326, 335 (D. Conn. 2004) (stating the standard). Plaintiffs have pleaded a claim for IIED.

### A.  Gerken and Cosgrove's Alleged Conduct Was Extreme and Outrageous

Gerkan and Cosgrove's alleged conduct was extreme and outrageous because

29

their conduct constituted retaliation against two students of color. Liability for intentional infliction of emotional distress requires conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind. *See Taylor v. Maxxim Med., Inc.*, No. 3:99CV338 AHN, 2000 WL 630918, at *3 (D. Conn. 2000). The extreme and outrageous conduct in this matter constituted retaliation.

As pleaded, Defendants were investigating allegations of what occurred at "secret dinner parties" that Professor Chua was supposedly hosting with Gavin, Sierra, and unidentified federal judges. (SAC ¶ 46.) When Sierra and Gavin *refused to lie* to support Defendants' investigation, Defendants retaliated by sharing the Dossier with a professor at Yale, who was considering Sierra and Gavin for the Coker Fellowship. (*Id.* ¶ 57.) Cosgrove also directly threatened Sierra, claiming that Yale Law School was receiving complaints about her potentially serving as a Coker Fellow due to the Dossier, and further suggested that such complaints would be moot if Sierra made a statement against Chua. (*Id.* ¶ 62.) That threat having no effect, Cosgrove became more direct, telling Sierra that if Sierra accepted a Coker Fellowship with the professor—despite Sierra's repeated denials that she had received an illicit offer from the professor—Cosgrove or another member of the Yale Law School administration would approach the professor with the allegations. (*Id.* ¶ 63.) When Gavin informed Cosgrove and Eldik about his concerns regarding the lies and misrepresentations included in the Dossier, it was suggested to Gavin that unless he filed a complaint against Chua, the administration could not

effectively protect him from further harassment. (*Id.* ¶ 65.) These acts constituted retaliation, which is extreme and outrageous conduct.

### B. Plaintiffs Have Alleged Severe Emotional Distress

Plaintiffs have pleaded severe emotional distress. Under Connecticut law, proving a claim of intentional infliction of emotional distress requires proof that a plaintiff's emotional distress was severe, and such determination may stand even if evidence of medical or other treatment is not pleaded. *See Berry v. Loiseau*, 614 A.2d 414, 426 (Conn. 1992). Plaintiffs have pleaded that Defendants' conduct caused both Sierra and Gavin to suffer extreme emotional distress, leading to insomnia, anxiety, nausea, and loss of appetite. (SAC ¶ 117.) Gavin and Sierra, moreover, continue to experience distress, pain and suffering, inconvenience, and loss of enjoyment of life stemming from Defendants' misconduct. (*Id.* ¶ 118.) Plaintiffs have alleged severe emotional distress.

The Court should find that Plaintiffs have stated a claim for IIED.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' Motion and allow them to proceed with their claims for breach of contract, promissory estoppel, intentional interference with prospective business relationship, defamation, unreasonable publicity, false light, and intentional infliction of emotional distress.

Dated: New Haven, Connecticut
         March 17, 2022

By: _/s/ Andrew B. Bowman_____
Andrew B. Bowman
**LAW OFFICES OF ANDREW B. BOWMAN**
1804 Post Road East
Westport, Connecticut 06880
Telephone:   (202) 259-0599
andrew@andrewbowmanlaw.com

John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5401
Facsimile:     (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs*