John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5401
Facsimile:     (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiffs*

Andrew B. Bowman
**LAW OFFICES OF ANDREW B. BOWMAN**
1804 Post Road East
Westport, Connecticut 06880
Telephone:   (202) 259-0599
andrew@andrewbowmanlaw.com
*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **SIERRA STUBBS** and **GAVIN JACKSON**,<br><br>                              Plaintiffs,<br><br>– against –<br><br>**HEATHER GERKEN, ELLEN COSGROVE, YASEEN ELDIK,** and **YALE UNIVERSITY**<br><br>                              Defendants. | Case No. 3:21-cv-01525<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO STAY DISCOVERY** |

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

LEGAL STANDARD ........................................................................................................... 7

   I.   DEFENDANTS' MOTION TO DISMISS WILL BE DENIED ...................................... 7

   II.  ROUTINE DISCOVERY BURDENS DO NOT JUSTIFY A STAY .............................. 10

   III. PLAINTIFFS SIERRA AND GAVIN WILL BE PREJUDICED IF DEFENDANTS' MOTION TO STAY DISCOVERY IS GRANTED ............................................................ 12

CONCLUSION .................................................................................................................... 12

## **TABLE OF AUTHORITIES**

**Cases**

*Waterbury Hosp. v. U.S. Foodservice Inc.*,
    No. 06 Civ. 1657, 2007 WL 328899 (D. Conn. Feb. 1, 2007).................................................. 7

*Brooks v. Macy's Inc.*,
    No. 10 CIV 5304 (BSJ) (HBP), 2010 WL 5297756 (S.D.N.Y. Dec. 21, 2010) ...................... 11

*Burns v. Quinnipiac Univ.*,
    120 Conn. App. 311 (Conn. App. Ct. 2010) ............................................................................ 8

*Connecticut ex rel. Blumenthal v. BPS Petroleum Distibs., Inc.*,
    No. 3:92-CV-00173, 1991 WL 177657 (D. Conn. July 16, 1991)......................................... 12

*Cuartero v. United States*,
    No. 05 Civ. 1161, 2006 WL 3190521 (D. Conn. Nov. 1, 2006) ............................................. 7

*Johnson v. Schmitz*,
    119 F. Supp. 2d 90 (D. Conn. 2000) ........................................................................................ 8

*Morien v. Munich Reinsurance Am., Inc.*,
    270 F.R.D. 65 (D. Conn. 2010) ................................................................................................ 8

*Osberg v. Yale Univ.*,
    No. CV085021879S, 2009 WL 659072 (Conn. Super. Ct. Feb. 11, 2009) ............................ 8

*Stanley Works Israel Ltd. v. 500 Grp., Inc.*,
    No. 3:17-cv-01765, 2018 WL 1960112 (D. Conn. Apr. 26, 2018) ......................................... 7

*Young v. McGill*,
    No. 09 Civ. 1186, 2012 WL 1660680 (D. Conn. May 11, 2012).......................................... 8

**PRELIMINARY STATEMENT**[1]

The Court must deny the Renewed Motion to Stay Discovery (the "Motion," Dkt. No. 45) by Defendants Heather Gerken ("Gerken"), Ellen Cosgrove ("Cosgrove"), Yaseen Eldik ("Eldik") and Yale University ("Yale") as they have failed to establish good cause under Federal Rule of Civil Procedure ("Rule") 26 to grant a stay. As pleaded, Defendants are three Yale Law School administrators who worked together in an attempt to blackball Plaintiffs Sierra Stubbs ("Sierra") and Gavin Jackson ("Gavin") from post-graduate opportunities for standing their ground and refusing to lie to support Yale's investigation, the outcome of which was predetermined. Defendants' extreme and outrageous conduct is not only impermissible but warrants discovery to continue under the Court's existing Scheduling Order (Dkt. No. 32).

