**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------x
                              :
SIERRA STUBBS and             :    No. 3:21CV01525(SALM)
GAVIN JACKSON                 :
                              :
v.                            :
                              :
HEATHER GERKEN, ELLEN         :
COSGROVE, YASEEN ELDIK,       :
and YALE UNIVERSITY           :    September 29, 2022
                              :
------------------------------x
```

## RULING ON DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT [Doc. #36]

Plaintiffs Sierra Stubbs and Gavin Jackson (collectively "plaintiffs"), each of whom was a student at Yale Law School, bring this action alleging, in sum, that two deans of the Yale Law School, along with the Law School's Director of Diversity, Equity and Inclusion, "worked together in an attempt to blackball" plaintiffs from the prestigious job opportunities that are often available to Yale Law School students and graduates. Doc. #30 at 2, ¶1. Plaintiffs proceed pursuant to a Second Amended Complaint asserting claims against all defendants for: (1) breach of contract; (2) promissory estoppel; (3) intentional interference with prospective business relationship; (4) defamation; (5) unreasonable publicity; (6) false light; and (7) intentional infliction of emotional distress. See generally

1

id. at 16-21.

Defendants Heather Gerken ("Gerken"), Ellen Cosgrove ("Cosgrove"), Yaseen Eldik ("Eldik"), and Yale University (collectively "defendants") have filed a Motion to Dismiss the Second Amended Complaint. See Doc. #36. Plaintiffs have filed a memorandum in opposition to defendants' motion. See Doc. #40. As defendants assert in their reply brief, plaintiffs' memorandum in opposition attempts, unsuccessfully, to "re-frame the story[]" that is otherwise pled in the Second Amended Complaint. Doc. #44 at 2.[1]

For the reasons stated below, defendants' Motion to Dismiss the Second Amended Complaint [**Doc. #36**] is **GRANTED, in large part, and DENIED, in limited part.**

I.   **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); accord Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021). In reviewing such a motion, the Court "must

---

[1] Throughout this Ruling, the Court cites to the page numbers reflected in each document's ECF header, rather than the pagination applied by the filing party.

accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." Kaplan, 999 F.3d at 854 (citations omitted).

"[W]hile this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or naked assertions devoid of further factual enhancement." Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678 (citations and quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). Attached to the Second Amended Complaint is a six page document bearing the title: "Timeline of Events[.]" Doc. #30-1 at 2. In addition to the "Timeline," there are fourteen pages of text messages captured by screenshot. See id. at 8-21. Plaintiffs have elected to call this document the "Dossier[.]" Doc. #30 at 3, ¶3. For purposes of clarity, the

3

Court hereinafter refers to the document attached to the Second Amended Complaint as the "Dossier."[2]

Because the Dossier is attached the Second Amended Complaint, the Court has considered the contents thereof when deciding the Motion to Dismiss.

## II.   **FACTUAL BACKGROUND**

For purposes of deciding the Motion to Dismiss, the Court presumes the following factual allegations set forth in the Second Amended Complaint [Doc. #30] to be true.

### A.   Yale Law School and Plaintiffs' Enrollment

Plaintiffs enrolled at Yale Law School ("YLS") in the Fall of 2019. See Doc. #30 at 8, ¶32. As of the filing of the Second Amended Complaint, plaintiff Sierra Stubbs ("Stubbs") had completed her second year at YLS and was then "on a voluntary leave of absence from the school." Id. at 5, ¶15. Plaintiff Gavin Jackson ("Jackson") had enrolled in his third year at YLS. See id. at 5, ¶16.

YLS "employs a limited grading scale and does not compute grade point averages[.]" Id. at 5, ¶21. The grading system at

---

[2] It bears noting that this sophomoric document bears little resemblance to a true dossier, defined by Black's Law Dictionary as "[a] file or brief; a bundle of papers relating to a particular matter." Dossier, Black's Law Dictionary (11th ed. 2019).

YLS places its students "in high competition over non-grade
signifiers of merit." Id. at 6, ¶24. One of these signifiers is
the "Coker Fellowship, a highly coveted teaching assistant
position." Id. at 6, ¶25. These fellowships offer valuable
learning opportunities and "substantial" networking benefits.
Id. at 7, ¶31; see also id. at 6-7, ¶¶27-30.

    B.   Events Leading to the "Dossier"

Stubbs and Jackson each first met Professor Amy Chua
("Chua") when each was enrolled in Chua's International Business
Transactions course. See Doc. #30 at 8, ¶33. Chua "has served as
an important mentor for her students, many of whom successfully
obtain prestigious [judicial] clerkships." Id. at 8, ¶34.

In September 2018, well before Stubbs and Jackson met Chua,
Gerken, the current Dean of YLS, began "publicly criticizing
Chua[.]" Id. at 8, ¶35; see also id. at 5, ¶18. In "an email to
all members of the [YLS] community[,]" Gerken expressed
"'enormous concern'" about "'allegations of faculty misconduct'
supposedly against Chua[.]" Id. at 8, ¶36.[3] It was "reported"
that in 2019 "Chua had entered a 'no-socializing' agreement with

---

[3] The allegations against Chua included claims that she had
"given advice on dress or appearance to [judicial] clerkship
candidates preparing for interviews[.]" Doc. #30 at 8, ¶36.

the University whereby she agreed not to socialize with students off-campus." Id. at 9, ¶38.

In February 2021, plaintiffs "separately attended Zoom 'office hours' with Chua to discuss their coursework." Doc. #30 at 9, ¶39. These conversations "would also cover career discussions and any concerns that [plaintiffs] voiced about the University." Id. at 9, ¶40. Such concerns included those of Jackson, who "struggled with what he felt was a lack of institutional support for students of color, which ended with his frustrated resignation from the board of the Yale Law Journal." Id. at 9, ¶41. Jackson's resignation "received media coverage[,]" which "caused" him "to face significant hostility at the school." Id. Chua was "in a unique position to offer [Jackson] guidance on these issues[,]" having been subject to "race-based, online instigated hostility, as well as being one of the few faculty members of color at" YLS. Id. at 9, ¶42. Because of the "sensitive nature of the subject," plaintiffs "wished to discuss their issues with Chua in person." Id. at 9, ¶43. "To avoid meeting in public[,]" plaintiffs "and Chua decided to meet at Chua's home[.]" Id. at 9, ¶44. Plaintiffs met with Chua at her home on two occasions in February 2021 and March 2021. See id. at 10, ¶45. It was at this time, beginning in February 2021, that plaintiffs "became embroiled in Gerken

6

and Cosgrove's apparent vendetta against Chua." Id. at 9, ¶39;
see also id. at 3, ¶8 (referencing "the University's crusade
against Chua[]").[4]

C.    The "Dossier" and the Aftermath

Plaintiffs' meetings with Chua "became [the] subject of
pernicious law school gossip[,]" including a "20-page document,
the Dossier (Ex. A), that purported to document the 'secret
dinner parties' that Chua was supposedly hosting with
[plaintiffs], and unidentified federal judges." Doc. #30 at 10,
¶46; see also Doc. #30-1. The Second Amended Complaint alleges
that the Dossier "claims that [plaintiffs] had 'repeatedly lied'
about their experience as students of color at the Law School,
and further 'repeatedly lied' about the existence of the secret
dinner parties, before supposedly admitting their existence to
the Dossier's author[.]" Doc. #30 at 10, ¶49; see also Doc. #30-
1. The Dossier also "denounced" plaintiffs "for 'deliberately
enabling' a 'secret atmosphere of favoritism, misogyny, and
sexual harassment.'" Id. at 11, ¶51. "The Dossier eventually
gained such wide circulation that it became the subject of

_____

[4] At all times relevant to the allegations in the Second Amended
Complaint, Cosgrove was the Associate Dean of Student Affairs at
YLS. See Doc. #30 at 5, ¶19.