To start, the Court must deny Defendants' request for a stay because Defendants' own perceptions of the strength of their Motion to Dismiss fail to override the high bar necessary to obtain a stay based on the pendency of a motion to dismiss. Under Connecticut law, merely filing a dispositive motion does not warrant the issuance of a stay discovery under Rule 26(c), which Plaintiffs have opposed (Dkt. No. 40, the "Opposition"). Instead, it is prudent to commence discovery if the evidence obtained is likely to weaken Defendants' dispositive motion.

Next, Defendants' arguments regarding the burden of discovery fare no better, for Plaintiffs Sierra and Gavin have made no specific discovery requests. Defendants argue

---

[1] All capitalized terms are defined in Plaintiffs' Second Amended Complaint (Dkt. No. 30, "SAC"). Some terms are redefined herein for the Court's convenience.

1

that Plaintiffs' Rule 26(f) Report—which *proposes* up to ten depositions—creates significant burden on Yale and its community. But it is not appropriate, under Connecticut law, for Defendants to determine that the discovery sought, when Plaintiffs have made no specific discovery requests or demands, is too burdensome without first understanding the scope of discovery.

Finally, the Court must deny Defendants' Motion because Plaintiffs will be prejudiced by a discovery stay, as any delay in bringing Plaintiffs' claims risks further erosion of the witnesses' memory and evidence they need to bring their claims against Defendants.

The Court must deny Defendants' request to stay discovery.

## STATEMENT OF FACTS

*Sierra and Gavin Begin Their Studies at Yale*

Plaintiffs Sierra and Gavin enrolled at Yale Law School in the Fall of 2019. (*Id.* ¶ 32.) After a successful academic year in her first year of law school, Sierra met Professor Amy Chua ("Chua") for the first time in the Spring of 2020 in her International Business Transactions class. (*Id.* ¶ 33.) Gavin met Chua for the first time in the Spring of 2021 while also enrolled in her International Business Transactions course. (*Id.* ¶ 33.)

Defendant Gerken began publicly criticizing Chua in September 2018—a year before Sierra or Gavin had even enrolled in the law school—during the confirmation hearings for now-Supreme Court Justice Brett Kavanaugh. (*Id.* ¶ 35.) In response to anonymous public allegations that amounted to Chua having given advice on dress or appearance to clerkship candidates preparing for interviews, Gerken sent an email to all

members of the Yale Law School community (which was quickly leaked to the press) concerning the "allegations of faculty misconduct" supposedly against Chua and describing them as "of enormous concern" to Gerken. (*Id.* ¶ 36.) In her missive, Gerken also directed students who had "been affected by misconduct" to "reach out to" Defendant Cosgrove. (*Id.* ¶ 37.) It was subsequently reported in 2019 that Chua had entered a "no socializing" agreement with the University whereby she agreed to not socialize with students off-campus. (*Id.* ¶ 38.)

Starting in February 2021, both Sierra and Gavin became embroiled in Gerken and Cosgrove's apparent vendetta against Chua. (*Id.* ¶ 39.) That month, Sierra and Gavin separately attended Zoom "office hours" with Chua to discuss their coursework. (*Id.* ¶ 39.) These office hours discussions would also cover career discussions and any concerns that Sierra or Gavin voiced about the University. (*Id.* ¶ 40.) In particular, Gavin struggled with what he felt was a lack of institutional support for students of color, which ended with his frustrated resignation from the board of the Yale Law Journal. (*Id.* ¶ 41.) His resignation received media coverage including on the popular legal blog (particularly among law students) Above the Law. (*Id.* ¶ 41.) This caused Gavin to face significant hostility at the school. (*Id.* ¶ 41.)

Chua, having similarly faced such race-based, online-instigated hostility, as well as being one of the few faculty members of color at Yale Law School, was in a unique position to offer Gavin guidance on these issues. (*Id.* ¶ 42.) Given the sensitive nature of the subject, Gavin and Sierra (who was Gavin's friend and had also faced similar hostility) wished to discuss their issues with Chua in person. (*Id.* ¶ 43.) To avoid meeting

3

in public to discuss such a sensitive subject, Sierra, Gavin, and Chua decided to meet at Chua's home, which was a common practice amongst Yale faculty members. (*Id.* ¶ 44.) (In fact, Gerken has met with both Sierra and Gavin at Gerken's own residence on several occasions.) (*Id.* ¶ 44.)