investigative reporting from" several national news outlets. Id. at 10, ¶47.

Plaintiffs "became aware of the Dossier in late April 2021, when it had begun to circulate among the [YLS] student body." Doc. #30 at 11, ¶52. On April 23, 2021, Cosgrove and Eldik, the Director of Equity, Diversity and Inclusion at YLS, contacted plaintiffs about the Dossier. See id. at 11, ¶53. "Cosgrove and Eldik pressured [plaintiffs] to make a formal statement confirming the allegations against, and lodge their own formal complaint, against Chua." Id. at 11, ¶54 (sic). Despite plaintiffs "repeatedly denying the Dossier's assertions, Cosgrove and Eldik pressured [plaintiffs] to make ... false statements against Chua." Id. at 11, ¶55.

In communications with Stubbs, Cosgrove and Eldik made reference to "the 'effort against Professor Chua' and insisted that if [Stubbs] would 'just give them' a statement, they would have 'enough' against Chua." Id. at 12, ¶56. Plaintiffs "consistently refused to make false statements, and instead repeatedly asked Cosgrove and Eldik for assistance against the troubling invasion of privacy and resulting harassment that they suffered." Id. at 12, ¶57. "Cosgrove and Eldik ignored these requests ... and discouraged [plaintiffs] from filing a formal

complaint concerning the harm" caused by the Dossier. Id. at 12, ¶58.

During a call among Cosgrove, Eldik, and Stubbs, Eldik told Stubbs "that the Dossier would likely end up in every judges' [sic] chambers, following her even after she graduates, effectively sabotaging any hopes of her securing a clerkship whether she applied now or in the future." Doc. #30 at 12, ¶59 (quotation marks omitted). In a similar call among Cosgrove, Eldik, and Jackson, "Eldik and Cosgrove strongly suggested that [Jackson] should not apply for a clerkship in the summer of 2021 because of the Dossier's wide publicity." Id. at 12, ¶60. For these reasons, "[i]t was suggested" that plaintiffs "cooperate by making a statement against" Chua. Id. at 12, ¶61.

"Cosgrove also directly threatened [Stubbs], claiming that [YLS] was receiving complaints about her potentially serving as a Coker Fellow due to the Dossier, and further suggested that such complaints would be moot if [Stubbs] made a statement against Chua." Id. at 12-13, ¶62. Cosgrove thereafter told Stubbs that if Stubbs "accepted a Coker Fellowship with the professor – despite [Stubbs's] repeated denials that she had received an illicit offer from the professor – Cosgrove or

another member of the [YLS] administration would approach the professor with the allegations." Id. at 13, ¶63.[5]

Jackson likewise denied the claims in the Dossier that "the [P]rofessor had extended him an illicit Coker Fellowship offer." Id. at 13, ¶64. Jackson "asked Cosgrove and Eldik to help him deal with the false rumors being spread by other students to the contrary," but "Cosgrove and Eldik indicated that they were unaware of any complaints or rumors to that effect ... and insinuated that they would require concrete proof of this harassment before assisting" Jackson. Id. at 13, ¶65. "When [Jackson] informed Cosgrove and Eldik about his concerns regarding the lies and misrepresentations included in the Dossier, it was suggested to [Jackson] that unless he filed a complaint against Chua, the administration could not effectively protect him from further harassment." Id. at 13, ¶66.

In April 2021, Stubbs, "who was a student in Gerken's academic clinic and ... writing a lengthy paper under Gerken's direct and personal supervision, sought Gerken's advice in dealing with the Dossier." Doc. #30 at 13-14, ¶¶67-68. Gerken

---

[5] The "professor" referred to throughout the Second Amended Complaint is described by plaintiffs as "an esteemed law professor and expert in constitutional law, ... who already employed [plaintiffs] as long-term research assistants[.]" Doc. #30 at 2, ¶4. The Court hereinafter refers to that individual as the "Professor."

"advised [Stubbs] to 'be candid'" about the Dossier with faculty members, including Cosgrove and Eldik. <u>Id.</u> at 14, ¶69. Stubbs "explained to Gerken that the allegations in the Dossier were false and questioned why her own candor was at issue." <u>Id.</u>

Thereafter, "Gerken and Cosgrove personally approached the [P]rofessor, who was in the process of hiring Coker Fellows" to "dissuade him from offering a Coker Fellowship to" either plaintiff and to "convince him that [plaintiffs] were lying about their interactions with Chua, making them untrustworthy and unsuited for employment, despite the [P]rofessor already employing [plaintiffs] as his research assistants." <u>Id.</u> at 14, ¶¶701-71. Gerken and Cosgrove showed the Professor "a copy of the Dossier that Cosgrove had personally marked up with highlighting and annotations to show where Cosgrove believed that [plaintiffs] were lying." <u>Id.</u> at 14, ¶72. "Cosgrove did not try to investigate the specific allegations contained in the Dossier[,]" even though plaintiffs "repeatedly informed her that" it contained "lies and misrepresentations." <u>Id.</u> Plaintiffs assert that "[t]hese actions constituted improper retaliation[]" as defined in the University's Policy Against Discrimination and Harassment (hereinafter the "Policy"). <u>Id.</u> at 15, ¶73; <u>see also id.</u> at 3, ¶9.

As a result of defendants' actions, plaintiffs have suffered "significant harm[,]" including "significant career damage[.]" Id. at 15, ¶¶74-75. Plaintiffs "did not apply for any judicial clerkships, and their ability to form and maintain relationships with their peers has also been irreparably and permanently stunted." Id. at 15, ¶76. Plaintiffs have "suffered insomnia, anxiety, nausea, and loss of appetite." Id. at 15, ¶77.

D.   Post-Litigation Statements

On the same date that plaintiffs filed the original Complaint, "Yale, through Monica Bell ('Bell'), a [YLS] Associate Professor of Law and Sociology with expertise in constitutional law, published additional false accusations about" plaintiffs. Doc. #30 at 15, ¶79. "Yale through Bell accused" plaintiffs "of acting with the sole intent of disrupting Yale's process of considering whether to reappoint Gerken as Dean of Yale Law School with press attention[,]" and stated that the lawsuit is 'frivolous' and 'embarrassing for'" plaintiffs. Id. at 16, ¶¶81-82.

## III. **DISCUSSION**

Defendants assert that each count of the Second Amended Complaint "fail[s] to state a claim." Doc. #36-1 at 12. The Court considers each of defendants' arguments in turn.

12

A.   <u>Breach of Contract</u>

Defendants assert that plaintiffs' breach of contract claim
fails because: "(1) the Policy did not exist when the events
Plaintiffs complain of took place; (2) Plaintiffs do not allege
they were retaliated against for complaining of harassment at
all; and (3) they do not allege they were retaliated against for
complaining of the type of harassment prohibited by the Policy."
Doc. #36-1 at 18. Plaintiffs contend that they have adequately
pled a breach of contract claim under Connecticut law. <u>See
generally</u> Doc. #40 at 19-25.[6]

The parties do not dispute that plaintiffs' "breach of
contract claim [is] based on a non-retaliation policy in a
university handbook," and that a university handbook may be
treated as an enforceable contract between the school and its
students. Doc. #36-1 at 12 (citing Doc. #30 at 16, ¶¶84-85); <u>see
also</u> Doc. #36-1 at 18; Doc. #40 at 19. The parties also do not
appear to dispute that the Court may consider the language of
the Policy because the Policy is incorporated by reference into
the Second Amended Complaint and is integral to plaintiffs'
breach of contract claim. <u>See</u> Doc. #36-1 at 18-20; Doc. #40 at

---

[6] There is no dispute that Connecticut law applies to the
substance of plaintiffs' claims.