*The Dossier*

Unbeknownst to Sierra or Gavin at the time, these two meetings somehow became subject of pernicious law school gossip. (*Id.* ¶ 46.) One of their classmates went so far as to compile a bizarre 20-page document, the Dossier, that purported to document the "secret dinner parties" that Chua was supposedly hosting with Gavin, Sierra, and unidentified federal judges. (*Id.* ¶ 46.)

On its face, the Dossier—which refers to Sierra and Gavin as "Jane Doe" and "John Doe" in its main text but identifies them by name through exhibited screenshots of text messages—claims that Sierra and Gavin had "repeatedly lied" about their experience as students of color at the Law School, and further "repeatedly lied" about the existence of the secret dinner parties, before supposedly admitting their existence to the Dossier's author either in person or in "self-deleting" text messages. (*Id.* ¶ 49.)

Sierra and Gavin became aware of the Dossier in late April 2021, when it had begun to circulate among the Yale Law School student body. (*Id.* ¶ 52.) Shortly thereafter, beginning on April 23, 2021, Cosgrove and Eldik contacted Sierra and Gavin concerning the Dossier. (*Id.* ¶ 53.) However, they were not investigating the fact that a Yale Law School student was circulating such a document for an apparent harassing purpose, or even investigating the allegations made in the Dossier. (*Id.* ¶ 53.)

4

Instead, Cosgrove and Eldik pressured Sierra and Gavin to make a formal statement confirming the allegations against, and lodge their own formal complaint, against Chua. (*Id.* ¶ 54.) Despite Sierra and Gavin repeatedly denying the Dossier's assertions, Cosgrove and Eldik pressured Sierra and Gavin to make such a statement, even calling them on a daily basis over the course of a week in April 2021, insisting that Sierra and Gavin had a "moral obligation" to "future generations of students" to make the false statements against Chua. (*Id.* ¶ 55.)

During the course of this week, Sierra and Gavin consistently refused to make false statements, and instead repeatedly asked Cosgrove and Eldik for assistance against the troubling invasion of privacy and resulting harassment that they suffered. (*Id.* ¶ 57.) Cosgrove and Eldik ignored these requests to help and discouraged Sierra and Gavin from filing a formal complaint concerning the harm the Dossier and its creator had caused Sierra and Gavin. (*Id.* ¶ 58.) Instead, Cosgrove and Eldik ratcheted up the pressure. (*Id.* ¶ 59.) On a joint call including Cosgrove, Eldik, and Sierra, Eldik told Sierra that the Dossier would likely end up in "every judges' chambers," "following [her] even after [she] graduates," effectively sabotaging any hopes of her securing a clerkship whether she applied now or in the future. (*Id.* ¶ 59.) In a joint call including Cosgrove, Eldik, and Gavin, Eldik and Cosgrove strongly suggested that Gavin should not apply for a clerkship in the summer of 2021 because of the Dossier's wide publicity. (*Id.* ¶ 60.) It was suggested that, for these reasons, Sierra and Gavin should cooperate by making a statement against Professor Chua. (*Id.* ¶ 61.) Cosgrove also directly threatened Sierra, claiming that Yale Law School was receiving complaints about her potentially serving as

5

a Coker Fellow due to the Dossier, and further suggested that such complaints would be moot if Sierra made a statement against Chua. (*Id.* ¶ 62.)