20. Defendants have provided a copy of the Policy with the Motion to Dismiss. <u>See</u> Doc. #36-3.

Defendants first assert that the breach of contract claim fails because the Policy "has an 'effective date' of August 1, 2021, and a 'revision date' of January 1, 2022[,]" but "no retroactive language[.]" Doc. #36-1 at 21; <u>see also</u> Doc. #36-3 at 2. Accordingly, defendants contend: "Plaintiffs have failed to state a claim for breach of the ... Policy ... because it did not exist at the time of the alleged breach." Doc. #36-1 at 21. Plaintiffs do not dispute this. Instead, plaintiffs assert:

> [T]he August 1, 2021, Anti-Retaliation Policy was, according to Yale's own public statements, simply a codification in one place of already existing written policies distributed throughout many different pre-existing documents. On August 2, 2021, Yale published a statement to the entire university community unequivocally acknowledging that fact, stating that the August 1 policy sets out in one place the definitions of discrimination, harassment, and retaliation applicable to all students, faculty, and staff that previously have been located in various documents.

Doc. #40 at 21 (citation, quotation marks, and emphases omitted). This assertion is made only in argument; it is not alleged in the Second Amended Complaint.

> Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. Generally, we do not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference,

14

and ... matters of which judicial notice may be taken. Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (citation and quotation marks omitted).

Plaintiffs argue facts that are not pled in the Second Amended Complaint. The Second Amended Complaint alleges that defendants breached the Policy. See Doc. #30 at 16, ¶¶85-86. It does not allege, as plaintiffs argue, that there were any "oral and written expressions of the parties in light of the policies and customs of the particular institution[.]" Doc. #40 at 20 (citation and quotation marks omitted). Nor do plaintiffs allege, as they argue, that the Policy is a mere "codification in one place of already existing written policies[.]" Id. at 21. The events in question occurred before the Policy on which plaintiffs rely was adopted. Accordingly, it cannot have been breached when it did not yet exist. Plaintiffs' breach of contract claim fails on that basis.[7]

---

[7] Importantly, the breach of contract claim fails to state a claim against the individual defendants. As defendants assert: "There is no basis for holding individual university administrators accountable for alleged breaches of a contract between a student and a university." Doc. #36-1 at 23 n.9. Additionally, there are no allegations "that Eldik retaliated against Plaintiffs[;] he is not even alleged to have shared the 'dossier' with the Professor." Id. Plaintiffs offer no response to these arguments.

15

The breach of contract claim also fails because the conduct alleged in the Second Amended Complaint does not fall within the scope of the Policy that was allegedly breached. Defendants attach a copy of the Policy to their Motion to Dismiss. See Doc. #36-3. The Policy contains the following definitions:

**Discrimination**
Discrimination means treating an individual adversely in University admissions or in the conduct of educational programs or employment based on sex, sexual orientation, gender identity or expression, race, color, national or ethnic origin, religion, age, disability, status as a special disabled veteran, veteran of the Vietnam era or other covered veteran, or membership in any other protected classes as set forth in Connecticut and federal law ("protected characteristics").

**Harassment**
Harassment means subjecting an individual to objectively offensive, unwelcome conduct based on any of the protected characteristics, when such conduct (i) is severe, persistent, or pervasive and (ii) has the purpose or effect of unreasonably interfering with the individual's work, academic performance or participation in university activities or creates an intimidating or hostile environment. Harassment may be found in a single severe episode, as well as in persistent behavior. Harassment is evaluated using a "reasonable person" standard.

**Retaliation**
Retaliation means any adverse action taken against a person who has reported a concern, filed a complaint, and/or participated in an investigation pursuant to this policy. Retaliation includes conduct that would discourage a reasonable person from engaging in activity protected under this policy. Retaliation may be present even where there is a finding of "no responsibility" on the underlying allegations of Discrimination or Harassment. Retaliation does not mean good faith actions lawfully pursued in response to a report of Discrimination or Harassment. In determining whether an act constitutes Retaliation, the context of the act will

be considered, including the individual's exercise of
free expression in accordance with Yale's free
expression policies.

Doc. #36-3 at 2-3 (footnote omitted).

The plain language of the Policy prohibits retaliation in
response to complaints of discrimination or harassment based on
a "protected characteristic" as that term is defined in the
Policy. Id. at 2; see also Fed. Ins. Co. v. Speedboat Racing
Ltd., 200 F. Supp. 3d 312, 329 (D. Conn. 2016) (Under
Connecticut law, "the court must give the terms their natural
and ordinary meaning, and interpret them with each provision
read in light of the other provisions[.]" (citations and
quotation marks omitted)).

Plaintiffs now attempt to rewrite the allegations of the
Second Amended Complaint to fit the parameters of the Policy.
For example, plaintiffs assert, with no citation to the Second
Amended Complaint, that they "reported concerns regarding racial
discrimination and harassment, as the Dossier attempted to
delegitimize their experiences as students of color." Doc. #40
at 22. This is an inaccurate characterization of the Second
Amended Complaint. The Second Amended Complaint alleges that
plaintiffs approached "Cosgrove and Eldik for assistance against
the troubling invasion of privacy and resulting harassment they
suffered." Doc. #30 at 12, ¶57. The Second Amended Complaint

also explicitly alleges that Jackson "asked Cosgrove and Eldik to help him deal with the false rumors being spread by other students" that "the [P]rofessor had extended him an illicit Coker Fellowship Offer[,]" and that Jackson reported "his concerns regarding the lies and misrepresentations included in the Dossier[.]" Id. at 13, ¶¶64-66. The allegations do not assert retaliation <u>because plaintiffs reported racial discrimination and harassment</u>. To be sure, the allegations of the Second Amended Complaint suggest an undercurrent of plaintiffs' concerns regarding the treatment of minority students and professors at YLS. The Second Amended Complaint, however, alleges that defendants retaliated against plaintiffs because plaintiffs refused to be complicit in the alleged vendetta against Chua, <u>not</u> because plaintiffs reported concerns about racial discrimination and harassment. <u>See, e.g.</u>, Doc. #30 at 3, ¶¶7-8; <u>see also id.</u> at 17, ¶87.

Plaintiffs next assert that their allegations fall within the scope of the Policy because they "'participate[d] in an investigation' into allegations of discrimination or harassment." Doc. #40 at 22. Specifically, plaintiffs assert, with no citation to the Second Amended Complaint, that they "participated as 'witnesses' dragged into an investigation into (among other things) allegations of sexual harassment, and they

were retaliated against because of the (truthful) answers they gave in that investigation – answers Gerken and the Law School Administration did not want to hear." Id. at 23.

Plaintiffs rest this argument on a single text message attached to the Dossier, which states: "I think [the alleged secret dinner parties are] deliberately enabling the secret atmosphere of favoritism, misogyny, and sexual harassment that severely undermines the bravery of the victims of sexual assault abuse that came forward against Rubenfeld." Doc. #30-1 at 10; see also Doc. #30 at 11, ¶51. This is the only reference in the Second Amended Complaint or its attachments to an allegation of sexual harassment, and that allegation is not specifically directed to Chua, but rather to "Rubenfeld[,]" whom defendants represent is Chua's husband. See Doc. #44 at 6 n.5. Nevertheless, plaintiffs specifically allege that defendants did not investigate the allegations of the Dossier. See Doc. #30 at 11, ¶53. The only investigation referenced in the Second Amended Complaint is that into Chua. See id. at 1, ¶1. Even the most favorable reading of these allegations suggests that the "investigation" related to Chua's alleged violation of the anti-socialization agreement she had with Yale, and not to any allegations of sexual harassment. See, e.g., id. at 12, ¶56. The

Second Amended Complaint does not adequately allege that such an investigation would fall within the ambit of the Policy.