*Gerken's Retaliation*

In April 2021, Defendant Gerken became personally involved in the efforts to pressure Sierra and Gavin to make a false statement against Chua. (*Id.* ¶ 67.) Gerken's direct involvement began when Sierra, who was a student in Gerken's academic clinic and was then writing a lengthy paper under Gerken's direct and personal supervision, sought Gerken's advice in dealing with the Dossier. (*Id.* ¶ 68.) While it later became apparent that Gerken was fully aware of the Dossier, Gerken advised Sierra to "be candid" with Cosgrove and Eldik and faculty members who may hear of the Dossier. (*Id.* ¶ 69.) Sierra in response explained to Gerken that the allegations in the Dossier were false and questioned why her own candor was at issue. (*Id.* ¶ 69.)

A few days thereafter, Gerken and Cosgrove personally approached the professor, who was in the process of hiring Coker Fellows for his small group, with the intent to induce the professor to decline to extend a fellowship to either Sierra or Gavin. (*Id.* ¶ 70.) The purpose of Gerken and Cosgrove's approach to the professor was to not only dissuade him from offering a Coker Fellowship to Sierra and Gavin, but to convince him that Sierra and Gavin were lying about their interactions with Chua, making them untrustworthy and unsuited for employment, despite the professor already employing both Sierra and Gavin as his research assistants. (*Id.* ¶ 71.)

In the course of this attempt, Gerken and Cosgrove brought with them a copy of the Dossier that Cosgrove had personally marked up with highlighting and annotations

to show where Cosgrove believed that Sierra and Gavin were lying. (*Id.* ¶ 72.) Cosgrove did not try to investigate the specific allegations contained in the Dossier with Sierra or Gavin, even though they repeatedly informed her that it was full of lies and misrepresentations. (*Id.* ¶ 72.) These actions constituted improper retaliation, which Yale's Handbook defines as "any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy." (*Id.* ¶ 73.)

## **LEGAL STANDARD**

The issuance of a stay pending a motion to dismiss is by no means automatic. *Stanley Works Israel Ltd. v. 500 Grp., Inc.*, No. 3:17-cv-01765, 2018 WL 1960112, at *2 (D. Conn. Apr. 26, 2018). Courts must dismiss a motion to stay discovery where the movant fails to demonstrate good cause. *Waterbury Hosp. v. U.S. Foodservice Inc.*, No. 06 Civ. 1657, 2007 WL 328899, at *1 (D. Conn. Feb. 1, 2007) (citing *Cuartero v. United States*, No. 05 Civ. 1161, 2006 WL 3190521, at *1 (D. Conn. Nov. 1, 2006)). Good cause is evaluated using three factors: (1) the strength of the dispositive motion; (2) the breadth of discovery sought; and (3) the prejudice a stay would have on the non-moving party. *Id.* Defendants' motion to stay discovery fails to satisfy this standard and must be dismissed.

## **ARGUMENT**

I. **DEFENDANTS' MOTION TO DISMISS WILL BE DENIED**

Defendants' Motion must be denied because they will not prevail on their Motion to Dismiss. Merely filing a dispositive motion does not warrant the issuance of a stay discovery under Rule 26(c). *Young v. McGill*, No. 09 Civ. 1186, 2012 WL 1660680, at *3 (D.

7

Conn. May 11, 2012) (stating the standard); *Morien v. Munich Reinsurance Am., Inc.*, 270 F.R.D. 65, 67-68 (D. Conn. 2010) (denying the defendant's motion to stay discovery after finding that the plaintiffs would likely discover information related to their allegations during depositions, thereby weakening the defendant's motion to dismiss). Here, it is likely that Plaintiffs will discover information related to their claims, as the underlying evidence involves Yale's internal documents and communication. Plaintiffs, moreover, have opposed Defendants' Motion to Dismiss, as described below.