Thus, for the reasons stated, the Second Amended Complaint fails to state a claim for breach of the Policy. Accordingly, defendants' Motion to Dismiss plaintiff's breach of contract claim is **GRANTED**.

B.   Promissory Estoppel

Defendants assert: "Plaintiff's promissory estoppel claim fails because it impermissibly duplicates their breach of contract claim." Doc. #36-1 at 26. Defendants also assert: "Plaintiffs' promissory estoppel claim cannot survive because it incorporates their breach of contract claim." Id. at 28 (citing Doc. #30 at 16-17, ¶¶84-88). Plaintiffs contend that they have adequately pled a promissory estoppel claim in the alternative. See Doc. #40 at 25-26.

"Connecticut courts allow a claim of promissory estoppel to proceed only after it has been established that no express contract existed." Bell v. Univ. of Hartford, 577 F. Supp. 3d 6, 36 (D. Conn. 2021). Because the Court has dismissed the breach of contract claim, plaintiffs may proceed on the promissory estoppel claim in the alternative. However, plaintiffs have failed to state a claim for promissory estoppel.

20

"Plaintiffs reallege and incorporate" the allegations related to the breach of contract claim in the claim for promissory estoppel. Doc. #30 at 17, ¶89. Defendants assert that because the promissory estoppel claim incorporates the breach of contract claim, the "promissory estoppel claim cannot survive[.]" Doc. #36-1 at 28. Plaintiffs do not address this aspect of defendants' argument, and rely instead on general alternative pleading principles. See Doc. #40 at 25-26.

"A successful promissory estoppel claim must contain three essential elements: (1) a clear and definite promise; (2) a reasonable expectation by the promisor that the promise would induce reliance; and (3) actual and reasonable reliance on that promise by the promisee." Davis v. Liberty Mut. Ins. Co., 218 F. Supp. 2d 256, 262 (D. Conn. 2002). The only promise alleged is the "promise" contained in the Policy. Plaintiffs concede as much in their briefing: "Defendants made a clear and definite promise – the Anti-Retaliation Policy – to [plaintiffs] that they would not retaliate against them if they ever complained of harassment." Doc. #40 at 26. For reasons previously discussed, the Policy, and therefore any "promise" based thereon, did not exist at the time of the events in question. Thus, there could be no reasonable expectation of reliance by Yale, and no actual reliance by plaintiffs, on a promise that had not yet been made.

21

Therefore, defendants' motion to dismiss plaintiffs' claim for promissory estoppel is **GRANTED**.

C.   Intentional Interference With Prospective Business Relationship

Defendants assert that plaintiffs fail to state a viable claim for intentional interference because: (1) "Plaintiffs do not allege a business relationship with any third party except for the Professor[;]" and (2) plaintiffs "do not allege that they suffered any actual loss as a result of Defendants' supposed interference." Doc. #36-1 at 29. Plaintiffs contend that they have pled a viable intentional interference claim because "they have alleged a specific business relationship with third parties[,]" and "have alleged an actual loss to support" this claim. Doc. #40 at 26, 28.

> It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss.

Am. Diamond Exch., Inc. v. Alpert, 28 A.3d 976, 986 (Conn. 2011) (citations and quotation marks omitted). The Court first

considers whether plaintiffs have adequately alleged the existence of a business relationship.[8]

     *1.   Existence of a Business Relationship*

     Defendants concede that plaintiffs have "plausibly allege[d] a business relationship with the Professor." Doc. #36-1 at 29. However, defendants contend that the allegation that plaintiffs "had a prospective relationship with Yale's professors and judges' chambers around the country" is speculative and ignores Connecticut law. Id. (sic) (citation and quotation marks omitted). Plaintiffs contend that they "have pleaded the specific relationships that were harmed: the Coker Fellowship with the Professor and federal clerkship opportunities[.]" Doc. #40 at 28 (citations omitted).[9] Because defendants concede the existence of the relationship with the Professor, the Court considers whether plaintiff's allegation that they "had a prospective relationship with ... judges' chambers around the country[]" is sufficient to support their

---

[8] As defendants note, "to the extent this claim is based on the sharing of the 'dossier,' it fails against Eldik, who is not alleged to have shared it with anyone." Doc. #36-1 at 30 n.10. Plaintiffs offer no response to this argument.

[9] Plaintiffs appear to have abandoned the claim that defendants interfered in any "prospective relationship with Yale's professors[,]" as their arguments focus solely on the relationship with (1) the Professor and (2) unspecified federal judges. Doc. #30 at 18, ¶94.

intentional interference claim as to this alleged

"relationship[.]" Doc. #30 at 18, ¶94 (sic).

Defendants assert: "Connecticut law requires tortious

interference claims to aver the specific business relationships

that were allegedly interfered with." Doc #36-1 at 29.

Defendants interpret the cases addressing the relationship

requirement too narrowly. Defendants cite Baer v. New England

Home Delivery Servs., LLC, No. NNH-CV-06-4021976, 2007 WL

3173701, at *3 (Conn. Super. Ct. Oct. 18, 2007), to support

their position. Specifically, defendants rely on the statement:

"Tortious interference requires proof that a defendant

intentionally interfered with ... a specific business

relationship or relationships." Doc. #36-1 at 29 (quoting Baer,

2007 WL 3173701, at *3). Baer's reasoning, however, is not so

narrowly drawn. The Superior Court stated:

> Tortious interference requires proof that a defendant
> intentionally interfered with a known business
> relationship. It is insufficient to allege and prove
> that the defendant knew or ought to have known that its
> practices had a tendency or potential, however strong,
> to interfere with a competitor's business generally. The
> defendant must intentionally and knowingly target a
> specific business relationship or relationships.

Baer, 2007 WL 3173701, at *3 (citation and quotation marks

omitted). This decision does not hold that a specific third

party must be identified in the way defendants suggest, i.e., a

24

specific judge as opposed to the "categorical allegation" made by plaintiffs. Doc. #36-1 at 30. Instead, the Baer decision supports a finding that plaintiffs have stated a claim with respect to the lost clerkship opportunities. Here, drawing all inferences in favor of plaintiffs, plaintiffs have alleged that defendants knew of their prospective relationships with federal judges and sought to specifically target those relationships by threatening that the Dossier would "end up in 'every judges' chambers[.]'" Doc. #30 at 18, ¶95 (sic); see also id. at 4, ¶11.

Defendants next cite the decision of Callahan v. Callahan, No. X08-FST-CV-15-6027843-S, 2017 WL 3332743, at *2 (Conn. Super. Ct. June 27, 2017), in support of their argument. Specifically, defendants rely on the statement: "Simply put, the plaintiffs cannot establish a claim for tortious interference with a business expectancy with a third party that they cannot identify." Doc. #36-1 at 30 (quoting Callahan, 2017 WL 3332743, at *2). Callahan, and other Superior Court decisions, rely on the case of Norden Sys., Inc. v. Gen. Dynamics Corp., No. CV-89-0101260-S, 1990 WL 264084, at *2 (Conn. Super. Ct. Nov. 8, 1990), for this proposition. Norden, however, did not contemplate that a specific third party must be identified in the way defendants suggest.

25

In _Norden_, the plaintiff's "complaint allege[d] that it expected to enjoy future economic advantages in the form of production options, subcontracts in follow-on and derivative programs, both foreign and domestic." _Id._ at *3. The Superior Court found these allegations insufficient to state a claim because they "fail[ed] to specifically identify the third party or parties with whom Norden would enter into such subcontract programs." _Id._ In contrast to _Norden_, plaintiffs have named a defined and limited group of individuals as the "third party": federal judges, for whom they expected to clerk.