First, Plaintiffs have alleged a breach of contract claim against all Defendants because Yale retaliated after Sierra and Gavin refused to make false statements against Chua in the course of Yale's investigation. (Opposition at 14–19.) Under Connecticut law, a private university's policies and customs, written or unwritten, are contractually binding. *Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320-21 (Conn. App. Ct. 2010); *Osberg v. Yale Univ.*, No. CV085021879S, 2009 WL 659072, at *3 (Conn. Super. Ct. Feb. 11, 2009); *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000). Yale's anti-retaliation policy prohibits "any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy." When Sierra and Gavin refused to lie to support the University's conclusory investigation, Defendants began a retaliation campaign, which included such adverse actions as attempting to dissuade a Yale Law School professor—who already employed Sierra and Gavin as research assistants—from offering Sierra and Gavin a Coker Fellowship, and disseminating the Dossier about Sierra and Gavin. The Court should find that Plaintiffs have alleged a claim for breach of contract and a promissory estoppel claim in the

8

alternative.

Second, Plaintiffs have alleged a defamation claim against all Defendants because Defendants presented the Dossier as factual evidence to third parties. (Opposition at 24–28.) While Defendants now couch some of their defamatory statements as "opinions," the circumstances and nature of Defendants' statement are clear: Defendants actively refused to investigate the specific allegations contained in the Dossier while disseminating the defamatory Dossier to members of the public and the Yale Law School community, including at least one professor. The Dossier provided, among other false statements, that Sierra and Gavin were serial liars who attended Chua's secret dinner parties with unnamed federal judges; that they had received illicit Coker Fellowship offers; and that they had not sought out "racial consolation" from Chua. After Sierra and Gavin—two law students who realized that Defendants' misconduct was harmful to their career as future lawyers—filed this suit, Bell, on behalf of Yale and the other Defendants, then falsely stated that Plaintiffs' suit was filed with the *sole intent* of tortiously interfering with Gerken's reappointment as the Dean of Yale Law School with press attention. Such a statement does not, in any way, qualify as mere speculation on the outcome of this litigation. Defendants in reckless disregard by publicizing the Dossier. The Court should find that Plaintiffs have alleged a claim for defamation.

Third, Plaintiffs have alleged a claim for intentional interference with prospective business relationships. (*Id.* at 21–24.) Defendants' tortious interference began when they disseminated the defamatory Dossier to the public—while simultaneously threatening that it would end up in every judges' chambers if Sierra and Gavin applied for federal

9

clerkships at any time in the future—and directly to at least one Yale Law School professor. Such interference prevented Plaintiffs from applying for clerkships. The Court should find that Plaintiffs have alleged a claim for intentional interference with prospective business relationships.

Fourth, Plaintiffs have alleged claims for publicity and false light because Defendants broadcasted the Dossier—which concerns the private lives of Sierra and Gavin—to the public. (*Id.* at 28–29.) The Dossier, which claims that Sierra and Gavin had "repeatedly lied" about their experience as students of color at Yale Law School and were supportive of and purposely benefiting from corruption, nepotism, sexual harassment, and bigotry, is highly offensive to a reasonable person. Defendants, who refused to investigate the Dossier, had knowledge, or acted in reckless disregard by publicizing the Dossier. Plaintiffs have alleged claims for publicity and false light.

Fifth, Plaintiffs have alleged a claim for intentional infliction of emotional distress because Defendants' conduct during their retaliatory campaign was extreme and outrageous and was designed to cause Sierra and Gavin severe emotional pain. Indeed, Defendants' conduct has caused such pain—including emotional distress and anxiety—that is utterly intolerable for a school campus. (*Id.* at 29–31.) The Court should find that Plaintiffs have alleged a claim for intentional infliction of emotional distress.

The Court should deny Defendants' Motion to stay discovery.

## II.   ROUTINE DISCOVERY BURDENS DO NOT JUSTIFY A STAY

Defendants have not met their burden to demonstrate that the breadth of discovery and burden of responding to it warrants a stay of discovery. Specifically,

10

statements made in a Rule 26(f) Report regarding what discovery plaintiffs believe may be needed throughout the course of the entire litigation are not themselves discovery requests. *Waterbury Hosp.*, 2007 WL 328899, at *2 (finding the defendant adequately protected from unduly broad and burdensome requests by the Federal Rules of Civil Procedure); *see also Brooks v. Macy's Inc.*, No. 10 CIV 5304 (BSJ) (HBP), 2010 WL 5297756, at *2 (S.D.N.Y. Dec. 21, 2010) (finding it impossible to assess the breadth of discovery sought when no discovery request have been served). It is not appropriate for the Court to determine that the discovery sought is too broad without first seeing exactly what it is Plaintiffs are requesting. *Id.*