In reaching its conclusion, the _Norden_ court compared the tort of tortious interference with prospective business relationships to the "closely related ... tort of interference with contractual relationships, which requires a contract between parties and interference by a third." _Id._ Based on that comparison, the Superior Court found "that, in order to satisfy the elements of tortious interference with prospective economic advantage, such specific identificaiton of a third party is required." _Id._ (sic).

The need to identify a third party in a claim for tortious interference with prospective business relationships appears to have derived from the "well-settled" law that

the tort of interference with contractual relations only
lies when a third party adversely affects the
contractual relations of two _other_ parties. An agent
acting legitimately within the scope of his authority
cannot be held liable for interfering with or inducing
his principal to breach a contract between his principal
and a third party, because to hold him liable would be,
in effect, to hold the corporation liable in tort for
breaching its own contract[.]

Wellington Sys., Inc. v. Redding Grp., Inc., 714 A.2d 21, 31

(Conn. App. 1998) (citations and quotation marks omitted); see

also, Butler Am., LLC v. Ciocca, No. X08-FST-CV-19-6043745-S,

2020 WL 6788193, at *4 (Conn. Super. Ct. Mar. 12, 2020) ("To

have a viable tortious interference with business relations

claim, identification of a third party is required. As discussed

above, the defendants are not third parties to the UPA who were

capable of tortious interference because the plaintiff has

alleged that the defendants were the employees of HCL during the

time of the post-closing conduct."). This line of reasoning does

not support defendants' argument that a "specific" third party

must be identified.

    Finally, defendants contend: "Plaintiffs' allegation

mirrors the deficient allegations of the plaintiff in the recent

case of Michalsky v. Moffly Publications, Inc., [No. FST-CV-19-

6042420-S,] 2020 WL 5537003 (Conn. Super. Ct. Aug. 13, 2020)."

Doc. #36-1 at 30. The allegations of Michalsky are

distinguishable. There, the plaintiff "allege[d] that he will

have job applications and he will have interviews and the false termination for cause will be communicated." <u>Michalsky</u>, 2020 WL 5537003, at *11. The plaintiff there did not identify <u>any</u> third party, and for that reason, the Court found the plaintiff's allegations "[a]t best ... are premature." <u>Id.</u>

By contrast here, plaintiffs allege that they "had a prospective relationship with ... judges' chambers around the country[,]" but that defendants "intentionally interfered with their prospective relationships while knowing of the relationship." Doc. #30 at 18, ¶94 (sic). This allegation, among others, is sufficient at this stage of litigation to plead the relationship prong of plaintiffs' intentional interference claim as to the prospective clerkship opportunities.[10]

    2.  *Actual Loss*

Defendants assert that plaintiffs' intentional interference claim should be dismissed because plaintiffs "fail to plausibly allege actual loss." Doc. #36-1 at 31. Plaintiffs respond by re-asserting the allegations in the Second Amended Complaint that defendants claim are deficient, namely that plaintiffs "were

---

[10] Although defendants categorize plaintiffs' prospective relationships with "every judge in the United States" as "speculative[,]" Doc. #36-1 at 31, drawing all inferences in favor of plaintiffs, it is reasonable to infer that plaintiffs had a reasonable prospect of obtaining clerkships based on their status as "compelling candidates" from YLS. Doc. #30 at 4, ¶11.

unable to become Coker Fellows, ... an opportunity that would have provided valuable post-graduate opportunities[]" and "were unable to apply for clerkships because Defendants stunted such opportunities." Doc. #40 at 28.

"Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss; it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffered actual loss. Proof that some damage has been sustained is necessary to support a cause of action for tortious interference." Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 761 A.2d 1268, 1275–76 (Conn. 2000) (citations, quotation marks, and footnotes omitted). This requires a plaintiff to plead "actual damage suffered; that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." DiNapoli v. Cooke, 682 A.2d 603, 608 (Conn. App. 1996) (citations and quotation marks omitted); see also Kelly v. Kurtz, 219 A.3d 948, 967 (Conn. App. 2019) ("The proper measure of damages in an action for tortious interference with business expectancies is ... the pecuniary loss to the plaintiff of the benefits of the prospective business relation." (citation and quotation marks omitted)).

29

Even drawing all inferences in plaintiffs' favor, the
Second Amended Complaint fails to adequately allege actual loss
as a result of defendants' alleged interference with plaintiff's
ability to become Coker Fellows. There are no allegations that
plaintiffs suffered any "actual damage" as a result of
defendants' alleged interference. Indeed, there are no
allegations that either plaintiff applied for a Coker
Fellowship, or that either plaintiff's application for the
Fellowship was denied because of defendants' alleged
interference. Accordingly, defendants' motion to dismiss
plaintiffs' intentional interference claim with respect to lost
Coker Fellowship opportunities is **GRANTED**.

However, drawing all inferences in plaintiffs' favor as to
lost clerkship opportunities, plaintiffs have plausibly alleged
"that, except for the tortious interference of the defendant[s],
there was a reasonable probability that the plaintiff[s] would
have" been hired as federal judicial law clerks. DiNapoli, 682
A.2d at 608. As "compelling candidates" from YLS, it is
reasonable to infer that but-for defendants' interference,
plaintiffs would have applied for, and been hired as, federal
judicial law clerks. At this early stage, this is sufficient to
plead actual loss. Cf. Schumer v. S. Conn. State Univ., No. NNH-
CV-09-5025809, 2010 WL 4276684, at *7 (Conn. Super. Ct. Sept.

30

28, 2010) (The plaintiff failed to "present[] evidence that he
suffered actual loss" where plaintiff "presented no evidence
upon which a trier of fact could reasonably conclude that it was
reasonably probable that he would have been hired for the tenure
track faculty position."); Hi-Ho Tower, 761 A.2d at 1276 ("[A]n
award of compensatory damages is not necessary to establish a
cause of action for tortious interference as long as there is a
finding of actual loss, and a finding of actual loss may support
an award of punitive damages.").

Accordingly, defendants' motion to dismiss plaintiffs'
intentional interference claim with respect to lost clerkship
opportunities is **DENIED**.

    D.   <u>Defamation</u>

Defendants assert that plaintiffs' defamation claim fails
because: (1) "Plaintiffs complain of non-actionable opinions,
not facts[;]" (2) "the allegations ... lack the necessary
specificity[;]" and (3) "the defamation theory directed at
Bell's statements cannot be attributed to Yale under the
doctrine of respondeat superior." Doc. #36-1 at 32-33 (footnote
omitted). Plaintiffs contend that they "have pleaded a claim for
defamation per se." Doc. #40 at 29.

> At common law, to establish a prima facie case of
> defamation, the plaintiff must demonstrate that: (1) the
> defendant published a defamatory statement; (2) the

31

> defamatory statement identified the plaintiff to a third
> person; (3) the defamatory statement was published to a
> third person; and (4) the plaintiff's reputation
> suffered injury as a result of the statement.

Gleason v. Smolinski, 125 A.3d 920, 947 (Conn. 2015) (citation,
quotation marks, and footnote omitted). "Defamation is also
actionable per se. In general, there are two classes of libel
that are actionable per se: (1) libels charging crimes and (2)
libels which injure a [person] in his [or her] profession and
calling." Skakel v. Grace, 5 F. Supp. 3d 199, 206 (D. Conn.
2014) (citation and quotation marks omitted). "In the case of a
statement that is defamatory per se, injury to a plaintiff's
reputation is conclusively presumed such that a plaintiff need
neither plead nor prove it." Id. at 207.