To start, Plaintiffs have not yet served their discovery requests, so Defendants lack a specific, factual basis to support their claim that Plaintiffs will seek broad discovery necessitating a discovery stay. Instead, Defendants simply rely on Plaintiffs' Rule 26(f) Report, which "intend[s] to take ten depositions." (Motion at 18.) Whether Plaintiffs' requests "would cause significant disturbance within the [Yale] community and beyond" (*Id.* at 19) is not to be determined from Plaintiffs' Rule 26(f) Report, as Plaintiffs have not formally noticed any depositions.

Defendants, moreover, have conceded that Plaintiffs' counsel was *not* sanctioned or found to have violated a court order. Indeed, Judge Dooley sanctioned the plaintiffs in *Kalra v. Adler Pollock v. Sheehan, P.C.*, D. Conn. Case No. 3:18-CV-00260, and, as the docket in that matter shows, Attorney Bowman had withdrawn as plaintiffs' counsel in that action effective September 14, 2020—four months before the sanctions order (Dkt. No. 45-1) which Defendants now rely on to stay discovery. Judge Dooley even noted the

11

withdrawal in her order, explaining that the court there had granted Bowman's withdrawal request based on an "irretrievable breakdown" between Bowman and his clients. (Dkt. No. 45-1 at 8.) Defendants' argument to stay discovery must fail as the Court never sanctioned nor found Plaintiffs' counsel liable for any misconduct.

The Court should deny Defendants' Motion to stay discovery.

### III. PLAINTIFFS SIERRA AND GAVIN WILL BE PREJUDICED IF DEFENDANTS' MOTION TO STAY DISCOVERY IS GRANTED

Finally, courts may consider the prejudice that might inure to the non-moving party as a result of imposing a stay. *Waterbury Hosp.*, 2007 WL 328899, at *1. Plaintiffs may require evidence and witnesses relevant to their claims that go back nearly two years. Any further delay in bringing Plaintiffs' claims risks further erosion of the witnesses' memory and evidence they need to bring their claims against Defendants. *Connecticut ex rel. Blumenthal v. BPS Petroleum Distibs., Inc.*, No. 3:92-CV-00173, 1991 WL 177657, at *2 (D. Conn. July 16, 1991) (noting that the delay imposed by a stay of discovery always presents some degree of prejudice to plaintiffs because "[w]itnesses relocate, memories fade, and persons allegedly aggrieved are unable to seek vindication or redress for indefinite periods of time on end.") Defendants' workplace responsibilities—which caused the underlying allegations in this action—are not a reason to stay discovery. The obvious harm to Plaintiffs Sierra and Gavin in further delaying the resolution of this action plainly outweighs the illusory and inconsequential harm asserted by Defendants.

### CONCLUSION

The Court should deny Defendants' Motion and allow Plaintiffs to proceed with

discovery.

Dated: New Haven, Connecticut
       April 22, 2022

                                        By: */s/ Andrew B. Bowman*
                                        Andrew B. Bowman
                                        **LAW OFFICES OF ANDREW B. BOWMAN**
                                        1804 Post Road East
                                        Westport, Connecticut 06880
                                        Telephone:   (202) 259-0599
                                        andrew@andrewbowmanlaw.com

                                        John G. Balestriere
                                        Matthew W. Schmidt
                                        **BALESTRIERE FARIELLO**
                                        225 Broadway, 29th Floor
                                        New York, New York 10007
                                        Telephone:   (212) 374-5401
                                        Facsimile:    (212) 208-2613
                                        john.balestriere@balestrierefariello.com
                                        matthew.schmidt@balestrierefariello.com
                                        *Attorneys for Plaintiffs*