Under Connecticut law, a plaintiff must meet "somewhat
particular pleading requirements for a defamation" claim.
Naughton v. Gutcheon, No. 3:21CV00402(KAD), 2022 WL 2802335, at
*4 n.14 (D. Conn. July 18, 2022).

> A claim of defamation must be pleaded with specificity,
> as the precise meaning and choice of words employed is
> a crucial factor in any evaluation of falsity. The
> allegations should set forth facts sufficient to apprise
> the defendant of the claim made against him. A complaint
> for defamation must, on its face, specifically identify
> what allegedly defamatory statements were made, by whom,
> and to whom. Imprecise pleading is not permitted in the
> context of alleged defamation[.]

Stevens v. Helming, 135 A.3d 728, 732 n.3 (Conn. App. 2016)

(citations and quotation marks omitted).[11]

       1.   *Cosgrove & Gerken*[12]

Defendants assert that plaintiffs complain of "textbook opinion statements, not statements of fact[:]"

> Plaintiffs allege Gerken and Cosgrove shared the marked-up copy of the "dossier" "to show where Cosgrove <u>believed</u> that [plaintiffs] were lying," SAC ¶72, and otherwise convince the Professor that [plaintiffs] "were lying about their interactions with Chua, making them untrustworthy and unsuited for employment," <u>id.</u> at ¶71.

Doc. #36-1 at 34. Plaintiffs contend that "Gerken and Cosgrove presented the Dossier as a fact and not as simply their own opinions on Plaintiffs' credibility." Doc. #40 at 31.

> [I]n Connecticut, to be actionable in defamation, the offending statement must convey an objective fact rather than an opinion. A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being

---

[11] Defendants assert that, other than the allegations relating to the Dossier, the allegation that "'Defendants shared and stated numerous false statements defaming [plaintiffs] to third parties[]' ... fails to satisfy <u>Iqbal</u> and the basic requirements of defamation pleading." Doc. #36-1 at 35 (quoting Doc. #30 at 18, ¶99). Plaintiffs do not respond to this argument. The Court agrees that this allegation is not sufficiently specific to plead a defamation claim. Accordingly, as to Gerken and Cosgrove, the Court considers only the allegation that Gerken and Cosgrove defamed plaintiffs by sharing the Dossier with the Professor. <u>See</u> <u>id.</u>

[12] Defendants assert that Eldik is not alleged to have shared the Dossier with anyone. <u>See</u> Doc. #36-1 at 33 n.12. Plaintiffs do not address this assertion. Because the allegations of the Second Amended Complaint do not implicate Eldik in any defamatory acts, all claims asserted against Eldik for defamation are **DISMISSED.**

> known.  An  opinion,  on  the  other  hand,  is
> personal comment about     another's     conduct,
> qualifications or character that has some basis in fact.

CSL Silicones, Inc. v. Midsun Grp. Inc., 301 F. Supp. 3d 328,

376 (D. Conn. 2018) (citations and quotation marks omitted).

"Statements of opinion, even if negative or otherwise harmful,

cannot, as a matter of law, form the basis for a defamation

claim." Chiaravallo v. Middletown Transit Dist., 561 F. Supp. 3d

257, 289 (D. Conn. 2021).

> Whether the alleged statements are statements of opinion
> or of objective fact is a threshold question, and if the
> statements  are  opinions,  then  the  claim  must  be
> dismissed.  The determination of whether a statement is
> one  of  opinion  or  objective  fact  is  a  matter  of  law
> unless  the  statement  is  ambiguous;  in  that  case  the
> determination is a question of fact for the jury.

Lopos v. City of Meriden Bd. of Educ., No. 3:04CV00352(AWT),

2006 WL 1438612, at *8 (D. Conn. May 16, 2006). "Merely because

a statement is phrased as an opinion does not, however, mean

that it is not actionable. Connecticut courts have generally

found that one must look at the context and the implications of

the statement when determining if it was actionable or not."

Sweeney v. Faracalas, No. NNH-CV-09-5029383, 2010 WL 1508305, at

*4 (Conn. Super. Ct. Mar. 10, 2010).

> The Connecticut Supreme Court has synthesized from the
> relevant case law three overarching considerations to be
> applied  in  determining  whether  an  alleged  defamatory
> statement  is  an  actionable  statement  of  fact:  (1)
> whether the circumstances in which the statement is made

> should cause the audience to expect an evaluative or
> objective meaning; (2) whether the nature and tenor of
> the actual language used by the declarant suggests a
> statement of evaluative opinion or objective fact; and
> (3) whether the statement is subject to objective
> verification.

Dunbar v. Omnicom Grp., Inc., No. 3:19CV00956(KAD), 2021 WL 633732, at *14 (D. Conn. Feb. 18, 2021) (citation and quotation marks omitted); see also NetScout Sys., Inc. v. Gartner, Inc., 223 A.3d 37, 49-50 (Conn. 2020). "Thus, the important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." Wynn v. New Haven Bd. of Educ., No. 3:21CV00925(SVN), 2022 WL 1063732, at *3 (D. Conn. Apr. 8, 2022) (citation and quotation marks omitted).

   As an initial matter, the Court finds that the claim in the Dossier that plaintiffs "repeatedly lied[,]" Doc. #30-1 at 2, is the type of statement that could constitute defamation per se.[13]

---

[13] The Second Amended Complaint alleges that the Dossier "claims that [plaintiffs] had 'repeatedly lied' about their experiences as students of color at the Law School, and further 'repeatedly lied' about the existence of the secret dinner parties, before supposedly admitting their existence to the Dossier's author[.]" Doc. #30 at 10, ¶49. This is not an accurate description of the Dossier. There is only one assertion that plaintiffs "repeatedly lied" in the Dossier, and that is in reference to the dinner parties. Doc. #30-1 at 2 ("At first, John Doe and Jane Doe repeatedly lied about the dinners.").

Taken in the context of the legal profession, where character
reigns supreme and is rigorously verified before admission, a
statement of fact that a person "repeatedly lied" could
undoubtedly "injure a man in his profession and calling[.]"
Skakel, 5 F. Supp. 3d at 206. This statement gives rise to a
presumption of "injury" to plaintiffs' "reputation ... such that
plaintiff[s] need neither plead nor prove" the injury in order
to state a claim for defamation. Skakel, 5 F. Supp. 3d at 207.
However, the allegations of the Second Amended Complaint do not
assert that defendants conveyed objective facts, sufficient to
constitute actionable defamation.

Plaintiffs assert in argument that Gerken and Cosgrove
"shared the Dossier as factual statements." Doc. #40 at 30. The
allegations of the Second Amended Complaint do not support this
assertion. The Second Amended Complaint alleges that Gerken and
Cosgrove approached the Professor with a marked-up version of
the Dossier to show the Professor that Cosgrove "believed"
plaintiffs were lying about certain matters, in an attempt to
dissuade him from selecting plaintiffs for a Coker Fellowship.
Doc. #30 at 14, ¶72. Indeed, plaintiffs reassert in their
briefing: "Gerken and Cosgrove brought with them a copy of the
Dossier that Cosgrove had personally marked up with highlighting
and annotations to show where Cosgrove believed that

[plaintiffs] were lying." Doc. #40 at 31 (emphasis added). A belief is not "[a] statement [that] can be defined as factual" because it does not "relate[] to an event or state of affairs that existed in the past or present and is capable of being known." CSL Silicones, 301 F. Supp. 3d at 376. Rather, this statement, given the circumstances in which it occurred, could only constitute an evaluative, "personal comment about another's conduct, qualifications or character that has some basis in fact[,]" which is non-actionable opinion. Id.

Plaintiffs assert that Gerken and Cosgrove "proceeded to share the Dossier as a fact they accepted as true" because they "refused to investigate[]" the allegations of the Dossier. Doc. #40 at 31. Plaintiffs assert that the lack of investigation transformed the opinion into one that "impl[ied] knowledge of existing facts," which "are not protected and can ultimately be considered as defamatory as pure factual statements." Shea v. City of Waterbury, No. HHB-CV-08-5007926, 2009 WL 1057986, at *5 (Conn. Super. Ct. Feb. 20, 2009); see also Doc. #40 at 31. The lack of investigation, however, does not transform opinion into fact. Nor does the failure to investigate mean that Cosgrove and Gerken accepted the statement as true. Rather, without an investigation, Cosgrove and Gerken were in no position to present anything as fact, and were accordingly limited to

37

presenting their beliefs and other non-actionable evaluative
opinions.

Accordingly, defendants' motion to dismiss plaintiffs'
defamation claim related to Cosgrove and Gerken's alleged
sharing of the Dossier with the Professor is **GRANTED**. See, e.g.,
Iosa v. Gentiva Health Servs., Inc., 299 F. Supp. 2d 29, 38 (D.
Conn. 2004) ("The statement that there were 'serious concerns'
about Plaintiff's performance is an opinion by McQuay about the
adequacy of Plaintiff's work[,]" and "cannot as a matter of law
be defamatory.").

>   *2.   Professor Bell*

Defendants next contend that "[p]laintiffs do not allege
that Bell's alleged statements to the press are actionable
statements of objective fact." Doc. #36-1 at 36. Plaintiffs
assert that Bell's statements are ones that "a reasonable person
would understand to be facts." Doc. #40 at 32.

To reiterate, plaintiffs allege that Bell, a non-party to
this litigation, accused plaintiffs of: "bringing their suit not
to seek a remedy for wrongs, but out of improper motivations and
intentions[,]" Doc. #30 at 15, ¶80; "acting with the sole intent
of disrupting Yale's process of considering whether to reappoint
Gerken as Dean of [YLS] with press attention[,]" id. at 16, ¶81;
and bringing a "'frivolous'" lawsuit intended to "generate press

attention and 'cause a stir.'" <u>Id.</u> at 16, ¶82. Plaintiffs allege that these statements were made to the <u>Yale Daily News</u>. <u>See id.</u>

"Courts in this state and others, as well as federal courts, have consistently determined that characterizing a lawsuit as frivolous, foolish or in some other derogatory manner constitute matters of opinion." <u>Traylor v. Parker</u>, No. FST-CV-13-5015533-S, 2016 WL 5003981, at *4 (Conn. Super. Ct. Aug. 4, 2016). This is precisely how Bell characterized the lawsuit to the Yale Daily News.

Accordingly, Bell's alleged statements are non-actionable opinion. Thus, defendants' motion to dismiss plaintiffs' defamation claim related to Bell's statements to the Yale Daily News is **GRANTED**.[14]

E.   <u>Unreasonable Publicity and False Light</u>

Defendants next contend that plaintiffs' claims of unreasonable publicity and false light "fail because Plaintiffs do not allege the 'dossier' was ever publicized." Doc. #36-1 at 38. Defendants also contend that the "unreasonable publicity claim ... fails because the contents of the 'dossier' were not

---

[14] Even if Bell's statements were actionable, plaintiffs have not pled adequate facts to impute Bell's actions to Yale under the doctrine of respondeat superior. <u>See</u> Doc. #36-1 at 37-38. This serves as a separate basis to dismiss plaintiffs' defamation claim arising from Bell's statements.

private when the 'dossier' was shared with the Professor and it contains matters of legitimate public concern." Id. Plaintiffs assert that they "have pleaded unreasonable publicity and false light claims against Defendants because Defendants shared the Dossier with the public." Doc. #40 at 33.

> Connecticut courts have recognized a cause of action for invasion of privacy, and in doing so have adopted the 3 Restatement (Second) of Torts formulation of that action. Goodrich v. Waterbury Republican–American Inc., 448 A.2d 1317 (Conn. 1982). The Restatement recognizes four specific categories of invasion of privacy: 1) unreasonable intrusion on the seclusion of another; 2) appropriation of the other's name or likeness; 3) unreasonable publicity given to the other's private life; and 4) publicity that unreasonably places the other in a false light before the public. 3 Restatement (Second) of Torts §652A (1977).

Pace v. Bristol Hosp., 964 F. Supp. 628, 630 (D. Conn. 1997). "An essential element of a false light invasion of privacy claim is that the defendant gives publicity to false information." Id. at 630-31. Similarly, an unreasonable publicity claim requires "public disclosure of any matter that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Perkins v. Freedom of Info. Comm'n, 635 A.2d 783, 790 (Conn. 1993) (citation and quotation marks omitted). As to claims under either theory, "a number of Connecticut trial court decisions have adopted the Restatement definition of publicity." Roman v. United Illuminating Co., No.

40

NNH-CV-14-6044689-S, 2015 WL 3555343, at *5 (Conn. Super. Ct. May 12, 2015) (citation and quotation marks omitted) (unreasonable publicity); see also Pace, 964 F. Supp. at 631 (false light).

The Restatement defines "publicity" as making "a matter ... public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Pace, 964 F. Supp. at 631 (citation and quotation marks omitted); see also Roman, 2015 WL 3555343, at *6 (same). "To establish the essential element of publicity, the plaintiff must produce proof not merely of limited, private communication to one or more other persons, but of widespread communication to the general public or a significant segment thereof[.]" Pace, 964 F. Supp. at 631 (citations and quotation marks omitted); see also Powell v. Jones-Soderman, 433 F. Supp. 3d 353, 377 (D. Conn. 2020) (same), aff'd, 849 F. App'x 274 (2d Cir. 2021); Roman, 2015 WL 3555343, at *6 (same).

The Second Amended Complaint's "Preliminary Statement" alleges: "The Dossier, which Defendants disseminated, placed [plaintiffs] at the center of an ongoing campus-politics feud between Gerken and Chua." Doc. #30 at 3, ¶6. Plaintiffs later allege that Gerken and Cosgrove "circulat[ed] a document full of

41

lies to Plaintiffs' employer and professor[.]" Id. at 3, ¶9.
Other than publicizing the Dossier to the one Professor, there
are no factual allegations supporting the contention that
"Defendants shared the Dossier with the public." Doc. #40 at
33.[15]

"To establish publicity, the plaintiff must produce proof
not merely of limited, private communication to one or more
other persons, but of widespread communication to the general
public or a significant segment thereof." Powell, 433 F. Supp.
3d at 377 (citation and quotation marks omitted); see also
Holmes v. Town of E. Lyme, 866 F. Supp. 2d 108, 132 (D. Conn.
2012) ("Publicity is a communication that reaches, or is sure to
reach, the public at large." (citation and quotation marks
omitted)). "Distribution to one other entity does not constitute
public disclosure." Allen v. Verizon Wireless, No.
3:12CV00482(JCH), 2013 WL 2467923, at *9 (D. Conn. June 6, 2013)
(citation and quotation marks omitted).

The allegations of the Second Amended Complaint fail to
plausibly state that any defendant "published" the Dossier, as

---

[15] Defendants assert that "Eldik is not alleged to have shared
the 'dossier' with anyone, so these claims against him fail."
Doc. #36-1 at 38 n.16. Plaintiffs do not respond to this
assertion. The Court agrees that the allegations of the Second
Amended Complaint fail to state a claim against Eldik for
unreasonable publicity or false light.

that term has been construed by Connecticut courts. Accordingly, defendants' Motion to Dismiss plaintiff's claims of unreasonable publicity and false light is **GRANTED**.[16]

F.    Intentional Infliction of Emotional Distress

Last, defendants assert that plaintiffs fail to state a claim for intentional infliction of emotional distress ("IIED") because the Second Amended Complaint "does not allege that Gerken and Cosgrove engaged in 'extreme and outrageous' conduct, or that Plaintiffs have suffered 'severe' emotional distress." Doc. #36-1 at 43.[17] To state a claim for IIED,

> four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

---

[16] In light of this finding, the Court does not address defendants' other arguments as to these claims. However, it bears noting that the allegations of the Second Amended Complaint suggest that the Dossier had been widely circulated among plaintiffs' peers before defendants even became aware of its existence. See Doc. #30 at 11, ¶¶52-53. Additionally, it is not lost on the Court that by attaching the Dossier to the Second Amended Complaint, plaintiffs have affirmatively chosen to further circulate the contents of the Dossier.

[17] Defendants assert: "Plaintiffs' IIED claim ... stems from Gerken and Cosgrove's supposed retaliation." Doc. #36-1 at 43 (citation and quotation marks omitted). Plaintiffs do not dispute this characterization, and focus their briefing on the conduct of Gerken and Cosgrove. Accordingly, the Court considers this claim abandoned as to Eldik.

Appleton v. Bd. of Educ. of Town of Stonington, 757 A.2d 1059,
1062 (Conn. 2000) (citation and quotation marks omitted).
"Liability for [IIED] requires conduct that exceeds all bounds
usually tolerated by decent society. Liability has been found
only where the conduct has been so outrageous in character, and
so extreme in degree, as to go beyond all possible bounds of
decency, and to be regarded as atrocious, and utterly
intolerable in a civilized community." Carrol v. Allstate Ins.
Co., 815 A.2d 119, 126 (Conn. 2003) (citations and quotation
marks omitted). Thus, conduct which "is merely insulting or
displays bad manners or results in hurt feelings is insufficient
to form the basis for an action based upon intentional
infliction of emotional distress." Id. "Whether the Defendant's
conduct is sufficient to satisfy the element of extreme and
outrageous conduct is a question, in the first instance, for the
Court." Stack v. Jaffee, 248 F. Supp. 2d 100, 104 (D. Conn.
2003).

Defendants contend that plaintiffs' IIED "claim stems from
Gerken and Cosgrove approaching the Professor with a marked-up
copy of the dossier to show where Cosgrove believed that
Plaintiffs were lying." Doc. #36-1 at 44 (citation and quotation

44

marks omitted). Defendants assert that these allegations "do not clear" the high "bar for extreme and outrageous conduct[.]" Id.

Plaintiffs, without citing to the Second Amended Complaint assert: "Gerkan and Cosgrove's alleged conduct was extreme and outrageous because their conduct constituted retaliation against two students of color." Doc. #40 at 34-35 (sic). Thereafter, plaintiffs summarize the actual allegations of the Second Amended Complaint, which do not allege, or even support an inference, that Gerken and Cosgrove retaliated against plaintiffs because of their race. See id. at 35-36. The allegations of the Second Amended Complaint are plain. Plaintiffs allege that defendants retaliated against them because plaintiffs refused to participate in defendants' alleged "vendetta against Chua." Doc. #30 at 9, ¶39. The allegations of the Second Amended Complaint do not allege that race played any role in defendants' allegedly retaliatory actions.[18]

---

[18] Both plaintiffs and Chua are alleged to have faced "race-based[] ... hostility[]" at YLS. Doc. #30 at 9, ¶42. But this is not alleged to be the reason why defendants acted as they did towards plaintiffs. Plaintiffs have attempted to reframe the allegations of the Second Amended Complaint to assert that defendants took affirmative acts against them because of race-based hostility. The gravamen of the Second Amended Complaint, however, is that defendants failed to act by not investigating the Dossier and by not protecting plaintiffs from the gossip of their peers.

Plaintiffs otherwise fail to address the authority cited by defendants supporting the dismissal of the IIED claim. Nevertheless, even when construed in the light most favorable to plaintiffs, defendants' "alleged conduct cannot reasonably be characterized as extreme and outrageous[.]" Grigorenko v. Pauls, 297 F. Supp. 2d 446, 449 (D. Conn. 2003); see also id. at 447-49 (dismissing IIED claim where the plaintiff alleged that the defendants "maliciously caused harm to [the plaintiff's] reputation and career[]" by "jointly submit[ing] a letter to [the] Dean of the Yale University School of Medicine, expressing their belief that [the plaintiff] may have failed to properly cite source material in her published works and accus[ed] her of plagiarizing[]").

Even if plaintiffs had plausibly alleged extreme and outrageous conduct, they have failed to adequately allege that the "emotional distress sustained ... was severe." Appleton, 757 A.2d at 1062. Plaintiffs allege that as a result of defendants' actions they "have suffered insomnia, anxiety, nausea, and loss of appetite." Doc. #30 at 15, ¶77. Again, plaintiffs ignore the authority relied on by defendants to support the argument that these allegations do not suffice to state a claim.

The Connecticut Appellate Courts "have never adopted a bright-line test for determining what kinds of mental distress

are sufficiently serious to sustain a claim of [IIED], but [the] trial courts have consistently used the standard set forth in the Restatement." Maselli v. Reg'l Sch. Dist. No. 10, 235 A.3d 599, 617 (Conn. App. 2020), cert. denied, 238 A.3d 19 (Conn. 2020).

> Comment (j) to the Restatement (Second) of Torts, §46, provides in relevant part: The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Emotional distress is unlikely to be considered severe in the absence of treatment, medical, psychological, or otherwise.

Id. (citations and quotation marks omitted).

The allegations of plaintiffs' symptoms standing alone -- insomnia, anxiety, nausea, and loss of appetite -- are insufficient to withstand a motion to dismiss, especially since those symptoms "can be common responses to stress." Powell, 433 F. Supp. 3d at 378 (Plaintiff failed to establish "that he suffered severe emotional distress" where he "suffered headaches, sleeplessness and loss of appetite and that his social relationships also suffered. He did not seek medical treatment, and, although a failure to seek medical treatment does not preclude a finding of severe emotional distress, he did not testify as to the intensity and frequency of his headaches, sleeplessness and appetite fluctuation, all of which can be

common responses to stress." (citation omitted)); see also
Almonte v. Coca-Cola Bottling Co. of N.Y., 959 F. Supp. 569,
575–76 (D. Conn. 1997) ("The symptoms described by plaintiff —
sleeplessness, depression, anxiety — are no doubt common among
employees who have been fired, regardless of the circumstances.
Absent some evidence that plaintiff suffered these symptoms to
an extraordinary degree, the facts alleged in his pleadings and
opposition papers, taken in the light most favorable to
plaintiff, do not support his claim of severe emotional
distress.").

Accordingly, defendants' motion to dismiss plaintiffs' IIED
claim is **GRANTED**.

## IV.   <u>CONCLUSION</u>

For the reasons stated, defendants' Motion to Dismiss the
Second Amended Complaint [**Doc. #36**] is **GRANTED in large part,
and denied, in limited part.**

**All claims are DISMISSED, <u>except</u> Count Three alleging
intentional interference as it relates to lost clerkship
opportunities.**

Discovery in this matter is stayed. See Doc. #55. On or
before **October 20, 2022,** the parties shall file a revised Rule
26(f) Report of Parties' Planning Meeting. Thereafter, the Court
will issue a Revised Scheduling Order and Case Management Plan.

It is so ordered at Bridgeport, Connecticut, this 29th day of September, 2022.

                                      /s/
                             HON. SARAH A. L. MERRIAM
                             UNITED STATES CIRCUIT JUDGE
                             Sitting by Designation